UNITED STATES DISTRJCT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------X
LERIN PIERCE,                                              **AMENDED**
                                                           **COMPLAINT**
     Plaintiff,
                                                           16 CV 5703 (BMC)
     -against-

CITY OF NEW YORK,                                          **JURY TRIAL DEMANDED**
P.O. TAQI, P.O. SONIA BELLARDO,
P.O. MERCADO, P.O. JOHN DOES 1-3

     Defendants
------------------------------------------------X

    1.    This is chiefly a case of police brutality wherein an officer behind the wheel, defendant Bellardo, used a car to stop a fleeing suspect, plaintiff, who was innocent of a crime. Then another officer – upon information and belief, Mercado - handcuffed and beat plaintiff severely while as he yelled out a false charge of "Stop Resisting!"

    2.    Plaintiff, a black man, was called "boy" twice in two different street encounters and his race factored into an emotionally charged hunch wherein defendant Taqi tried to get him to confess to criminal action. When plaintiff would not, Taqi and another officer threatened arrest, but did not actually arrest plaintiff. With no explicit custodial restrictions, plaintiff left the scene, leading to the incident with the car.

    3.    On September 1st, 2014, at about 11:30am Plaintiff, an analyst with the New York City Park Department with no criminal record, walked into a Radio Shack at 457 Fulton St. Brooklyn. There was a store-closing sale as Radio Shack was in or emerging from Chapter 11.

    4.    Entering the store, Mr. Lerin walked past an associate standing to greet customers of South Asian descent. Plaintiff was looking for a I-Phone charging case as he had intended to by an I-Phone at another store. He found the case, among many others attached to a store fixture.

1

A sales associate who was ringing up a customer said to Plaintiff, "Someone will be there in just a minute." She was not too far from the phone cases, almost right to the side of Plaintiff.

4.  Plaintiff waited and waited, then saw an IPhone case that was *not* secured on the fixture. Someone at Radio Shack had been negligent and not locked it up for some reason, but plaintiff did nothing illegal by picking it up and reading the back of the unsecured box. A minute later, the greeter of South Asian descent, in a rude tone said, "Can I help you?" Plaintiff didn't need any help at that point: he just wanted to know what the case did.

5.  The tone of the exchange continued to get nasty. The Samuel then said, "Are you going to buy that?"

6.  "Maybe. That's why I'm reading it," said plaintiff. Samuel was hovering over him. "Is there a reason why you're standing over me?"

7.  "Well I'm trying to figure out how you got the merchandise. Normally, someone comes over and takes it off and hands this item to you."

8.  Mr. Lérin replied, "Well, this case was laying here on top of the rack."

9.  The clerk asked if he wanted "to buy this item, or were you trying to steal this item?"

10. Plaintiff, disappointed in the treatment and being accused of a theft said, "Nah I'm good. I am not going to buy shit here," and he handed Samuel the case.

11. As Plaintiff left he ignored Samuel and as he was walking out the store, he was followed. Samuel kept making statements to keep the conversation going:

> Samuel: "Do me a favor", "do me a favor".
>
> Plaintiff: "Dude, don't say shit to me."
>
> Samuel: "What is your name? Give me your name now!"

12. Plaintiff left the store with his own possessions, nothing more.

13. Clerk: "No, come back and give me your name!" Expletives ensued.

14. Plaintiff was out of the door by then and put his headphones on, walked to the AT&T store (476 Fulton St. Brooklyn, NY). It took about 2-3 minutes to walk there and he spent about 15-20 minutes in AT&T.

15. Plaintiff left AT&T store and headed to Chase Bank (20 Flatbush Ave. Brooklyn NY). It took him about 2-3 minutes to walk to Chase. When he got there he deposited a check at 12:17 PM. He walked out of Chase Bank heading downtown towards Target and the shopping centers near Barclays Center. About half a minute or less later, he noticed a cop pull to the side of the street. Plaintiff continued to walk and paid the officer no mind, as he had no reason to.

16. As he continued walking, an officer in the car (upon belief Tariq) walked along side and got plaintiff's attention. Plaintiff removed his headphones.

17. The Tariq stepped in front of plaintiff and said, "Were you in Radio Shack a moment ago?"

18. Plaintiff had no legal basis to stop or answer, but did, and answered yes. Then Tariq said, "Were you shoplifting in Radio Shack?"

19. Plaintiff had the right to say no and leave. Instead, he tried to resolve the conflict and said, "What? Is this regarding the Indian guy at the store?" Plaintiff went on to explain what happened and said, "No, I was just standing there looking at a phone case."

20. The officer, interrupting, said, "How did you get the item? Did you cut a wire?" Plaintiff said "No… I took the item from the shelf," and he described how it alone lay atop unattached and he looked at it.

21. The Officer accused him of "cutting the wire to take the case." Since there was no wire, only hard metal rods, Plaintiff began to fear an unjust outcome to this exchange.

22. Plaintiff said that "there was no wire to cut, and the guy didn't come over to help me, so one was laying on the rack, unattached. I picked it up and looked at it."

23. Tariq then either lied or repeated a lie and said plaintiff had set off an alarm. This was not so. There was no alarm going off when plaintiff left the store.

24. Plaintiff began to explain very slowly: "I removed the item off the rack. There was no wire to cut. I was standing there looking at the item. I wasn't going to take anything and you are not going to tell me what I was going to do. I was standing there."

25. Samuel arrived on the street and said, "Yes, he was he was going to take this!" He held up the phone case. "I know he was going to take it. He had a pair of scissors and cut the wire."

26. Samuel from Radio Shack was standing behind Plaintiff with another officer (female unknown).

27. Tariq: "Can we step over here and talk, do you mind?" Plaintiff agreed.

28. Tariq and he spoke back and forth, arguing about the matter; plaintiff believed he was trying to trap him into making an admission. Tariq said the NYPD got a 911 call saying plaintiff cut a wire, set off an alarm and took a phone case. Plaintiff told him you keep trying to change my words. "I didn't take anything - how can I have taken something and it's in his hand? . . . . I didn't cut a wire, I don't have any scissors to cut a wire and the items were not on a wire."

29. Samuel then threw in a lie perhaps grounded in racism - i.e., they all look the same - "He comes in the store all the time. He came in the store the other day and stole something." Plaintiff had never been to the Radio Shack before.

30. The representative and then other two other officers ganged up on plaintiff, arguing the matter. Samuel said anything he wanted, contradicting himself repeatedly. As the parties continued to argue the unknown officer stepped in and asked Samuel:

"When he gave you back the item or threw it however you got the item back was he walking out the door?"

Samuel: "No"

Unknown Officer: "So you two were exchanging words about the case and you asked for it and he gave it back to you as you both were standing?"

Samuel: "Yes"

Officer #2: "And he wasn't walking out the store towards the exit and you stopped him and he gave you back the item?"

Samuel: "No." This was an obvious contradiction from his earlier statement.

31. There was a brief pause, like 15-20 seconds. There was no probable cause and plaintiff could have left, but stayed to try to resolve the situation.

32. Samuel: "But he was going to take it! I seen him cut the wire and the alarm went off."

33. Officer #1: "Well, we are going to cuff you, take you back to the store and look at the tape."

34. Plaintiff: "What are you going to cuff me for? You cannot tell me what I was trying to do."

35: Tariq: "We have the right to investigate that's what we doing we are going to look at the video. And if it looks like you even cut a wire you'll be arrested for attempted robbery…it's not going to show you cutting a wire on the tape, right?" Tariq did not tell plaintiff he was under arrest, and had he not threatened him with cuffs, plaintiff would have returned to the store.

36. Plaintiff: "You won't find me cutting a wire because there is no wire to cut. You just caught him in a lie. I did not steal anything. You are not going to cuff me for something I did not do when you just caught him lying. You are investigating right now and he just said I didn't steal anything and I was handed him the case, then he changed his story."

37. Tariq and Samuel stepped about 15-20 feet away from plaintiff and were talking out of plaintiff's earshot. The female officer was standing next to Plaintiff. Another officer (#3) pulled up in a mini size NYPD cart.

38. The female officer explained what was going to the officer in the cart.

39. The officer in the cart, who called plaintiff "boy," said, "Well, just cuff his ass and if it looks like you cut a wire, we will arrest your ass."

40. In other words at this time, plaintiff was not under arrest since the cart officer made it clear he would only be arrested if evidence showed plaintiff cut a wire would he be arrested.

41. Mr. Pierce again protested. Officer in the Cart said "fuck it, cuff his ass, we're going to the store and if it looks anything like you're doing something you have no business doing, it will be attempted robbery."

42. Plaintiff feared for his safety. He was close to certain the officers would arrest him no matter what they found upon return to the store.

43. Officer in the Cart then checked plaintiff's gym bag - a Red Nike bag with a string-closing top - and found no scissors.

44. Plaintiff was not under arrest, and felt he was being tricked into being arrested, and it had been about 15-20 minutes of dialogue and arguing. He felt angry, bullied, violated, embarrassed, and at risk of physical injury. He didn't have to stop when the officer talked to him initially. His conduct was completely innocent, there was no evidence of criminality, contradictions from Samuel, no arrest, yet still he was being detained.

45. In retrospect it was for the worse, but Plaintiff felt he had no other option. He panicked and ran towards downtown Brooklyn on Flatbush Avenue leaving his red bag behind. (Inside the bag was a mango seed in a Ziploc bag and an empty yogurt cup. As he was sprinting on the right

sidewalk of Flatbush Avenue, an unmarked tan police car started to chase him as well as a regular black and white.

46. The black and white hit him to stop him from running. The tan car stopped, but the black and white did not: it sped up and intentionally hit plaintiff.

47. Plaintiff flipped up into the air and landed on the ground. He barely got up off the ground and held his arms in the air. He could not even walk and was winded. An officer, upon information and belief Bellardo, then knocked him down to the pavement and put handcuffs on him. Then he struck plaintiff in the face numerous times.

48. Mr. Pierce had no way of protecting himself and screamed "stop….Jesus… stop …" "I can't breathe!" Indeed, he has asthma. The officer took his head and repeatedly banged my it to the street, then rubbed the side of his face into the pavement.

49. Plaintiff briefly blacked out, still feeling he could not breathe at all; he could have died like Eric Garner.

50. Plaintiff heard a female voice say, "easy…easy…easy…I think there are cameras in this area." She added, "He always does this! She was not referring to plaintiff as she had never seen him before."

51. Immediately thereafter, Mercado was on top of Plaintiff, hitting him while handcuffed and shouted, "Why you resisting, why you resisting, stop resisting!" This was a lie to justify the abuse.

52. Plaintiff was put in the back seat of the police car on the right side. An officer (the same officer that was hitting him) got in to the back seat as well – he is more likely than not sure of this. He continued to call him names like: "you a dumb mother fucker [laughing]…running from

the police?? [laughing] you dumb fuck, boy. You didn't think we were gonna catch you? You dumb fuck…You never run from the police boy you fucked up, you fucked yourself [laughing]."

53. Plaintiff was taken to the 84th Precinct (301 Gold Street, Brooklyn, NY) to an officer at the front desk who asked questions. An officer explained to him what had happened. The desk officer asked if he needed to be taken to the hospital.

54. Plaintiff said yes and complained of being very dizzy. Bellardo then in a lying manner said, "Oh, you really need to go to a hospital? Well when the ambulance gets here you're going to be a gentleman right? And you're going to act like a man when they check you out." She was trying to justify the beating to the desk officer.

55. Also, she recommended that since plaintiff could walk, he should just follow up with his primary care physician because it would hours for x-rays and MRI's because if I wanted to have the opportunity to see a judge by tonight and get released he need to make it there at a particular time.

56. She said this because she didn't want the injuries documented with him in the officers' custody; that way, they could plausibly deny they had done anything and he had been beaten up after his release.

57. But plaintiff insisted on going, for good reason: he had been seriously injured. He was taken to a cell and told to wait for an ambulance to arrive.

58. When the ambulance came, plaintiff was examined and given medicine for his pain and told to follow up with his doctor. He was shackled to the hospital bed and the doctor had to request the cuffs to be taken off in order to properly examine him.

59. He was released sometime after midnight after arraignment. He returned to court once and was given an ACD. Originally he was charged with attempted robbery, possession of

8

burglar's tools, and other charges – charges that were demonstrably false or uninvestigated until the ACD. The burglar's tool was an average steak knife that plaintiff had used to cut open his mango. The knife would never have cut through a metal rod. The police department did not voucher it, nor the backpack, though both are noted in their arrest documents.

60. Plaintiff suffered the following physical injuries and underwent the following treatment:

-Flashers/floaters in his eyes

-Abrasions on the right side of face and forehead

-Surgery on inside of his lower lip

-a herniated disc that has resulted in

- About 20+ physical therapy sessions
- About 20+ chiropractor visits
- About 5+ toradol injections
- 2 epidural shots
- Pending Insurance approval for- Yeung Endoscopic Spine Surgery (YESS) endoscopic discectomy

-A tear in his left shoulder rotator cuff requiring a Cortisone injection

-A Pinched nerve in neck left side found by 2 EMG tests

-Mild Carpel Tunnel in his left arm

- Head, neck, lumbar, shoulder, brachial plexus MRI's

-X-Rays: back, shoulder

61. Plaintiff suffered the following mental injuries: PTSD, Depression, Insomnia, Nightmares. He has had over 25 visits with Psychosocial Specialist and over 10 sessions with a Psychiatrist, who has prescribed him Zoloft and Clonidine

62. He now sues for redress.

FIRST CAUSE OF ACTION
FALSE ARREST 42 U.S.C. § 1983

63. Plaintiff repeats and realleges all previous paragraphs as if repeated verbatim herein.

64. Plaintiff was arrested and imprisoned without probable cause in violation of his rights not be arrested without probable cause as guaranteed to them by the 4th and 14th amendments and by 42 U.S.C § 1983.

## SECOND CAUSE OF ACTION
## EXCESSIVE FORCE 42 U.S.C. § 1983

65. Plaintiff repeats and realleges all previous paragraphs as if repeated verbatim herein.

66. Bellardo hit plaintiff with a car to stop him for a nonsense, contradictory story about cutting a wire and then Mercado, after arresting plaintiff, violently struck plaintiff while he was in handcuffs, rubbing his face into the ground and using excessive force in violation of plaintiffs' constitutional rights to be free from unreasonable, unnecessary, and wanton use of force guaranteed to them by 4th and 14th amendment and 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION
## VIOLATION OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS IN ATTEMPTING TO COVER UP THE EXCESSIVE FORCE

67. Plaintiff repeats and realleges all previous paragraphs as if repeated verbatim herein.

68. Defendant Bellardo in several instances tried to cover up the abuse by warning the abusing officer that there were cameras, and he then lied suggesting that plaintiff was resisting arrest.

69. Bellardo also lied about plaintiff at the precinct and attempt to dissuade him from going to the hospital because if he didn't it would lessen the chain of custody between the police and plaintiff's injuries.

## FOURTH CAUSE OF ACTION
## FAILURE TO PROTECT

70. Plaintiff repeats and realleges all previous paragraphs as if repeated verbatim herein.

71. All officers who witnessed the beating failed to protect plaintiff from the crimes being inflicted upon him by the bearing officer. At this time plaintiff does not know his name, but can recognize him and is almost certain it was the man who took him to the police car. The other officers are equally liable, however, insofar as they did not stop the abuse. One at best warned the officer committing the crime of assault that he might get caught and later tried to dissuade plaintiff from going to the hospital to attenuate the proximate cause between the arrest and the injuries.

## FIFTH CAUSE OF ACTION
## MUNICIPALITY CLAIM UNDER MONNELL

72. Plaintiff repeats and realleges paragraphs 1 through 71 as if each paragraph is repeated verbatim herein.

73. The violations of Plaintiff's constitutional rights and of Federal Law as herein above enumerated by Defendants Police Officers and each of them, were carried out under the following policies, customs, and practices of Defendant City of New York:

i. Failure to establish, publish, and instill in New York City Police Officers the practical meaning of probable cause or reasonable cause for arresting a citizen or charging a citizen with a crime so that officers would not detain, arrest, and/or charge citizens based on their hunches, inklings, or mere suspicion and without reasonable or probable cause;

ii. Encouraging the aggressive policing policy of the Giuliani and Bloomberg administrations to arrest first and ask questions later - indeed plaintiff was charged with possession of burglar's tools when they found none, and attempted robbery when there was none;

iii. Failing to establish, publish, and instill in New York City Police Officers guidelines for when using force against a civilian is necessary and how much force is necessary;

iv. Failing to take proper corrective and punitive actions against overreaching police officers and creating the impression that crime reduction is paramount and triumphs over constitutional rights in all circumstances.

v. Perpetuating the Blue Wall of Silence.

74. Under 42 U.S.C. § 1983, Defendant City of New York is jointly and severally liable with Defendants Police Officers and each of them for the general and specific damages Plaintiff sustained, as well as for the attorneys' fees and the costs and disbursements of the action.

## SIXTH CAUSE OF ACTION
## VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW
## DISCRIMINATORY HARASSMENT UNDER CHAPTER 6

75. Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs.

76. Plaintiff was, and black people in general are continually harassed discriminatorily by the New York City Police Department.

77. By virtue of the foregoing, Plaintiff has been damaged and was stopped because, or in part because, he was black and despite no evidence of a crime was detained so that the police could pin an arrest on him.

WHEREFORE, Plaintiff demand as follows:

A. Compensatory damages;

B. Punitive damages to be determined by the trier of fact;

C. Cost of suit and attorneys' fees pursuant to 42 U.S.C. § 1988 and the New York City Human Rights Law;

D. Such other relief as the Court may deem just and proper.

Dated: New York, New York
       5 January 2017


                    /s/
_____
GREGORY ANTOLLINO (GA 5950)
Attorney for Plaintiff
275 Seventh Avenue # 705
New York, NY 10001
(212) 334-7397