# Exhibit 1

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                        :
                        :
LERIN PIERCE,          :16-CV-05703 (BMC)
                        :
       Plaintiff,     :
                        :
                        :United States Courthouse
   -against-        :Brooklyn, New York
                        :
                        :
ZEESHAN TAQI, ET AL., :Monday, June 12, 2017
                        :1:35 p.m.
       Defendant.     :
                        :
                        :

- - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the         ATTORNEY AT LAW
Plaintiff:        275 Seventh Avenue
                Suite 705
                New York, New York 10001
           BY:  GREGORY S. ANTOLLINO, ESQ.

           LAW OFFICE OF DANIELA ELIZABETH NANAU, P.C.
                89-03 Rutledge Avenue
                Glendale, New York 11385
           BY:  DANIELA ELIZABETH NANAU, ESQ.

For the         NEW YORK CITY LAW DEPARTMENT
Defendants:       OFFICE OF THE CORPORATION COUNSEL
                100 Church Street
                New York, New York 10007
           BY:  CAROLYN KAY DEPOIAN, ESQ.
                VALERIE ELIZABETH SMITH, ESQ.

Court Reporter:  VICTORIA A. TORRES BUTLER, CRR
225 Cadman Plaza East / Brooklyn, NY 11201
VButlerRPR@aol.com
Proceedings recorded by mechanical stenography; transcript produced by Computer-Aided Transcription.

```
                         Proceedings                        2
```

1          (In open court.)

2          (Judge BRIAN M. COGAN enters the courtroom.)

3          (The following occurs outside the presence of the

4    jury.)

5          THE COURTROOM DEPUTY:  All rise.

6          THE COURT:  Good afternoon.

7          ALL:  Good afternoon.

8          THE COURT:  Have a seat, please.

9          THE COURTROOM DEPUTY:  Pierce v. Taqi, et al.,

10   Docket Number 16-CV-5703.

11         Counsel, please state your appearance, starting with

12   the plaintiff.

13         MR. ANTOLLINO:  Greg Antollino for the plaintiff.

14         Good afternoon, Your Honor, and Daniela Nanau is now

15   outside and making a call to a witness.

16         MS. DEPOIAN:  Good afternoon, Your Honor.

17         This is Carolyn Depoian for Officers Taqi, Belardo

18   and Mercado.

19         MS. SMITH:  Good afternoon, Your Honor.

20         Valerie Smith for defendants, Officer Taqi, Belardo

21   and Mercado.

22         THE COURT:  Okay.  There are a couple of preliminary

23   things I have.

24         First, Mr. Antollino, I do not know if you saw the

25   order I entered this morning striking the new witness and

Proceedings                                                3

1   exhibit list that you filed at 12:23 a.m. this morning.  We

2   had had a pre-trial conference.  We had had extensive

3   proceedings on witnesses and exhibits, and your list violated

4   many of the rulings I made on that, and we are not starting

5   over at midnight on the day before trial.  So that is

6   stricken.

7          Do not violate my rulings.

8          MR. ANTOLLINO:  My intention --

9          THE COURT:  I do not care what your intention was.

10         Next.  My chambers has been receiving frantic calls

11  from the social worker.  I think it's Trujillo.

12         MR. ANTOLLINO:  Yes.

13         THE COURT:  That, no doubt, is the person who

14  Mr. Antollino referenced Ms. Nanau was calling to try to get

15  her here.

16         The social worker told my chambers that she received

17  the subpoena today.  I signed that subpoena on the day it was

18  presented to me a week ago.  My chambers has advised the

19  social worker that we cannot give her legal advice.

20         I am advising you, Mr. Antollino, that if you get

21  her here, it is on a voluntary basis because you cannot

22  subpoena a professional on the day of trial, and expect them

23  to drop everything and come to your case.  So that subpoena

24  will not be enforced.  Ms. Nanau, of course, may keep calling

25  her and if she comes, she comes.

Proceedings                                    4

1          MR. ANTOLLINO:  What they say is not true.

2          THE COURT:  I am sorry?

3          MR. ANTOLLINO:  You didn't give me a chance to

4   respond to what they said.  They got it today because I sent

5   them another one.

6          I sent, I have --

7          THE COURT:  I will have a hearing if I get a

8   contempt motion and she does not appear.

9          Is there anything the parties need to discuss before

10  we bring in the jury?

11         MS. SMITH:  Yes, Your Honor, there is one issue.

12         Your Honor did make rulings regarding the deposition

13  of Ashley Holloway.  And additionally, at the pre-trial

14  conference, Your Honor, did order plaintiff to provide the

15  edited video two days in advance of trial.  We just received

16  an E-mail to a YouTube link late last night after 10:00 p.m.

17  with plaintiff's edited version.

18         It's also our understanding that plaintiff has

19  changed the sections of the deposition in that video to not

20  comply with Your Honor's orders and decisions regarding that

21  deposition; specifically, he has taken out two sections with

22  which defendants would want included in any reading of that

23  transcript.

24         MR. ANTOLLINO:  That's not -- that's not true.

25         What I did was this.  Your Honor said you didn't

Proceedings                                              5

1   want duplicative and cumulative matter, and since Ms. Smith

2   came in late, she asked a lot of questions that I had asked

3   when she was not there.  So I didn't include that.

4           In addition, I decided this morning that one portion

5   of the video they could offer, if they wanted to; but that I

6   did not because it would confuse the jury.  The issue is this;

7   that my client had an upper lip problem.

8           THE COURT:  Okay.  I don't want to hear about it.

9   The fact of the matter is, as I stated at the pre-trial

10  conference, if the defendants want to counter-designate under

11  the rule of completeness additional portions of the

12  deposition, they had that right.  You have excluded those

13  portions.  The video is excluded.

14          Is there anything else we need to address before the

15  jury comes in?

16          MS. DEPOIAN:  Just very briefly, Your Honor.

17          We did receive a copy of plaintiff's exhibits in an

18  exhibit binder.  It's somewhat incomplete.  I believe we have

19  copies of most things elsewhere; but if there's any delay in

20  us looking at something, I just ask the Court be aware that we

21  don't have one complete copy of everything.

22          THE COURT:  If you don't have a complete copy, the

23  exhibit is not getting into evidence.  So we will cross that

24  bridge if it happens.

25          MR. ANTOLLINO:  Judge, I have simply made two videos

Proceedings                                6

1   and I followed the order, and this morning I took one little

2   piece out and I spoke to them about it.  I brought it to their

3   attention and I will just play the whole video that Your Honor

4   originally ruled on.  I have no problem with that.

5           THE COURT:  If you play the video as it comes in as

6   I said it could come in --

7           MR. ANTOLLINO:  Yes.

8           THE COURT:  -- you may do that.

9           MR. ANTOLLINO:  Okay.  But you did say not to put

10  anything cumulative in there and I paid attention to that

11  ruling.

12          The cumulative stuff is where are you from?  When

13  did you move to New York?  Things like that.  And I'm not -- I

14  took it out the second time.

15          THE COURT:  Are the defendants concerned with that

16  portion, the pedigree information?

17          MS. DEPOIAN:  No, Your Honor.

18          THE COURT:  Mr. Antollino, that is not what they are

19  worried about.  I know that is not what they are worried

20  about.

21          MR. ANTOLLINO:  She said two portions, and I don't

22  know what they're worried about.  I will put in the thing that

23  I took out that I didn't offer.  I just said would you object?

24  And they do object.

25          I take your point, and I am going to put the whole

1   thing in; but I just took out the additional pedigree

2   information.  If they want to designate, if they want to

3   say --

4           THE COURT:  They do not agree with you that all you

5   took out was the additional pedigree information.

6           MR. ANTOLLINO:  What else did I take out?

7           THE COURT:  Now, you may not speak to them during

8   this trial.  You may speak to me.  You may confer with them

9   during a recess.

10          You have now told me that you are going to use a

11  video which conforms to the ruling I made.

12          MR. ANTOLLINO:  Yes.

13          THE COURT:  If that is true, you can do that.

14          MR. ANTOLLINO:  Yes.

15          THE COURT:  If you begin to play that video, and I

16  have to determine whether it conforms to the ruling I made,

17  and I determine that it does not, then I will stop you from

18  using the video and I will instruct the jury that they are to

19  disregard it.

20          Now, with regard to opening statements.  Do not

21  object to your adversary's opening statement during the

22  opening statement, unless you believe it is something that has

23  to be immediately corrected.  Otherwise, save your objections

24  until after the statement is completed, and if you think it is

25  appropriate to either preserve the order, or for me to give a

Proceedings                                  8

1   limiting instruction, you can ask me at side-bar.

2           Second, with regard to objections during the trial.

3   Do not give me any speaking objections.  If you object to

4   something, just say objection.  I will rule on it.  If you are

5   dissatisfied with the ruling and feel you need to preserve

6   your record, or better articulate the objection, we will do

7   that at side-bar.

8           All right.  Is there anything further?

9           MR. ANTOLLINO:  How would you like a contempt

10  proceeding -- I have an affidavit of service.

11          THE COURT:  I am not going to tell you how to

12  practice law.

13          MR. ANTOLLINO:  All right.  That's fine.  I just

14  wanted to know if you had any preference.  That's all.

15          THE COURT:  I have a preference that we do things

16  according to the Federal Rules of Civil Procedure.

17          MR. ANTOLLINO:  I did that.  I did that, Judge.

18          THE COURT:  Okay.  I did not see proof of service of

19  that subpoena filed.

20          MR. ANTOLLINO:  That's true.  I do have it, though.

21          THE COURT:  Okay.  Anything further before we bring

22  in the jury?

23          MS. DEPOIAN:  Nothing, Your Honor.

24          THE COURT:  All right.

25          We will recess for two minutes and make sure they

Proceedings                                            9

1    are assembled.

2              (Recess taken.)

3              (In open court.)

4              (Judge BRIAN M. COGAN enters the courtroom.)

5              THE COURTROOM DEPUTY:  All rise.

6              THE COURT:  We will stand for the jurors' entrance

7    and exit from the courtroom.

8              (Pause in the proceedings.)

9              THE COURTROOM DEPUTY:  All rise.

10             (Jury enters.)

11             THE COURT:  All right.  Everyone in the courtroom

12   may be seated.

13             Let us get the jurors arranged.

14             THE COURTROOM DEPUTY:  Stand up, please.  Raise your

15   right hand.

16             (Jury sworn.)

17             THE COURTROOM DEPUTY:  You may be seated.

18             THE COURT:  Okay.  We have an empty chair, Melonie.

19   Why is that?

20             THE COURTROOM DEPUTY:  I do not know.

21             (Pause in the proceedings.)

22             THE COURT:  All right.  Good afternoon, ladies and

23   gentlemen.

24             THE JURY:  Good afternoon.

25             THE COURT:  I am Judge Cogan.  Now that you have

Proceedings                                                10

1    been sworn in as members of the jury, I am going to briefly

2    tell you something about your duty as jurors and give you some

3    preliminary instructions.

4           At the end of trial, I will give you more detailed

5    instructions, and it is those instructions that will govern

6    your deliberations.

7           Now, you may wonder why you got to see two judges

8    today.  The very nice Judge Kuo this morning, and the less

9    nice me, this afternoon.  The reason for that is we have two

10   kinds of judges in this courthouse.  We have magistrate judges

11   like Judge Kuo who help district court judges with things that

12   happen before trial, and we have district court judges who do

13   trials.  So that is why there were two judges that you had

14   today.

15          Now, at the end of the presentation of the evidence

16   and my final instructions to you, it is going to be your duty

17   to decide the facts from the evidence in this case and reach a

18   decision on whether the plaintiff has proven, by a

19   preponderance of the evidence, that the defendants are liable

20   for the wrongs that he has charged them with.  Now, you and

21   you alone, are going to be the judges of the facts.  You are

22   going to hear the evidence, decide the facts and then apply

23   those facts to the law that I am going to give you at the end

24   of case.  That is how you reach your verdict.  In doing that,

25   you have to follow the law whether or not you agree with it.

Proceedings                                                11

1          The evidence in this case is going to consist of

2    several things; the testimony of witnesses, documents and

3    other things that are received into evidence as exhibits; any

4    facts upon which the lawyers agree; and the inferences that

5    you may reasonably draw from other evidence.

6          Evidence can be either direct or circumstantial.

7    You have probably heard of circumstantial evidence.  Let me

8    tell you the difference.

9          Direct evidence is testimony by a witness about what

10   that witness personally saw, heard or did, or evidence in a

11   document about something that happened.  Circumstantial

12   evidence is evidence that you can reasonably infer from the

13   direct evidence.

14         Now, one is not better than the other.  You can

15   consider both direct and circumstantial evidence in deciding

16   this case.  It is going to be up to you to decide how much

17   weight to give to any particular piece of evidence.  You have

18   to determine which of the witnesses you believe; what portion

19   of their testimony you accept; what may reasonably be inferred

20   from what that witness saw, heard or did; and what weight you

21   attach to each aspect of the evidence and to the evidence as a

22   whole.

23         Now, also understand what is not evidence.  The

24   questions and objections of the attorneys are not evidence.

25   Neither is any testimony that I instruct you to disregard.

Proceedings                                           12

1    The statements and arguments of the attorneys are not

2    evidence.  The only competent evidence for you to consider is

3    that which is admitted into evidence here in court in the

4    presence of the parties and all of you, the jurors.

5              Now, at times during the trial, I may sustain

6    objections to questions that the attorneys ask.  When that

7    happens, I will not permit the witness to answer; or if the

8    witness is too fast for me, I may instruct you that the answer

9    is to be stricken from the record or that you are to disregard

10   it.

11             If a witness does not answer a question because of

12   an objection, or if the witness answers and I instruct you to

13   disregard that answer, then you have to dismiss that question

14   and answer entirely from your minds like it never happened.

15   At other times I may overrule objections.  Do not read

16   anything into the fact that I am sustaining or overruling an

17   objection.  That is for me, that is not for you.  You just

18   listen to the answers to the questions that I allow into

19   evidence.

20             Arguments in connection with the introduction of

21   certain evidence, or other legal questions, may be made

22   outside your presence.  I may talk to the lawyers here at

23   side-bar; things may happen in discussions between us when you

24   are not in the room.  That is not because we are trying to

25   keep any important information from you.  We hold those

VB        OCR        CRR

Proceedings                                               13

1    conferences to help me fulfill my responsibility, which is to

2    ensure that evidence is presented to you correctly under the

3    law.

4           Remember that your decision has to be made solely on

5    the evidence before you.  Let common sense be your guide,

6    subject to and aided by, the instructions that I will give you

7    at the end of case.  There is, unfortunately, no magical

8    formula by which you should evaluate testimony or exhibits.

9    You bring to this courtroom all of the experience and

10   background of your lives; your common sense.

11          Use the same reasoning and tests that you use in

12   your everyday dealings with people to determine who is telling

13   the truth and to what degree; who to believe and who not to

14   believe; and how to reason, understand and weigh the documents

15   and exhibits.  Watch the witnesses very carefully and listen

16   to everything that they say.

17          Now, this is a civil case.  That means the plaintiff

18   has the burden of proving his case by what is called a

19   preponderance of the evidence.  That means that the plaintiff

20   has to produce evidence which, when considered in light of all

21   the facts, leads you to believe that what the plaintiff claims

22   happened is more likely true than not true.  To put it

23   differently, if you were to put the plaintiff's and the

24   defendants' evidence on opposite sides of a scale, the

25   plaintiff would have to make the scale tip to his side, such

1  that you believe his allegations are more likely true than

2  not.  If the plaintiff fails to meet that burden, then the

3  verdict has to be for the defendants.

4        Now, the parties are going to tell you a lot about

5  this case and Judge Kuo may have told you a little bit; but

6  just to, as concisely as I can, tell what you it is about, the

7  plaintiff alleges that the defendants, who are NYPD officers,

8  used excessive force on him while effecting his arrest.  The

9  arrest itself is not the issue.  Whether the plaintiff

10  committed a crime is not the issue.  The only issue you have

11  in front of you is whether the force used to make the arrest

12  was excessive.

13        Please remember that that is just a brief summary of

14  the claims in this case.  I will give you more detailed

15  instruction on the elements that the plaintiff has to prove to

16  prevail at the end of case.

17        Now, let me caution you about certain principles

18  that govern your conduct at jurors.  First, and this is very

19  difficult, do not talk to each other about this case, or about

20  anyone who has anything to do with it, until the end of the

21  case when you go to the jury room to decide on your verdict.

22        Second, do not talk with anyone about this case, or

23  about anyone that has anything to do with it, until the trial

24  has ended and you have been discharged as jurors.  That

25  includes members of your family and your friends.  You can

Proceedings                                                    15

1    tell them that you are a juror in a Federal case, and that is

2    it.  Only after you have delivered your verdict, and the case

3    has ended, and you have been discharged from your service, may

4    you talk with anyone else about the case.

5            Third, while I do not expect this to happen, do not

6    let anyone talk to you about the case, or anyone who has

7    anything to do with it.  If for any reason someone should try

8    to talk to you, please let Ms. Clarke know so that she can

9    relay it to me.  If that happens, do not tell anyone that it

10   happened except Ms. Clarke; not even your fellow jurors.

11   Again, I do not expect it to, but I just have to give you

12   these cautions.

13           Fourth, do not speak with any of the lawyers, the

14   parties or the witnesses, whether in or outside the courtroom.

15   Do not even pass the time of day or say hello or good-bye.  I

16   am instructing the lawyers, the parties and witnesses not to

17   speak to you, and not to even acknowledge or greet you if they

18   pass you in the hall.  So do not hold it against them if they

19   walk right by you and give you a thousand-mile stare like you

20   are not there; or if you go into an elevator that has one of

21   the parties or lawyers on it, and they get out of the elevator

22   just because you are getting in.

23           The reason for these instructions is simple.  You

24   have a very important job to do and we do not want anyone to

25   influence you, or to try to influence you, or even to try to

Proceedings                                                16

1   curry favor with you.  Everyone has to make a point of

2   avoiding even an appearance of impropriety, so that there is

3   no misimpression.

4            For that reason, when you convene in the morning, do

5   not hang around in a crowd in the courthouse.  Before taking

6   your seats each day, you will assemble in the jury room and by

7   the jury room, I do not mean the big one downstairs.  I mean

8   the one right behind me where you just came from.  Go directly

9   there, you have a building pass.  Every morning, just go right

10  into that room.  When you are all there, we will bring you

11  into the courtroom.

12           At the end of day, you will return to that room and

13  you will leave from that room.

14           Fifth, I do not know that there will be any press

15  coverage on this case.  I never know what interests reporters

16  or not, but if there is, you have to stay away from it.  So if

17  you are watching TV and you see something that looks like it

18  might be about this case, please click the remote and go to

19  another station.

20           If you open a newspaper and you see something, turn

21  the page.  If you are on the Internet and you see something

22  that might be about this case, please navigate to some other

23  page.

24           Sixth, do not do any research or investigation about

25  the case on your own.  Certainly, do not go to visit any

Proceedings                                                    17

1    location that may be mentioned during the trial.

2           Now, also, I know that many of you, probably all of

3    you, have cell phones; you use the Internet; you have many

4    ways of connecting to the Web.  You cannot conduct any

5    Internet research about this case, including using Google or

6    any other search engines.  It is very important that

7    everything you learn about this case we give to you right here

8    in the courtroom so that we are all on the same page and

9    nobody brings in extraneous information from the outside.

10          If you were to do that, and believe it or not,

11   sometimes there are checks done on juror's surfing habits

12   after a trial, and if it was found to be that happened, that

13   would violate your oath and constitute a very serious problem.

14   So, please, do not do any research about the case.

15          In addition, as part of the prohibition on

16   communicating about the case until after it is over, you

17   cannot use your cell phone or the Internet or any other

18   technology to communicate electronically with anybody else

19   about the case.  You may not communicate with anyone by E-mail

20   or text messaging about this case.  I am not telling you, you

21   cannot use the Internet.  You can.  You can send messages, but

22   not about this case.

23          You also cannot post anything to your Facebook

24   account, which some or most of you probably have.  Nothing on

25   Twitter; nothing on Instagram; no blogging; no other social

Proceedings                                    18

1   media websites; no Facebooking; MySpacing; linking in; nothing

2   at all can be posted anywhere on the Internet about your

3   experience in this case until you are done, and then you can

4   post anything you want to post.

5            Now, let me tell you about how the trial is going to

6   proceed.

7            First, each party may, but does not have to, make an

8   opening statement.  Remember that an opening statement is not

9   evidence.  It is just an outline of what the party intends to

10  prove or show that is offered to help you follow the evidence.

11  The parties do not have to give an opening statement.  If one

12  or the other chooses not to, then that choice should not be

13  considered as indicating anything.

14           After the opening statements, the plaintiff will

15  present witnesses and the defendants may cross-examine those

16  witnesses.  Then, if the defendants want, they can present

17  witnesses and the plaintiff may cross-examine them.  Last,

18  there may be rebuttal witnesses.

19           Now, once the witnesses are done, and the evidence

20  is closed, the attorneys will make closing arguments to

21  summarize and give you their interpretation of the evidence.

22  Like opening statements, those closing arguments are not

23  evidence.  They are just offered as guides to help your

24  understanding of the issues by letting you hear each side's

25  perspective of what each believes has been proving or not

Proceedings                                          19

1   proven.

2           Then after the closing arguments, I will give you

3   instructions on the law and you can retire to deliberate on

4   your verdict.

5           Please, this is very important.  Do not make up your

6   mind about what you think the verdict should be until after

7   you have heard all of the evidence; after I have instructed

8   you on the law at the end of case; and after you have

9   deliberated with your fellow jurors.  You have to keep an open

10  mind until then.

11          All parties deserve, and the law requires, that you

12  give them an opportunity to be fully heard and that you not

13  make up your mind until you and your fellow jurors have heard

14  all of the evidence and the instructions, and you have

15  completed your deliberations.

16          Finally, let me give you the schedule and some

17  details for the trial.

18          On a normal day, we will sit from 9:30 in the

19  morning until somewhere between 12:00 and 1:00, when we will

20  break for lunch, maybe a little later, and we will probably

21  take a morning break during that day.  Then we will go until

22  sometime between 4:00 and 5:00 o'clock in the afternoon,

23  depending how the evidence is coming in.

24          Now, I do not know if Judge Kuo told you, but I have

25  an engagement in another court that I cannot get out of

Proceedings                    20

1  tomorrow, so we will not sit tomorrow.  So we will do today

2  and we will resume Wednesday at 9:30 a.m., and we will just go

3  as necessary.  I think she probably gave you an estimate of

4  the trial.  I do not expect it to be a terribly long trial.

5         The times that I just gave you, though, keep in

6  mind, are approximate, and I need you to be a little bit

7  flexible if the evidence is coming in, in such a way that I

8  have to alter those times.

9         All right.  Also, it is very important that you get

10 here on time, by 9:30.  I know it is not unheard of for there

11 to be transportation problems in New York City.  Please, leave

12 a little early to take account of those.

13        The reason for that is that until all seven of you

14 are here, we cannot do anything, and there is nothing worse

15 than being the last person in the courtroom when everyone is

16 here, and everyone is waiting for you.  So do what you need to

17 do, please, to get here by 9:30.

18        Ms. Clarke, if she has not done it already, will

19 give you her telephone number so that if you do have an

20 emergency and cannot get here by 9:30, at least you will let

21 her know, and then we will deal with it.

22        You will note that when you come into the jury room,

23 we all stand in deference to the important and solemn duty

24 that you have undertaken.  You do not have to stand.  When you

25 come to your seats, just sit right down.  We will stand until

VB      OCR      CRR

Proceedings                                              21

1   you are all seated.

2          The last thing I want to talk to you about is taking

3   notes.  I see Ms. Clarke has given you note pads.  It is fine

4   to take notes.  I do not want to discourage you; but keep in

5   mind that the job of the court reporter here is to write down

6   every word that is said.  That is what we call a verbatim

7   transcript.  That becomes the official record of the case and

8   we can always refer back to the transcript if you have any

9   questions about something someone said.  So do not feel you

10  have to write down every word.

11         Now, you will see that I am on the computer while

12  this is going on.  I am not Googling or texting or sending out

13  messages or making dinner plans.  I am observing the

14  testimony.  I get a scroll of the testimony on my screen as it

15  comes in, so that if the attorneys make any objections, I can

16  quickly look at what is going on and make a ruling on it.  I

17  will also make notes as I go along.

18         Some of those notes are just to help me with legal

19  issues.  They may be for some other case that does not even

20  pertain to this one.  So if you see me making notes or typing

21  while I am looking at the screen, do not think, oh, that must

22  be really important.  The Judge is noting it.  That is not

23  true.  It does not affect what you are doing at all.  You are

24  finding the facts.  I am concerned about legal issues.

25         Just keep in mind if you do take notes, do not let

1   the writing of the notes stop you from listening to the

2   testimony.  I know when I get new law clerks, they are

3   recently out of law school, they are used to writing down

4   everything the professors say and when I give them an

5   assignment, I say to them stop writing; just listen.  And my

6   concern is that if they are trying to figure out how to write

7   what I just said, I will say something that is even more

8   important, and it will go right over their head, because they

9   are trying to figure out how to write the last thing I said.

10          So the most important thing is listening.  Like I

11  said, we have the verbatim transcript and we can get back to

12  you, if necessary, with anything you need to hear.

13          All right.  We will now begin with the plaintiff's

14  opening statement, Mr. Antollino.

15          MR. ANTOLLINO:  Thank you, Your Honor.

16  OPENING STATEMENT

17  BY MR. ANTOLLINO:

18          MR. ANTOLLINO:  May it please Your Honor.

19          THE COURT:  Mr. Antollino, can I ask, before you

20  start.  Close that folder.

21          MR. ANTOLLINO:  Oh, I'm sorry.

22          THE COURT:  Thank you.

23          MR. ANTOLLINO:  I will just put paper on top of it

24  so nothing shows.

25          Ms. Blake, the Court staff, court reporter, the

1  jurors, defense counsel, audience members, I treasure these

2  moments.  Cases, especially in the civil realm, don't go to

3  trial like they used to.  The practice of trial law is a dying

4  art, some would say.  So it makes me so proud when I get to

5  stand here and look at you and make a case and try my best for

6  my client, Lerin Pierce.

7          Every opening statement begins with good afternoon,

8  ladies and gentlemen.  Thank you for your time.  I mean that,

9  and maybe some of you would rather be somewhere else, with

10  your jobs and your freedom.  We recognize that answering your

11  jury summons takes you away from those, to some extent.  Maybe

12  some of you are excited.  I've been picked for a jury twice

13  and the cases settled before I could even listen to any

14  evidence.

15          And I feel like I'm never going to get on a jury.

16  But it is just so much fun to talk to you about the evidence

17  and what a trial is.  And as His Honor said, it is one of the

18  most important rights that you, as citizens, can exercise.  I

19  believe he said something like that, if not those exact words.

20          It is a right in the U.S. Constitution, which you've

21  all heard about.  I'm not going to get into details about

22  that; but there is an amendment to the Constitution.  You've

23  heard about the Bill of Rights.  One of the Bill of Rights is

24  the right to a trial by jury shall be preserved for any

25  controversy over $25 or $25 or more, I'm not sure.

Opening Statement - Antollino                          24

1           And this is what you might call a meta case.  A case

2    within a case about the Constitution.  So we brought this

3    case, which is guaranteed under the Constitution, about the

4    violation of Constitutional rights.

5           And His Honor will interrupt me if I go into the

6    explanation of the law.  I am not going to do that.  I am

7    going to try my best; but this is a case where we allege that

8    the police officers, the defendants here, collectively and

9    individually violated Lerin Pierce's Constitutional rights.

10          And His Honor already told you this is not a

11   criminal case.  It's not beyond a reasonable doubt that is the

12   standard.  I don't know if any of you remember the

13   clap-o-meter, where they had a talent show and a voice or a

14   sound check would measure which contestant got the most claps,

15   you know, and some of them were easy.  Some of them were

16   clearly better than others.  But some of them were just right

17   in the middle and just by the tiniest bit, were able to win.

18          It's just like in Wheel of Fortune, or what is it,

19   The Price is Right, when you roll that wheel and it's running

20   between bankruptcy and $100,000.  If it's $100,000, you win.

21   If it's bankruptcy, you lose.  It can be that close.  The

22   evidence does not have to be scientifically proven not beyond

23   a reasonable doubt, just by a preponderance.

24          So this is a civil case brought against police

25   officers of the New York City Police Department in a civil

VB          OCR          CRR

1    action for the excessive use of force in carrying out an

2    arrest.   The arrest not at issue.

3              I would like you to meet our team.

4

5              (Continued on following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VB        OCR        CRR

1        MR. ANTOLLINO:  There's me, Greg Antollino, I was

2   the first one to meet Lerin.  There is Daniela Nanau, who has

3   her own law firm in Queens, and she and I do a lot of work

4   together, because she can tolerate me and she helps me a lot.

5        There is Lerin Pierce, the plaintiff.

6        And in the back, over in the corner, we have

7   Kimberly Webster, who is not admitted to this particular court

8   but she has never seen a trial before.  Right next to her is

9   Lerin Simon.

10       MS. DEPOIAN:  Objection.

11       THE COURT:  Please don't object during opening

12  statements.

13       MR. ANTOLLINO:  I am going to put my best foot

14  forward so that this case is quick and interesting to each of

15  you.  In fact, it might be quicker than we thought because

16  today a witness we subpoenaed didn't come in, but we have got

17  witnesses ready to go.  The first thing you are going to see

18  is a film strip or a videotape.  My client, Lerin Pierce is 33

19  years old, and I mentioned his son, whom he shares custody

20  with his mother now.  The young man is not here every day.  He

21  just had to be here today.

22       THE COURT:  Mr. Antollino. Mr. Antollino --

23       MR. ANTOLLINO:  I will move on.  I will move on.

24       THE COURT:  Mr. Antollino, your client's son is not

25  a party, of course.

1          MR. ANTOLLINO:  I understand.

2          THE COURT:  So it really is not relevant.

3          MR. ANTOLLINO:  I understand.

4          Lerin was -- well, let me get back to what happened

5    in this case.  And it was a few years ago, which might seem

6    long to you, it might not.  This case was brought this year

7    and it moved very quickly and we hope we are going to be able

8    to put on an interesting, cohesive story.  Lerin was 30 at the

9    time.  I always tell people that I think life starts at 35.

10   Lerin is now 33.  And he has, I think, the most exciting part

11   of his life ahead of him, but he got injured in 2014, and his

12   injuries have improved and we want them to improve, but he has

13   to deal with them and he deserves compensation for that.  We

14   didn't bring him in a wheelchair to suggest that he is more

15   injured to exaggerate his injuries.  If you were to look at

16   him, you wouldn't see that he was injured.  It's like looking

17   at a watch, but the watch innards are not working perfectly

18   and it doesn't give the correct time.  He did, nevertheless,

19   suffer significant injuries in his, both physical and mental,

20   and the evidence from our handful of witnesses and the

21   documents we show you will demonstrate that the police

22   exacerbated, which means to make worse, a back problem that

23   was healing on its own.

24          August 29th, which just happens to be my birthday,

25   although Lerin didn't know me at the time, he went to his

1  doctor and complained that he had been doing -- cleaning --

2  power cleans and squats.  I don't know what a power clean is,

3  but I know what a squat is and that he was suffering pain.

4  And a squat is like this.  When you build up the muscles in

5  the leg and you hold the weight like this.  I think a power

6  clean is like this, but I'm not sure.  And it hurt very much

7  on that day.  It had nothing to do with the police, but his

8  doctor gave him the advice no, we don't need you to have an

9  MRI or any extraordinary medical attention at this time. What

10  we do need, however, is for you to take it easy on the weights

11  and don't do any power cleans and it will heal itself.  So

12  that is what he planned to do.  But that incident was

13  forgotten by the time September 1st came along.

14          Now, I want to talk to you about the idea of suing

15  the police.  Okay.  We understand that not all cops are bad

16  and we don't believe that these police officers are all bad

17  and we also know they have stressful jobs and they probably

18  are not given enough services to deal with the stress of that

19  job, okay.  None of us in this room, including the people on

20  our team are anti-police, but we do not want them to take out

21  their stress on us or whatever their motives are for taking

22  out stress.

23          Another thing we recognize on the part of the police

24  is that they have to make snap decisions, okay, and that

25  things can go very quickly, and the judge will explain the law

OPENING STATEMENT - ANTOLLINO                    29

1   to you, but for that reason, we're not suing for the arrest

2   because it just happened; we are suing for the manner in which

3   the arrest was carried out.  So what happened was this, so

4   it's September 1, 2014, which happened to be Labor Day that

5   year, and Lerin, who was at the time living with his

6   ex-girlfriend, who now lives in Arkansas, and you will hear

7   her testimony on a video because she's out of the jurisdiction

8   of this Court to be subpoenaed.  He went to do some errands

9   and on Labor Day 2014.  He walked around the Fulton Mall.  He

10  had just gotten an iPhone and he had wanted a charger for the

11  iPhone.

12          May I use a demonstrative exhibit, Your Honor?

13          THE COURT:  Have the defendants seen it?

14          MR. ANTOLLINO:  No.  Would you mind?  This is a

15  demonstrative exhibit just to show the Mophie charger at the

16  store.  Any objection?

17          MS. SMITH:  Yes.

18          MR. ANTOLLINO:  Okay.  Fine.

19          He went to the store and he was at a rack, which you

20  will see a picture of a charger known as Mophie, which I've

21  never heard before.  Mophie makes chargers for iPhones.  They

22  were on a rack and most of the chargers were attached to this

23  rack with the sticks and had to be unlocked, okay.  So, you

24  will see pictures of these, I anticipate, and there's a whole

25  bunch of them and they were of different types.  Lerin bent

1   down to look at one and the front of it just said Mophie

2   charger.  All of the specifications of the charger were on the

3   other side, but it was locked, so he kind of turned it around

4   and looked at it.  It's unfortunate that we have got to lock

5   things up, that stores have to lock things up.  Just at that

6   moment, there was a man who was working at the Radio Shack,

7   which we all know is no longer in existence, I think, who saw

8   him bending over and looking at it.  And somehow, he suspected

9   something nefarious because of that.  Nonetheless, he didn't

10  go over and talk to Lerin, he went to help a customer.  I

11  believe this person will testify in this trial.  I'm not sure.

12  We haven't called him.  The defense might.  So after a moment,

13  Lerin saw a charger that was not locked to the case.  It was

14  just there, and so he was able to simply look at the back of

15  the charger and read the specifications because you got to

16  know if your charger is going to work with your phone.

17          So Sharoon came back at that point and he said to my

18  client, without the least of pleasantries, were you going to

19  buy that item or were you going to steal that item?  And Lerin

20  was outraged, and he said no, I'm good, and he flipped him the

21  bidder.  And I don't mean a hummingbird.  And he chucked the

22  Mophie phone charger on to a tray or something and he walked

23  out of the store without the Mophie phone charger, having been

24  insulted like that.

25          He then went to Chase Bank to make a deposit, a tiny

1  deposit of $25, anything he had to rush to do, and then he

2  strolled to the AT&T store to look there to see what kind of

3  charger, perhaps personnel would be more receptive to letting

4  him inspect the merchandise before he bought it and not accuse

5  him of a theft because he was holding something.

6        Then he walked out of the AT&T store and he found

7  that Sharoon had followed him, and he had taken the Mophie

8  phone charger in his hands and he called -- no, he ran into a

9  man, whom we will call, by the name of Ahsin Rafique, Ace as

10  he is known.  He saw Ace get out of the subway and he just

11  told Ace what to do.  Sharoon was his supervisor and so he

12  told Sharoon to call the police.  And what he told Sharoon to

13  do was call the police, someone stole a Mophie phone charger

14  from our store.

15        Now, does this already begin to seem a little

16  strange?  Mr. Pierce left the Mophie phone charger in the

17  store and Sharoon is holding the Mophie phone charger in his

18  hand.  Really, perhaps he was just angry that after he

19  insulted my client, he was insulted back, and he wanted to get

20  back at him.  He later said that he had seen my client --

21        THE COURT:  Mr. Antollino, Mr. Antollino.

22        MR. ANTOLLINO:  Yes.

23        THE COURT:  Let's go on to the arrest, please.

24        MR. ANTOLLINO:  Sure.  I am getting to that point

25  right now.

OPENING STATEMENT - ANTOLLINO                    32

1        The police arrived and there were two vehicles with

2   the police, one with Mr. Taqi, who is behind the monitor

3   there, was in kind of a scooter, and another with Mr. Mercado,

4   Ms. Belardo, they were in a regular police cruiser.  Ace will

5   testify that he got into the cruiser to follow Mr. Pierce and

6   the arrest was not that quick because there was about

7   15 minutes, and this is documented in the records, of

8   conversation that occurred.  Sharoon is holding the Mophie

9   phone charger and said that he stole it from the store and

10  that just seems not logical.

11       There was a long conversation --

12       THE COURT:  Mr. Antollino --

13       MR. ANTOLLINO:  -- in which Mr. Mercado.

14       THE COURT:  Mr. Antollino, Mr. Antollino.  It really

15  doesn't matter if it seems logical or not.  As I told the jury

16  in my preliminary remarks, the legality of the arrest is not

17  at issue here.

18       MR. ANTOLLINO:  Sure. I understand.

19       THE COURT:  Whether or not the defendant actually

20  stole the item is not an issue here.  They should not consider

21  it.

22       MR. ANTOLLINO:  The carrying out of the arrest is

23  what we are talking about and there was a 15-minute discussion

24  until Officer Taqi said well, you know what we are going to

25  do, we're going to cuff you and take you to the store and

1   we're going to look at the surveillance tape and if there is

2   anything funny going on, we're going to put you in jail, and

3   at that point, my client panicked and he ran.  He was not

4   under arrest, but he panicked and he ran, and he ran down

5   Fulton to Flatbush and the police officer's response to it was

6   to put out an APB.  Officer Taqi went on foot and Officers

7   Mercado and Belardo went in this cruiser with Ace, who saw the

8   whole thing, because he couldn't get out of the car because

9   it's automatically locked.  And he ran from the police and

10  this is not about the arrest.  Hindsight is 20/20.

11          We're not saying they were wrong for the arrest.  We

12  are not saying Lerin was right in running, but how the arrest

13  was carried out.  There were two cars that chased Lerin down

14  Flatbush Avenue.  He made a turn from Fulton on to Flatbush

15  and two of them were chasing him.  At one point, he crossed

16  the street and the two cars pursuing this man for a $195

17  Mophie phone charger that was in Sharoon's hand had their

18  sirens on.  He ran across the street.  They went into the

19  other lane and they hit him.  And there might be some dispute

20  as to what exactly happened when they hit him.

21          Ace, the guy who worked at Radio Shack, who only met

22  Lerin formally this year, said that he was hit and the officer

23  said oh, shit.  I believe it was Officer Mercado who opened

24  the door, let Ace go.  Mr. Pierce was on the ground,

25  surrendered, and did not resist in any way.  Certainly when

1   someone is hit by a car, one's strength goes away.  Okay.  So

2   if they had simply arrested him and taken him away, that would

3   have been one thing, but they chased him with a car, hit him

4   with a car in another lane just so he wouldn't get away.  And,

5   in addition, when he was down on the ground -- if I may Your

6   Honor, just briefly, when he was down on the ground with his

7   -- you can't see me if I go that far.  When he was down on the

8   ground with his hands behind his back, and he couldn't see who

9   was doing this, they rubbed his face into the asphalt and they

10  kicked and beat him.  And you'll see the contusions on his

11  face and on his legs.  And they did that just to punish him,

12  to take out their anger on him.  And they picked him up, put

13  him in the cruiser and Officer Taqi got in the car.

14  Belardo -- by the way, it was Belardo, Officer Belardo, Sonia

15  Belardo, who was driving the car, but Sergeant Mercado was her

16  supervisor in what's known as the recorder seat.  Belardo saw

17  this going on and she said easy guys, easy, there are cameras

18  around here.  Maybe that got them to stop at that point, but

19  the damage or some damage had been done already.

20          They picked him up, put him in the car.  Taqi went

21  in the car and as Officer Belardo drove him to the precinct to

22  be booked, Taqi was next to him yelling in his face, fuck you,

23  you fucking fuck, how dare you run from the cops.  So really

24  it was about contempt of cop.

25          I believe the evidence will show they were trying to

OPENING STATEMENT - ANTOLLINO                    35

1   provoke him into fighting back so they could rough him up a

2   little bit more, but we don't even need to go there.

3          Okay, oh, he arrives at the precinct and he wants to

4   see someone at the hospital and they discourage it because it

5   will connect them to any injuries, or they will have an

6   injured body in their hands.

7          THE COURT:  Mr. Antollino --

8          MR. ANTOLLINO:  And --

9          THE COURT:  Mr. Antollino --

10         MR. ANTOLLINO:  Sorry.

11         THE COURT:  I need you to stick just to the facts

12  that you expect the evidence to show --

13         MR. ANTOLLINO:  Okay.

14         THE COURT:  -- and don't get to motive.  We will

15  have closing argument for that.

16         MR. ANTOLLINO:  I thought motive was evidence, but I

17  am happy to have you correct me.

18         The hospital examined and documented his injuries.

19  He was then arraigned, released, and his case was eventually

20  dismissed.  You are not here to think anything about -- we are

21  not claiming that they maliciously prosecuted him because his

22  case was dismissed.  We don't have a claim for that.  But

23  after it was all over, his life was changed.

24         Now, Lerin would be happier to have his old self

25  back than to have to come here and make this argument before

OPENING STATEMENT - ANTOLLINO                    36

1   you to ask for money, but, you know, we don't have magic wand

2   for that to happen.  We have a constitutional system in

3   Federal Court where someone can come in and ask a jury to

4   assess damages, say how much are these damages worth and take

5   the money from one side and bring it to the other side,

6   because in our system, justice is money, and that's all we

7   have, practically.

8          The injuries that he sustained were a tumor on his

9   lower lip that grew and grew and grew.  It had to be lanced,

10  popped and sewn together.  He began to have nightmares about

11  all sorts of weird things, not necessarily about the police,

12  and he must now still take medication in order to sleep, and

13  you will hear him testify that one week his prescription ran

14  out and the nightmares came back.

15         For a while, he saw floaters, and a floater is just

16  like a little light that has no physical reality except that

17  your eye sees it.  For a while he had these floaters in front

18  of him and that went away for a while, but it was nevertheless

19  part of his injury.

20         Is that the worst thing in the world?  No, but it is

21  part of his injury.  Finally, he found that his body did not

22  work the same way that it had.  He had enjoyed lifting

23  weights.  It is a great stress reducer and a social event

24  sometimes, but he cannot do it anymore because his body is

25  uneven.  He has a psychotherapist.  He has a good chiropractor

1    to help him, but he went to a couple of second rate -- or, let

2    me -- a couple of less than perfect doctors, just like there

3    can be less than perfect attorneys, until he finally found a

4    doctor, who will not testify, but we have a report, who found

5    a small some neuropathy in his elbow.  That means that the

6    strength in one hand is not equal to the strength in the other

7    hand.  And when you lift weights, you can't lift -- you are

8    just uneven.  If you are lifting weights, you want to be

9    symmetrical, but he was unable to do that.

10          Now, maybe you will look at him and say maybe he

11   looks symmetrical to me.  And even if he took his shirt off,

12   yoiu would say he looks symmetrical to me, but it was him, it

13   was his self image that was changed because of this.  He had a

14   rocking body such that many of us would like to have, and he

15   can no longer get his body there anymore.  So this took away

16   part of life he enjoyed, because if he engages in it now, he

17   looks lopsided.  That was a gift that he had that some higher

18   power or luck in the universe gave him but he will never get

19   it back.

20          Finally, he self-medicated, which means he used

21   alcohol, and I think we're at the point in our world where we

22   recognize that this is a problem.  It is a form of -- it is

23   not a shortcoming in a person; it is a disease.  He

24   self-medicated with alcohol to reduce the pain and when he

25   found the alcohol did not reduce the pain, he self-medicated

OPENING STATEMENT - ANTOLLINO          38

1   some more, and the good thing is that when he went to Dr. --

2   or actually psychotherapist Vanessa Trujillo, she got him to

3   understand that he was using too much alcohol and he reduced

4   his consumption.

5          Now, these officers have a hard job, but they did

6   choose this job and they took an oath to defend the

7   constitution for everyone and that includes the innocent and

8   the guilty.

9          The judge is going to explain the law and he will

10  interrupt me if I go too far, but the evidence will show that

11  even the worst person deserves to be treated with bodily

12  integrity and dignity when arrested.

13         Now, I have said all I have to say about the facts

14  of the case.  The judge will warn you not to talk about the

15  case while it is pending.  You do have the right to take

16  notes, but my personal feeling, I don't know about yours, is

17  you are here to take in the story and hear what happened.  If

18  you went to a movie, and I am not suggesting this is a movie.

19  I am not suggesting this is fiction, you wouldn't take notes

20  unless you were a film printer.  You can if you want, but you

21  can't share your notes with other jurors, well, my notes say

22  this.  They are just for your own benefit.  And if you feel

23  the need, then you should go ahead.  And if you felt like

24  something funny was going on that you saw      before you get

25  the case, the judge told you that before you are given the

OPENING STATEMENT - ANTOLLINO                    39

1   case and instructed on the law, the rules of court do not

2   allow you to talk about the case.  But if you saw something

3   funny or you heard something funny, like well, I don't think

4   that this guy has a good tactic or something like that, you

5   can send out a note saying that and let His Honor determine if

6   it's worse doing something about or not.

7            THE COURT:  Mr. Antollino, save this part for

8   closing, because you are just about out of time.

9            MR. ANTOLLINO:  Okay.  I am ending right now in

10  saying that you are exercising your right by sitting on this

11  jury and we are going to ask you to enforce the same right

12  that the same document gives to Lerin Pierce.

13           Thank you.

14           (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1   (Continuing)

2             THE COURT:  Thank you, Mr. Antollino.

3             MR. ANTOLLINO:  Thank you, Your Honor.

4             THE COURT:  Ms. Smith, for defendants?

5             MS. SMITH:  Yes, Your Honor.

6   OPENING STATEMENT

7   BY MS. SMITH:

8             MS. SMITH:  Good afternoon.

9             You have probably heard the saying, "you can't run

10  away from your problems."  But on September 1st, 2014, that's

11  exactly what the plaintiff tried to do.

12            The plaintiff had just been identified by two Radio

13  Shack managers for stealing, and he was about to be placed

14  under arrest when he ran away from the police.

15            MR. ANTOLLINO:  Your Honor.

16            THE COURT:  Overruled.

17            MS. SMITH:  And now the plaintiff wants you to give

18  him money for it.

19            On September 1st, 2014, plaintiff was accused of

20  stealing and was stopped by the police on Flatbush Avenue in

21  Brooklyn.  In fact, he was stopped by the defendants,

22  Officer Taqi, Officer Belardo and Sergeant Mercado.  Why?

23  Because he had been identified by not one, but two Radio Shack

24  managers as trying to shoplift.

25            And just as Officer Taqi has his handcuffs in his

1   hand and was about to place the plaintiff under arrest, the

2   plaintiff decided that the best way to deal with this problem

3   was to run away.

4           So what happened next?  Officer Taqi runs after the

5   plaintiff with his handcuffs still in his hands down Flatbush

6   Avenue.  And at the same time, Officer Belardo and

7   Sergeant Mercado get into their police car.  Officer Belardo

8   turns on the emergency lights and sirens and follows the

9   plaintiff down Flatbush Avenue with the assistant manager from

10  Radio Shack in the back seat of the car.

11          Let me set the scene for you.  Imagine Flatbush

12  Avenue.  Flatbush Avenue is a major throughway in Brooklyn.

13  It has four lanes of traffic, a divider lane and a bus lane,

14  and it's 12:00 p.m. on Labor Day.

15          And then you see an officer running after the

16  plaintiff with his handcuffs still in his hand and a police

17  car that's pacing them with their police lights and sirens on.

18  What's the plaintiff doing?  He's still running.  He runs for

19  blocks.

20          And as plaintiff is attempting to make his getaway,

21  he runs into Flatbush Avenue, heading towards the Atlantic

22  Terminal subway station.  Why does he run across Flatbush

23  Avenue with all these lanes of traffic and a bus lane on Labor

24  Day?  Because he's trying to get across the street to the

25  Atlantic Terminal.

Opening Statement - Smith                    42

1       And why does he want to go to the Atlantic Terminal?

2   Because the Atlantic Terminal is a transit hub for multiple

3   subway stations and the Long Island Railroad.  It's a good

4   place to disappear when you're running away from the cops.

5       When plaintiff runs across Flatbush Avenue, he darts

6   out of the way of another car and he doesn't see

7   Officer Belardo's car.  But Officer Belardo sees the plaintiff

8   and she slammed on her brakes.

9       Plaintiff, however, is so busy trying to make his

10  escape, that he doesn't see the car.  When he does see the

11  car, he tries to jump over the hood; but we aren't in the

12  movies and instead of making that cool jump and slide across

13  the hood of a car that we've all seen movie stars do, the

14  plaintiff ends up getting clipped by the front passenger side

15  of the car, and falls to the ground, while Officer Belardo is

16  hitting her brakes.

17      That's when Officer Taqi catches up to him.

18  Officer Taqi is able to put one handcuff on the plaintiff, but

19  the plaintiff isn't done avoiding his arrest.  So Officer Taqi

20  tries to place the other handcuff on the plaintiff, but the

21  plaintiff continues to resist.

22      This time, he's flexing and stiffening his arm to

23  avoid being handcuffed.  And you'll hear that this makes it

24  very difficult to arrest someone, especially if that someone

25  is a weight lifter, like the plaintiff was around this time.

Opening Statement - Smith                                43

1        Eventually, Officer Taqi is able to pull the

2   plaintiff's arm out from underneath his body and place him in

3   handcuffs.  And finally, Officer Taqi is able to arrest him.

4        After the plaintiff is in police custody, he was

5   escorted to the 84th Precinct by Sergeant Mercado and

6   Officer Belardo.  At the precinct the plaintiff complained of

7   feeling dizzy.  Well, he has asthma.  And he complained about

8   some cuts and scrapes.  That's consistent with someone who

9   fell to the ground and resisted arrest.

10        Regardless, the plaintiff was taken to Brooklyn

11   Hospital where he was evaluated, given a Tylenol and released

12   after only two hours, which is consistent with what actually

13   happened.  But not consistent with the story that the

14   plaintiff is trying to tell you.

15        THE COURT:  Ms. Smith, let's just stick to what

16   happened, according to defendants, that the evidence will

17   show.

18        MS. SMITH:  The plaintiff's medical records from

19   Brooklyn Hospital immediately after this incident, show that

20   the plaintiff made no complaints of back pain; made no

21   complaints of shoulder pain; made no complaints of losing

22   consciousness or blacking out; and made no complaints about

23   being punched in the head, as he's now attempting to claim.

24        As you listen to the evidence, we ask that you keep

25   in mind the timing of plaintiff's injuries, of his alleged

1   injuries.  For example, the day after this incident, the

2   plaintiff reached out to his primary care provider and he

3   didn't mention anything about the officers using force against

4   him, or that the police hit him.  He doesn't even mention

5   being hit by a car.  He only asks about his asthma medication.

6           Another example of timing is that the plaintiff

7   doesn't go to his doctor until a month-and-a-half later, and

8   then, a month after that, he files a notice of claim, which is

9   his notice of intent to bring this lawsuit.

10          Ladies and gentlemen, after hearing and seeing all

11  of the evidence, you will be instructed on the law for

12  excessive force; but we ask that while you listen to this

13  evidence, that you keep in mind that a police officer has the

14  right to use reasonable force to effectuate an arrest.  Don't

15  let the plaintiff run all the way to the bank for running from

16  his arrest.

17          THE COURT:  All right.  Thank you.

18          Plaintiff's first witness.

19          MR. ANTOLLINO:  Your Honor, at this time I'd like to

20  play the video of Ashley Holloway, and at times there are

21  exhibits that are marked and entered that I would ask at that

22  point to pause and publish them to the jury.  And I will do

23  that at each time it happens.

24          THE COURT:  First you have to get the exhibit into

25  evidence, and then if you want to pause, show it to the jury,

1    you can proceed.

2              Let's just proceed.

3              MR. ANTOLLINO:  All right.  We will proceed.

4              I think that Holloway establishes a foundation, but

5    we will proceed.

6              Okay.  This Court has excellent technology.  All

7    right.

8              Is there anyone who can't see?

9              (Video deposition of Ashley Holloway played for

10   jury.)

11             (Video paused.)

12             MR. ANTOLLINO:  Your Honor, you asked me to not

13   include all of the exhibits; just to take one or two.

14             THE COURT:  Mr. Antollino, the discussions that I

15   have with the attorneys about evidentiary matters prior to

16   trial, really should not be aired before the jury.  They are

17   just here to determine the facts not, the law.

18             MR. ANTOLLINO:  I understand that.  Okay.  So I will

19   just keep playing.

20             (Video resumes.)

21             MS. DEPOIAN:  Objection, Your Honor.

22             THE COURT:  Sustained.  Sustained.

23             Mr. Antollino, stop the tape, please.

24             MR. ANTOLLINO:  Sorry.

25             THE COURT:  Let me see counsel at side-bar, please.

Opening Statement - Smith                                          46

1          (Side-bar conference held on the record out of the

2    hearing of the jury.)

3

4          (Continued on following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VB        OCR        CRR

47

1              (Videotape of deposition of Ashley Holloway

2     playing.)

3              MS. DEPOIAN:  Objection, Your Honor.

4              THE COURT:  Sustained.

5              (Video paused.)

6              THE COURT:  Let me see counsel at sidebar.

7              (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        Sidebar                    48
```

1           (Sidebar held outside the hearing of the jury.)

2           THE COURT:  Didn't I rule this portion was excluded?

3           MS. DEPOIAN:  That's our objection.

4           MR. ANTOLLINO:  You ruled that this portion was

5     excluded?

6           THE COURT:  Yes.

7           MR. ANTOLLINO:  I tried my -- I spent six hours

8     trying to --

9           THE COURT:  I don't care how much time you spent.  I

10    ruled this was excluded.

11          MR. ANTOLLINO:  I can't remember what she was

12    talking about.  I can't even remember what she was talking

13    about.

14          THE COURT:  What's the next part that is included?

15          MR. ANTOLLINO:  Why didn't you tell me?

16          THE COURT:  She is not allowed to talk to you and

17    you are not allowed to talk to her on the record, is that

18    clear?

19          MS. DEPOIAN:  The next portion comes from page 396

20    of the deposition.

21          THE COURT:  This whole thing is going very badly.

22    It has many problems.  First of all, no one can understand the

23    questioner on either side.  It is all garbled.  It is a poor

24    quality video that you have uploaded to YouTube, apparently,

25    so it is impossible to understand the questions.  Some of the

Sidebar                                          49

1   answers we can understand.  When you use the video transcript,

2   you hand out to the jury, as an aid to their understanding,

3   the transcript redacted to include only those portions that

4   are being offered into evidence and then the video stops and

5   starts at the next place in the redacted transcript.  I'm not

6   sure how we deal with this because you playing the video with

7   no transcript aid and my not having confidence that you have

8   excluded the portion that I have excluded, how do we know

9   where we are?

10           MR. ANTOLLINO:  May I address counsel?

11           THE COURT:  No.

12           MR. ANTOLLINO:  They have noted one thing.

13           THE COURT:  How are you going to skip ahead to the

14   next thing that is included.  How do you know where that is on

15   the video?

16           MR. ANTOLLINO:  I think that I can skip ahead

17   because I know where it ends.

18           THE COURT:  I am going to let the jury go home early

19   now unless you have any other evidence that you would like to

20   interrupt this for and we can do another witness or something

21   else you want to do, because you need to go back and make sure

22   this video only contains portions that I have not excluded.

23           MR. ANTOLLINO:  Okay.

24           THE COURT:  I am not confident that you have done

25   that and we can't do that while keeping a jury waiting.

```
                        Sidebar                        50

1          MR. ANTOLLINO:  I might as well start with Lerin

2   Pierce.

3          THE COURT:  That's a good idea.  Let's try to use

4   the time.

5          MR. ANTOLLINO:  Okay.

6          (Sidebar concluded.)

7          (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Proceedings                                              51

1          THE COURT:  Ladies and gentlemen, one of the things

2    that you learn in a trial, it is not like a Broadway play, it

3    is not perfectly choreographed like everything is supposed to

4    go.  We are going to need to make some edits to this

5    transcript overnight, so we are going to interrupt this

6    testimony and start the plaintiff's next witness so we can use

7    the time while we are all here.

8          Go ahead, Mr. Antollino.

9          MR. ANTOLLINO:  Thank you, Your Honor.  I apologize

10   for the mishap.

11         THE COURT:  That's all right.

12         MR. ANTOLLINO:  Mr. Pierce, would you like to take

13   the stand, please.

14         Judge, can we take a five-minute break before Mr.

15   Pierce takes the stand?

16         THE COURT:  Okay, ladies and gentleman, let's take

17   five minutes.  Please remember don't talk about the case

18   amongst yourselves.  We will see you back here at 3:30.  Thank

19   you very much.

20         (Jury exits the courtroom.)

21         THE COURT:  Okay, 3:30.

22         MR. ANTOLLINO:  Thank you, Judge.

23         (Recess taken.)

24         THE COURTROOM DEPUTY:  All rise.

25         (In open court - jury not present.)

Proceedings                                                52

1          THE COURT:  My deputy had notified the parties

2    previously that if the parties wanted to speak to me, they

3    should let her know before we line the jurors up in the hall.

4    The jurors are now lined up in the hall, at which point my

5    deputy was told that Mr. Antollino wants to speak to me.   So

6    let's try to be quick, Mr. Antollino, so we don't take the

7    jury's time.

8          Why are you coming up here?

9          MS. NANAU:  I would like to approach, Your Honor,

10   because I would like to show you something.  The plaintiff had

11   this picture or a wheel at his deposition, which was an

12   accommodation for him to make him feel less tense and nervous.

13   He focused on this wheel, which is something that his

14   psychotherapist has suggested that he do when he has to cope

15   with situation that he is not prepared to cope with that well.

16         THE COURT:  What is it that you are asking from me?

17         MS. NANAU:  May he have the cell phone to look at

18   the wheel while in court?

19         THE COURT:  Is there any objection?

20         MS. DEPOIAN:  We were presented with this about five

21   minutes ago.

22         THE COURT:  It is outrageous that you didn't tell

23   the defendants about this.  They might have taken discovery on

24   this.

25         MR. ANTOLLINO:  Well, we gave it to them.  We didn't

MDL   RPR

Proceedings                                          53

1    know Vanessa Trujillo would violate subpoena.

2              THE COURT:  First of all, if he uses it, it is up to

3    the defendants whether or not there's an explanation as to why

4    he is using it.  I am not going to allow you to have him

5    testify as to the hearsay of this therapist saying she told

6    him to use that.  All right.  If we allow it, it is simply

7    because this is a gentleman who requires an accommodation,

8    which no one knew until right now.

9              MS. NANAU:  Your Honor, I would just point out that

10   he had this accommodation at his deposition and the defendants

11   did not object.

12             THE COURT:  It is a deposition.  This is the trial.

13   There is a difference.

14             MR. ANTOLLINO:  We also gave it to them.  Anyway.

15             THE COURT:  If we allow him to use this, do the

16   defendants want it brought out as to why he is using it?

17             MS. SMITH:  Your Honor, we have concerns that the

18   plaintiff will be reading from it, as he was during his

19   deposition.

20             THE COURT:  It looks like a design to me.  It

21   doesn't look like it has English words on it.

22             MS. SMITH:  It does, Your Honor, emotional

23   breakdowns with words of how to describe emotional --

24             THE COURT:  Can I see it, please?

25             Counsel is handing me the iPhone with a picture on it.

Proceedings                                      54

1          I really would like to accommodate a witness who has

2     a mental disability, but without an earlier hearing on this,

3     there are all kinds of words on what is called an emotional

4     wheel.  It has at the center anger, disgust, sad, happy

5     surprised, fear.  It then spreads into a second level of wheel

6     with another 20 or 30 words on it about reactions to have, and

7     then it has a third wheel with even more emotions expressed on

8     it.

9          If I could make a finding that it was a legitimate

10    aid to the witness based on psychological testimony, I might

11    allow it, but I cannot allow it in the abstract,

12    unfortunately, because I was given no notice of it, so the

13    request is denied.

14              MR. ANTOLLINO:  Thank you, Judge.

15              THE COURT:  Let's have the jury, please.

16              MR. ANTOLLINO:  You understand why we couldn't have

17    brought it up earlier?

18              THE COURT:  No, I don't.

19              MR. ANTOLLINO:  Ms. Trujillo didn't show up.

20              THE COURT:  You could have done a motion in limine.

21    I don't think I would have let her testify to that anyway.

22              MR. ANTOLLINO:  Okay.

23              THE COURT:  I don't know if I would have let her

24    testify to it or not, but since I never got any notice of it,

25    I never had the chance.

1          (Jury enters the courtroom.)

2          THE COURT:  Please be seated.  Let's proceed with

3    plaintiff's testimony.

4          MR. ANTOLLINO:  Your Honor, Mr. Lerin Pierce would

5    like to take the stand now for the rest of the day.

6          THE COURT:  Okay.

7          THE COURTROOM DEPUTY:  Mr. Pierce, you could come

8    forward.  Please raise your right hand.

9          (LERIN PIERCE was sworn/affirmed by the Clerk.)

10         MR. ANTOLLINO:  May I?

11         THE COURT:  Please.

12   DIRECT EXAMINATION

13   BY MR. ANTOLLINO:

14   Q    Good afternoon, Mr. Pierce.  How are you feeling?

15   A    Good afternoon.

16   Q    Are you comfortable?

17   A    Yes.

18   Q    Would you like some water?  There's water there if you

19   need any.

20         Let's jump into your move to New York City.  Why did

21   you move from Florida to New York City?

22   A    The first time I moved to New York City, I moved to

23   complete an internship, to graduate college.

24   Q    What college was that?

25   A    University of Florida.

Pierce - direct - Antollino                    56

1   Q    Any particular branch?

2   A    Say it again, please.

3   Q    Any particular branch of that university?

4   A    I was a sports management major in the College of Health

5   and Human Performance.

6   Q    And when you completed your internship, did that allow

7   you to graduate?

8   A    Yes, it did.

9   Q    What degree do you have?

10  A    Bachelor of Science Degree in sports management with a

11  minor in African-American studies.

12  Q    Now, after you got your degree, what did you do as far as

13  your physical location?

14  A    Well, I got my degree and I stayed in New York for about

15  eight months looking for a job, but the economy was bad and

16  the City of New York was not hiring at the time, so then I

17  moved back home to Fort Meyers, Florida.

18  Q    I am going to ask you to talk a little slower, so that

19  everyone can understand.

20  A    Sorry.

21  Q    I can understand you, but the slower the better.

22       Now, all right, so, you went back when the economy

23  was bad and you were in Florida for how long after that?

24  A    About a year.

25  Q    Okay.  And did there come a time that you were prompted

1    to move to New York City again?

2    A     Yes.  I moved back to New York City in 2013.

3    Q     Was there a reason for that?

4    A     Yes.  Two big reasons:  I met my girlfriend, fell in

5    love, and I took a job with the City of New York.  They

6    finally hired me.

7    Q     Where did you meet -- so I assume this girlfriend is

8    Ashley Holloway?

9    A     Ashley Holloway, yes.

10   Q     And where did you meet her?

11   A     I met her at homecoming in Tallahassee, Florida.

12   Q     Homecoming for which university?

13   A     Florida A&M.

14   Q     And was she living in Tallahassee at the time?

15   A     No.  No.  We met and, ironically, she was living in New

16   York at the time and I had just moved from New York.

17   Q     Did you immediately follow her to New York?

18   A     No, not immediately.  We carried a long-distance

19   relationship for about a year and I visited -- I mean, I lived

20   in New York before, so I visited quite often, about every two,

21   three months I would come see her.

22   Q     Okay.  And did there come a time that you moved

23   permanently to New York?

24   A     Yes.  A couple months before November, I was on

25   interviews for the City of New York and I kind of stayed

1  around and I ended up getting a job, so I decided to make the

2  official move.

3  Q    With what entity of the City of New York did you get a

4  job?

5  A    Parks & Recreation Department.

6  Q    Was there anything in particular you were hired to do

7  there?

8  A    I was first hired as a recreations specialist.

9  Q    What does a recreations specialist do?

10 A    City programming.  We supervise the gym on forest city

11 policies.  We have after-school programs.  We have different

12 fitness programs from all age ranges, from zero to

13 twenty-four, to adults, senior citizens.  So, basically, just

14 a lot of recreation programming, sports, day to day at a

15 recreation center.

16 Q    Was it a physical job?

17 A    Part of it.

18 Q    Okay.  And what borough were you stationed in?

19 A    Queens.

20 Q    Did you work with any segment of the population?

21 A    All populations.

22 Q    So are you and Ashley still involved?

23 A    No, we're not.

24 Q    When was the official break up?

25 A    Officially, January 1, 2016.  January 1, 2016.  No, 2000

Pierce - direct - Antollino                           59

1   -- 2015 or '16, I believe.

2   Q    So a few months after she left for Arkansas?

3   A    Yes.  We started January 1st, 2015, the New Year.

4   Q    Did you remain in a relationship with her for the period

5   of time when you were in New York and she was in Arkansas?

6   A    Yes, we did.

7   Q    Did you intend, notwithstanding her move, to maintain the

8   relationship?

9   A    Yes.  That was the plan.  I was going -- we were actually

10  deciding on where the next move would be, whether it be to

11  Atlanta or whether it be to Arkansas, where we had a good job

12  offer and I was soon to follow later on after I had, you know,

13  applied for jobs and whatnot.

14  Q    Okay.  And so I guess things changed?

15  A    Yes.

16  Q    We don't have to get into why, but did you remain friends

17  for a while thereafter?

18  A    After our break up?

19  Q    Yes.

20  A    Yeah, we did.

21  Q    You had mentioned Atlanta.  What does Atlanta -- why was

22  Atlanta mentioned?

23  A    She had lived in Atlanta before, when she did her

24  internship, before she moved to New York, so she was familiar

25  with the area and it was a consideration that we would

Pierce - direct - Antollino                    60

1  consider Atlanta and move to Atlanta because that's where my

2  son had been living for the past year or so.

3  Q    All right.  And your son is in whose custody?

4  A    Well, I share custody with my son, but he lives in

5  Atlanta with his mother.

6  Q    All right.  And how do you share custody?

7  A    Well, right now, since she is primary parent and he has

8  to be in school, I get summers.  I visit quite often.  He

9  comes here for spring break and anything we basically, you

10 know, discuss within the lines.

11 Q    Okay.  Now, let's talk about sports a little more.  Did

12 you ever play flag football?

13 A    Yes.

14 Q    You know, it may be that some jurors don't know what flag

15 football is.  So would you describe briefly what it is?

16 A    Flag football is a bunch of chaos.  Flag football

17 consists of two teams, like seven-on-seven, and you have flags

18 around your waist because it is a non-contact sports, and

19 basically you have a quarterback err and a hiker, and you have

20 receivers and you have a defense.  And basically it's just

21 intramural non-contact sport that is played with the

22 traditional football rules of college, high school or NFL.

23 Q    Was there a reason that you got involved in flag

24 football?

25 A    Yeah.  I mean, I played a lot of football in high school,

Pierce - direct - Antollino                    61

1   but Ashley, she's a really outdoorsy person.  She loves

2   physical activity.  And, so, her and a couple of her friends

3   from her alma mater and a fraternity she's a part of, they run

4   the flag football team, more so a social thing, they take

5   states for competition, so I would go be part of her friends

6   and, you know, the thing that she likes doing.

7   Q    Okay.  And did there come a time that you ever suffered a

8   knee injury while playing flag football?

9   A    Yeah.  Like I said, it is a bunch of chaos.  There's fun

10  people.  If they have no football experience as well, they

11  just -- you know, you get knocked around.  People falling

12  down.  So I had someone fall on my leg during one game and,

13  you know, kind of sprain my knee a little bit.

14  Q    All right.  Was it a serious injury?

15  A    No, it wasn't serious.

16  Q    Do you know how long it took to heal, if it did?

17  A    A couple days before I could walk on it.  I was fine

18  after icing it, icing, elevation, so by the next time the next

19  game came around or practice, I was fine.

20  Q    Now, you heard my opening statement.  I believe that just

21  before your arrest you went to your doctor to complain about a

22  back pain; is that right?

23            MS. DEPOIAN:  Objection.

24            THE COURT:  Overruled.  You went to the doctor,

25  right?

Pierce - direct - Antollino                    62

1          MR. ANTOLLINO:  Yes.

2          THE WITNESS:  Yes, I did.

3          THE COURT:  Next question.

4     Q     Did you want any extensive treatment for that --

5     withdrawn.

6          Was there any particular exam or test that you

7     wanted for that back pain?

8     A     There was.  I was explaining I was feeling a lot of

9     tightness and my hamstrings were tight.  I was seeing someone

10    about my abdominal area from doing sit-ups and stuff, and, so,

11    I just had a complaint, and they basically said I just need to

12    take it easy, I need to stretch more before I do stuff.  That

13    is what he emphasized a lot on.

14         I just really wanted to be get more in-depth and I

15    asked him should I get an MRI or something because it is just

16    really annoying me.  He just said no, you probably just need

17    some muscle relaxer and to take it easy and stretch.  I have a

18    bad habit of just not wanting to stretch before I do stuff.

19    So that was basically from there.  He prescribed me muscle

20    relaxer and said if I wanted to, I could go see a physical

21    therapist and he gave me a referral for that.

22         (Continued on following page.)

23

24

25

Pierce - direct - Antollino                    63

1  (Continuing)

2  Q    Okay.  And did you -- who was this doctor?

3  A    I honestly don't recall his name.

4  Q    Okay.  Did you have a regular doctor that you see?

5  A    Yes.  I have a regular primary care physician.

6  Q    It wasn't this regular primary care physician?

7  A    No.  My primary care physician, he wasn't -- he's

8  actually located in the Bronx most days, and so I went to this

9  health center, and he was not in for a couple of weeks.  So I

10 had to wait to go see him.

11 Q    So did you follow the other doctor's advice and stop

12 working out for a while?

13 A    Yes, I toned it down some.  I just took easy.

14 Q    All right.  And the stretching?

15 A    I stretch more.  I did a whole session of stretches.

16 That's probably basically what I would have did at physical

17 therapy.  That's why I felt the need to not go.  It wasn't

18 that serious.  I just wanted to be sure myself before I

19 continue.

20       I mean, I have a history of being a personal

21 trainer, working with clients.  So I like to just be safe and

22 make sure nothing's wrong before I, you know, continue to work

23 out as I do.

24 Q    Is your clients that you had at the City Department of

25 Parks or private clients?

Pierce - direct - Antollino                    64

1   A    Well, at this -- at that time, I was at the rec center.

2   So these are members of the community.

3          My prior engagement with physical fitness was at

4   New York Sports Club as a personal trainer, so.

5   Q    All right.

6   A    I just know when to, you know, be cautious about

7   something.  If an injury nags you for a couple days, you

8   should just go get it checked out.

9   Q    What is it that you learned that --

10          MR. ANTOLLINO:  Withdrawn.

11  Q    Did you learn that from somewhere?

12  A    Did I learn what, about?

13  Q    What you just said.

14  A    Yeah, from playing sports.  Playing sports in high

15  school.  Having little, small injuries.  My training to become

16  a physical therapist.  Advice I give clients.  You make sure

17  that they leave and they are not hurt or injured.  That's

18  basically the main priority.

19          You don't want to injure your clients and you want

20  to teach them to lift properly and safely.  So any time

21  there's a pain that consists of more than two days, whether

22  it's small, you should get it checked out.  And so that's

23  basically what I was doing.

24  Q    Okay.  So, unlike other people, like perhaps myself, if

25  you were to weigh on to whether to go to the doctor or not,

VB        OCR        CRR

Pierce - direct - Antollino                                    65

1   you would definitely go; would that be a fair statement?

2          MS. DEPOIAN:  Objection.

3          THE COURT:  Sustained.

4          MR. ANTOLLINO:  All right.  Withdrawn.

5   Q    Would it be fair to say that it is important for you to

6   have a doctor examine you?  Question mark.  That's the end of

7   the question.

8          MS. DEPOIAN:  Objection.

9          THE COURT:  Sustained.

10          MR. ANTOLLINO:  All right.

11  Q    Explain the importance, if there is any, to the jury, of

12  seeing a healthcare provider to take care of your body and/or

13  mind.

14          MS. DEPOIAN:  Objection.

15          THE COURT:  Sustained.

16          MR. ANTOLLINO:  All right.

17  Q    So you went to see this doctor, who was not your primary

18  care physician, and where was that located?

19  A    Around 14th Street.  Union Square is the facility over

20  there.  I think the exact address is on 16th Street, but I'm

21  not for sure; but my primary care physician a couple days out

22  of the week, he does go to that center.

23  Q    All right.  And that is, what is that center called?

24  A    On 16th Street?

25  Q    Yes.

Pierce - direct - Antollino                    66

1    A     I can't think of the name right now.

2    Q     Is it part of a bigger organization?

3    A     Repeat the question, please.

4    Q     Is it part of a bigger organization?

5    A     Yes, yes.  Family --- the Institute of Family Health.

6    Q     Okay.  So it's another -- so the Institute of Family

7    Health has different locations?

8    A     Yes.

9    Q     All right.  And you usually see -- what is the name of

10   your primary care doctor?

11   A     Dr. Kwame Kitson.

12   Q     And you usually see Dr. Kitson in the Bronx?

13   A     Yeah, in the Bronx, or he's at the facility a couple days

14   a week.  So when I was in Brooklyn, it was actually easier to

15   see him in the Union Square facility.

16   Q     Okay.  But it was important for you on August 29th to see

17   someone, whether it was Dr. Kitson or not?

18   A     Yes.

19   Q     All right.  And it was important to see someone, no

20   matter the location.

21   A     Right.  Someone who I normally go to in the center and

22   they take my insurance, so.

23   Q     What kind of insurance did you have at the time?

24   A     At that time I had Health Plus, which was under -- and I

25   still don't know this -- I'm sorry.  It was either under

Pierce - direct - Antollino                    67

1   Medicare or Medicaid, one of the two; but it was basically

2   Health Plus insurance.

3   Q    All right.  I think Medicare --

4        MR. ANTOLLINO:  Well, withdrawn.

5   Q    Were there any problems you had with that insurance?

6        MR. ANTOLLINO:  And this will come up later, Judge,

7   since we're on the topic, if I may.

8   A    Any problems I had with the insurance?

9   Q    Did you have any problems with Health First?

10       MS. DEPOIAN:  Objection.

11       THE COURT:  Sustained.

12       MR. ANTOLLINO:  All right.

13  Q    Okay.  So other than the muscle relaxants, did you do any

14  other drug therapy in August of 2014?

15  A    No.

16  Q    All right.  Now, I believe that you heard -- and

17  Ms. Smith say, and it's not evidence, but let's explore it --

18  that on September 2nd you called Dr. Kitson for a refill of

19  your asthma medication.  Is that a correct statement?

20       MS. DEPOIAN:  Objection.

21       THE COURT:  Sustained.

22       MR. ANTOLLINO:  All right.

23  Q    Did you call Dr. Kitson on September 2nd, 2014?

24  A    I sent him an E-mail --

25  Q    Okay.

Pierce - direct - Antollino                                68

1   A     -- message.

2   Q     All right.  And what -- and do you have asthma?

3   A     Yes, I do.

4   Q     Okay.  If you don't have your asthma medication with you

5   at any time, what are the risks?

6   A     There are a number of risks; shortness of breath.  I can

7   be extreme, I mean, you could die from not having your asthma

8   inhaler.  I'm not saying it was that serious; but

9   September 2nd, I asked him to send a script to the pharmacy so

10  I could pick it up, because prior to that, the incident that I

11  got in, I did not have my asthma inhaler and I was having

12  complications.  I needed him to send a prescription in, along

13  with a refill of the muscle relaxer, until I could see him.

14  Q     So it was not just the asthma medication that you asked

15  for a prescription; it was also the muscle relaxer.

16  A     Yeah.  I asked for some pain meds, muscle relaxer, and my

17  asthma medicine until I would be able to see him.  I tried to

18  book an appointment with him and again, he's booked a lot, but

19  he's in the Bronx and he's in that location, and I believe

20  they said it would be a few weeks before I was able to see

21  him.  So I sent him an E-mail to, you know, take care of me

22  before that time.

23  Q     All right.  So you sent him an E-mail for the medications

24  and to make an appointment; correct?

25  A     Yes.

VB        OCR        CRR

Pierce - direct - Antollino                    69

1   Q    And it was not just for your asthma medication; correct?

2   A    That's correct.

3   Q    All right.  Nevertheless, your asthma medication is very

4   important to your health; correct?

5   A    Correct.

6   Q    All right.  Now, let's get to the main event.

7         It's September 1st, 2014, and I assume since you are

8   a City employee at the time, you had the day off?

9   A    That's correct.

10  Q    Okay.  So what did you do?  Let me ask you this first.

11  Do you remember what you did when you woke up on that day?

12  A    On that day?

13  Q    It's just do you remember, and it's yes or no.

14  A    Oh, I woke up.  I was definitely with my girlfriend at

15  the time, Ashley.

16         THE COURT:  Mr. Pierce.

17         THE WITNESS:  Yes, sir.

18         THE COURT:  He just wanted to know if you remember

19  waking up that day.

20         THE WITNESS:  Oh.

21  A    Yes.  I do remember waking up that day.

22  Q    All right.  Now, we've heard some statements, some in

23  evidence, some not, that you went to a Radio Shack.

24         Do you recall anything significant that happened in

25  between getting up on that day and going to the Radio Shack?

Pierce - direct - Antollino                          70

1    A    Anything significant?

2    Q    Anything significant.

3    A    No.

4    Q    Okay.  So why did you want to go to the Radio Shack on

5    September 1st?

6    A    Well, my initial day was to go to the AT&T store, go by

7    Chase Bank and then go to Target and Best Buy.  That's in the

8    plaza in downtown.

9         So as I got out the train station, I was walking by

10   the Radio Shack store and I saw closing signs, closing out,

11   things marked down.  So I decided to stop in for a second.

12   Q    Okay.  So you didn't have a plan to go to Radio Shack?

13   A    No.

14   Q    But you saw the signs and so you saw the signs that led

15   you inside?

16   A    Yes.

17   Q    Okay.  Do you remember what train you got off of?

18   A    I was taking the A train.  I got off at the

19   Jay/MetroTech.

20   Q    Okay.  And that's not far from the Fulton Mall where the

21   Radio Shack was?

22   A    Correct.

23   Q    So when you walked into the Radio Shack, what can you

24   tell the jury about what happened?

25   A    When I got -- when I got off the train and went inside

VB        OCR        CRR

Pierce - direct - Antollino                                    71

1    the Radio Shack, I walked in.  I knew what I wanted to look

2    at.  I wanted to look at iPhone casings and iPhones.  So I

3    walked in the store.

4            There was a member there just basically kind of

5    propped up on one of the aisles.  I walked in.  I didn't

6    really speak.  I had my headphones on, so I acknowledged him

7    with a head acknowledgment, and I walked to where I found the

8    phone cases.

9    Q    Did he respond back to you in any way?

10   A    No.

11   Q    All right.  Was -- do you know the name of this person

12   now?

13   A    Yes.  I know his name now.  Sharoon Samuels.  He's the

14   manager of the store.

15   Q    All right.  I believe it's Samuel, not Samuels, but

16   that's neither -- not the most important thing.

17           The -- I said in my opening statement that you had

18   already purchased an iPhone.  So I guess I was incorrect in

19   that statement?

20           MS. DEPOIAN:  Objection.

21           THE COURT:  Sustained.

22           MR. ANTOLLINO:  All right.  Withdrawn.

23   Q    Was I -- did you not have an iPhone before walking in

24   there?  You were looking to buy both an iPhone and a charger?

25   A    That is correct.  I always had an iPhone.  It's just I

Pierce - direct - Antollino                    72

1   had recently lost my iPhone, and I just had a replacement

2   phone, and I was waiting for iPhones to go on sale, you know,

3   when one phone comes out, the other ones go on sale.

4            So I was looking to go to Target or Best Buy to get

5   a deal.  That was Labor Day.  They had sales on the phone.  So

6   it was time for me to upgrade, so I was basically looking for

7   an iPhone and to accompany it with an iPhone case.

8   Q     Okay.  And just a case or a charger?

9   A     The charging case, in particular.  That's what I was

10  looking at, yes.

11  Q     Okay.  And so you walked into the Radio Shack and

12  Mr. Samuel did not acknowledge you.  He was -- you said, he

13  was propped up against a wall?

14  A     Like against an aisle piece.  I don't know what it was,

15  but he was basically just standing there.  I mean, it was

16  pretty dead.  So he was just, you know, standing there in a, I

17  guess in a daze, I would best describe it.

18  Q     All right.  So in other words, when you say an aisle,

19  there were --

20  A     Basically how you're standing to the podium.  He was

21  basically leaning against the podium, just something like

22  that.

23  Q     Like this?

24  A     Basically, on the side.  Basically, yeah.

25  Q     And how many other workers were there?

Pierce - direct - Antollino                    73

1   A    One that I recall.  There was a female at the register.

2   Q    All right.  And other than her and Mr. Samuel, you don't

3   remember anyone else?

4   A    No, not any employees.

5            THE COURT:  All right.  Let me see counsel at

6   side-bar, briefly.

7            MR. ANTOLLINO:  Sure.

8            (Side-bar conference held on the record out of the

9   hearing of the jury.)

10

11           (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Side-bar.)

2          THE COURT:  I had ruled that in order for the jury

3    to have the background of why he was arrested, plaintiff could

4    give a brief version of his view of the events that led to the

5    arrest.

6          You are now asking questions about how many people

7    were in the store, and you are asking every detail about this,

8    and I do not see how that is relevant.

9          MR. ANTOLLINO:  I hear you.

10          THE COURT:  So get to the brief summary that gets

11    out his point that he was accused of stealing, but he did not

12    steal anything and then, let's get to what happened after

13    that.

14          MR. ANTOLLINO:  All right.  Thank you, Judge.

15          (Side-bar end.)

16

17          (Continued on following page.)

18

19

20

21

22

23

24

25

Proceedings                                      75

1              (In open court.)

2              MR. ANTOLLINO:  Okay.  May I call him Lerin or would

3    you prefer Mr. Pierce, Your Honor?

4              THE COURT:  That is up to you.

5              MR. ANTOLLINO:  Okay.

6    BY MR. ANTOLLINO:

7    Q    Lerin.  Let's fast-forward.

8    A    Okay.

9    Q    You find yourself looking at a phone charger?

10   A    Correct.

11             MS. DEPOIAN:  Objection.

12             THE COURT:  Overruled.

13   Q    And what happens then?

14   A    I was reading the back of one of the boxes and,

15   Mr. Samuel, the manager, came up to me and he's like, can I

16   help you with something?  Along those lines.  And I just shook

17   my head no.  I was reading the back of the box.

18             I shook my head no because initially, like I said, I

19   walked in the store, and I don't feel he acknowledged me, and

20   I was standing at the cases, as you described before.  Some of

21   them were -- well, all of them were locked up, except a few.

22   They were just laid on top of the -- a piece.  And so, it

23   wasn't the particular one I wanted, but it was explaining the

24   charging storage.

25             It was a case that had both a charger and storage

Proceedings                                              76

1  and I've never seen the storage iPhone case.  I don't even

2  know if they make them anymore, that would require storage.

3  But I was considering it and I'm reading the back of the box

4  and his demeanor, why he came up to me and approached me, I

5  felt, was kind of bashful.

6            There was another person in the store that he went

7  to go help that came in after me.  So I was just kind of

8  standing there.

9  Q    Want to kind of fast forward --

10 A    Okay.

11 Q    -- and get to the point where he walks up and says

12 something that you don't like.

13 A    Yeah.

14 Q    So --

15 A    Basically I'm reading the box, and he's like, so, can I

16 help you?

17           And I shook my head no.

18           And he's like, well, are you going to buy this or

19 are you going to steal this?

20           And I turned and looked at him and said, what?

21           He's like, yeah, I'm trying to figure out.  Normally

22 these things are locked up.

23           I said, well, this wasn't locked up and if you would

24 have came to help me, then you wouldn't have to have any

25 issues about questioning me like that.  I thought that was

Proceedings                                       77

1   rude.

2          He's like, well, are you going to buy it or not?

3          I said, you know what?  I wouldn't buy -- I said, I

4   wouldn't buy shit here.  I wouldn't buy shit from your store.

5          And he said, well, maybe you should leave then.

6          So I tossed it back on the shelf and I was walking

7   out, and he basically said, you know what?  You know what?  Do

8   me a favor, what's your name?  He asked me my name.  He kept

9   following me as I walked out.

10          Told him to leave me alone.  As I walked out the

11  store, I did flip him the bird; told him "F" you, and from

12  that point, he did the same thing.  He flipped me a bird and

13  he said, it's the way he said, he said, fuck you, too, fuck

14  you, fuck you.  And, you know, he was still in the store.

15          So there's glass.  So basically you can see him

16  from, I would guess, from about here to the end of this wall,

17  is how the glass is.  And he kind of like followed me as I

18  walked out, shoot me the bird saying, you know, loudly, you

19  know, fuck you; fuck you, too; fuck you.  Get out of my

20  fucking store.

21          And I put my headphones on and I went to the AT&T

22  store.

23  Q    All right.  And about how long were you in the AT&T

24  store?

25  A    About ten, twelve minutes.

Proceedings                                                              78

1   Q     All right.  And then you went, I believe, to a bank; is

2   that right?

3   A     Yes, I went to Chase Bank.  It's around the corner.

4   Q     Now, when you exited the Chase Bank, did something happen

5   that you did not expect?

6   A     Yes.  So when I got out of Chase Bank, I went to the

7   direction of Target and Best Buy, and Officer Mercado stopped

8   me.  I took my headphones out, because he startled me a little

9   bit, and he said, can I ask you a couple questions?

10          He asked me was I -- were you just in Radio Shack?

11   And I said yeah.

12          He said, okay.  He said were you stealing from the

13   Radio Shack?  And I said, no, no.

14          And I then, you know, thought about it and then I --

15   Q     Go slow.  Go slow.

16   A     And I asked him is this about the guy in the store?

17          And he's like, I just asking you some questions.  He

18   said, did you go in Radio Shack and you stole something?

19          I said no, I did not.

20          And he said, are you sure?  I got a call that you,

21   you, you, you took something and you took an item.

22          And I'm like, no.  I said, I was standing reading

23   the back of the box, and this guy came up to me rudely.

24          And he said, well, yeah, you took it, because you

25   were going to take it.

VB        OCR        CRR

Proceedings                                              79

1          And I said, no, no.  That's not what I just said.  I

2    said, I took the item off the shelf and I was reading the back

3    of the box, and he came up to me -- the manager came up to me

4    and he was rude to me.

5          And me and him kind of went back and forth on, you

6    taking the item?  Yeah, because you were going to take it.

7          So I changed tape.  I said, okay.  So I removed the

8    item and I was looking at it.  He was basically saying, yeah,

9    yeah, you took it.  You're going to take it.

10          And he asked could we step to the side and talk a

11   second.

12   Q    When you say step to the side, what do you mean?  Step to

13   what side?  Where were you at this time?

14   A    We were basically in the middle of the sidewalk by about

15   five feet from the -- there's a subway station right there.

16   Chase Bank.  There's a CVS.  It's Con Edison.  So I was about,

17   I don't know, say 20, 30 yards from the Chase Bank.  And we

18   were in the middle of the sidewalk and, you know, people were

19   coming by.

20          So he asked could we step to the side and talk for a

21   second.  I said, sure.

22   Q    All right.  So you had no problem talking to this police

23   officer?

24   A    Under the conditions, no.

25   Q    All right.  And were you aware that you had the right not

Proceedings                                    80

1    to speak to him?

2              THE COURT:  Mr. Antollino.

3              MR. ANTOLLINO:  All right.  Withdrawn.

4              THE COURT:  Let's go on to what happened next.

5

6              (Continued on following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   DIRECT-EXAMINATION (Continuing)

2   BY MR. ANTOLLINO:

3   Q    The next thing that happened is -- well, let me ask you

4   this, how many people are in the immediate vicinity of you and

5   Sergeant Mercado?

6   A    How many people?  How many?  How many patrons?

7   Q    There is you, Sergeant Mercado.  Was there anyone else?

8   A    Yes.  There was sergeant -- not sergeant, but Officer

9   Belardo, and then there was the actual AT&T manager.  While me

10  and Sergeant Mercado was talking, he, from behind me,

11  interrupts and he said yes, yes, he was going to steal this,

12  he was going to steal this.

13  Q    When you say AT&T manager, did you mean --

14  A    The Radio Shack manager, I'm sorry.

15  Q    So no ATT&T manager came out?

16  A    No.

17  Q    What about Officer Belardo, was she there?

18  A    Yes.  She was behind me as well, at a distance between I

19  and the Radio Shack manager.

20  Q    Were they in uniform?

21  A    Yes.

22  Q    All right.  And Officer Taqi arrived how?

23  A    So we were on the side talking and we were basically

24  going in a circle in a dispute.  We were basically -- I was

25  basically trying to point out to them the manager's

Pierce - direct - Antollino                          82

1    contradiction in his story about me taking something from the

2    store, and one of my complaints was it's in his hand to begin

3    with and I had my red backpack on and they asked me and I let

4    them look in my red backpack.  And then there was a question

5    about going to the store to look at tapes.  And then we

6    continued to go in a circle, and I asked them why did I need

7    to be handcuffed to go to a store and look at a tape when he

8    just -- when you just basically caught him in a lie.  I mean,

9    you just basically resolved the situation.  And I asked

10   Officer Belardo, because she seemed to be the one who had

11   reasonable skills.  She asked the guy the question.  So when

12   he got the item back or when he gave the item or whatever he

13   did, he tossed out of the store, were you guys in the middle

14   of the store or were you guys by the door, and the Radio Shack

15   manager basically admitted we were still in the middle of the

16   store talking, and then I left.  And so from there, I still

17   questioned the officers and asked them why -- why were you --

18              THE COURT:  Mr. Antollino --

19   Q    All right.  Now, there was some suggestion --

20              THE COURT:  Just hang on a minute.

21              Mr. Pierce, I am cutting you off a little and it has

22   nothing to do with you.  I understand you're not a lawyer.

23   You don't know the rules that we operate under.  So don't

24   think anything of that.  Mr. Antollino knows what comes next,

25   so I am just helping him to get there.

Pierce - direct - Antollino                    83

1          MR. ANTOLLINO:  I'm just trying to --

2          THE COURT:  Okay.  Go ahead.  Next question.

3   Q    This is a discussion you're having.  About how long did

4   it take?  We don't want to spread it out to the jury, about

5   how long did this discussion go on?

6   A    About 15 minutes or more.

7   Q    All right.  Now, when you talked about going to the

8   store, was there any particular way they offered to take you

9   to the store?

10  A    They said we're going to cuff you, and I asked well,

11  well, well, why, if what he just stated to you, if you're

12  going to see the same thing on camera, you're not going to see

13  me taking an item, why are you trying to handcuff me?  Are you

14  trying to arrest me?  It just did not seem right, feel right,

15  especially with a guy basically saying what he wanted --

16         THE COURT:  Hang on.  Stop that part.

17         Next question, please.

18  Q    Okay.  Did anyone ever say at that time you were under

19  arrest?

20  A    No.  My bag was searched and Officer Taqi came about --

21  Q    All right.  You have answered the question.  I am going

22  to cut you off because we have to move on, because we are not

23  suing the police for arrest.  Okay.

24         So, there came a time that you decided to leave; is

25  that right?

Pierce - direct - Antollino                                84

1    A    Yes.

2    Q    What was going through your mind at that time?

3    A    That there's no way that I'm going to get out of this.

4    They're trying to -- you know -- they're trying to, you know,

5    whatever, trick me and this makes no sense, it's -- I felt it

6    was -- it was bull crap.  I felt scared.  I panicked.  They

7    searched my bag.  I didn't know what more they needed to do

8    and -- except the fact that they were just going to, you know,

9    try to arrest me for no reason, and -- and at that time they

10   were -- there were several times that they were having

11   discussions and --

12                THE COURT:  Okay.  Hang on.

13                Let's go to the next question, please.

14                MR. ANTOLLINO:  Okay.

15                THE COURT:  Mr. Antollino, please help him a little

16   more.

17                MR. ANTOLLINO:  Sure.  I will.

18   Q    Okay.  So you decided to run; is that correct?

19   A    Correct.

20   Q    Okay.  And excuse me, so you ran, would it be fair --

21   well, does Fulton cross Flatbush?

22   A    Yes, but we were --

23   Q    So you ran from --

24                THE COURT:  Where did you run?

25                THE WITNESS:  I ran on Flatbush toward downtown, the

Pierce - direct - Antollino                              85

1   first street -- the first cross street was Livingston Street,

2   so I ran down Flatbush.  I passed Livingston Street and the

3   next streets were Lafayette, I believe.

4   Q    It doesn't really matter what the streets are.

5   A    I passed another street, but I ran towards the downtown.

6   Q    All right.  And you were on Flatbush when you were

7   running at this point?

8   A    Yes, on the right-hand side.

9   Q    And you are an athlete, so you were probably running

10  pretty fast?

11  A    I was scared, so I was probably running more fast than I

12  would normally.

13  Q    Okay.  And you, at some point, crossed -- or -- let me

14  just ask you.  Did you hear anything?

15  A    Midway down the street I finally heard sirens and then I

16  heard the -- I guess the drone noise.  That's not particularly

17  your traditional siren.  It's just like a horn or a drone.  I

18  don't know how to describe it.  But, basically, I heard sirens

19  and another cop car.

20  Q    And you heard -- okay.  Did this increase any feelings of

21  fear in your mind?

22  A    Yes.

23  Q    And did there come a time that you got to a point on

24  Flatbush where you crossed the street?

25  A    Yes.  I'd say about midway between the second street that

Pierce - direct - Antollino                86

1    I passed, which I believe was Lafayette, and the street that I

2    was coming up on was State Avenue, so I was more so like in

3    the middle of those cross streets.

4    Q    So why did you cross the street?

5    A    Ahead I saw just traffic and people.  To the right, I

6    couldn't run to the right because there was just businesses.

7    It was a long avenue of, you know, nowhere to go.  And to the

8    left, there was basically a dead day, if that makes any sense.

9    I saw an opportunity to cross the street.  And on the other

10   side, I just saw this construction site, a long green wall,

11   and I was just running.  I was just running across the street

12   to get to the other side of the street.

13   Q    Did you intend to escape through the subway?

14   A    No, not at all.  The subway is nowhere near to where I

15   was hit and any idea of that's where my next, you know --

16            THE COURT:  Okay, let's just move on, please.

17   Q    So you crossed the street, and how many cars were chasing

18   you?

19   A    There were two cars chasing me.

20   Q    Okay.  And were both of them marked cars?

21   A    No, they wasn't.

22   Q    Have you been able to find out who was -- let me ask you

23   this:  Was it Mr. Mercado and Ms. Belardo who were in the

24   marked car?

25   A    Yes.  They were in the police car, the marked car.

1    Q    Did you ever find out who was in the other unmarked car?

2         MS. DEPOIAN:  Objection.

3         THE COURT:  Sustained.

4    Q    How do you know the other car was an unmarked police

5    vehicle?

6    A    From the noise, again, the drone, the drone sound and how

7    it was trailing me.  It looked -- once you looked at it, it

8    looked like an unmarked car, tan in color, dark windows.  It

9    had the silver, I guess the grill on the front of the cars

10   that you see on a normal day when they pull someone over in

11   traffic.  But the way it was, you know, following me, it was

12   just on the inside lane, furthest to me, and it would just

13   speed up a little bit, make a noise and it would, you know,

14   fall back.

15   Q    All right.  So you -- could you describe to the jury what

16   this section of Flatbush Avenue was like with respect to the

17   lanes and the median, if any?

18   A    Yes.  There's a sidewalk and then there's the traffic

19   that was going with me.  There's three lanes, and then there's

20   a --  like I said, a median, yellow stripes that separate the

21   lanes.  And then on the other side, there are three more

22   lanes.

23   Q    All right.  So, there are at least five or six lane size

24   spaces?

25         MS. DEPOIAN:  Objection.

Pierce - direct - Antollino                    88

1              THE COURT:  Sustained.

2     Q    Okay.  Is it a wide street?

3     A    A pretty wide.  There's seven lanes, including the

4     median.  We were on the side of the median.

5     Q    All right.  Now, you crossed the street and you crossed

6     into the -- were you able to make it into the other side of

7     the street where -- let me back up a second.

8              When you were running down the street, were you

9     running in the direction of traffic?

10    A    No, I was running straight across the street.

11    Q    I know you were running across the street at one point,

12    but before you turned, were you running with traffic?

13    A    Oh, yes.  Correct.

14    Q    And then you crossed the street.  And did you make it

15    across the median into the other side of the street?

16    A    As I ran across the street, I made it to the other side

17    of oncoming traffic in the first lane.

18    Q    Okay.  And then what happened?

19    A    Then I was struck by a car, by the car that Officer

20    Belardo and Sergeant Mercado was in.

21    Q    And what about the tan car?

22              MS. DEPOIAN:  Objection.

23              THE COURT:  Sustained.

24    Q    What about the other car?  Did you see the other car at

25    that point?

Pierce - direct - Antollino                                    89

1   A    At what point?  When I was struck?

2   Q    Yes.

3   A    I didn't see the car when I was struck.  I saw the cars

4   as I ran across the street.  Like I said, the car was, you

5   know, basically there to contain me, I believe.

6              THE COURT:  Hang on.  Let's put another question.

7   Q    Don't make an assumption about what it was trying to do,

8   but it was behind the patrol car; correct?

9   A    No, the tan car was in front of the patrol car.  The tan

10  car was the car that was there and I crossed the street.  Like

11  I said, it would pull up some and it would back up.  When it

12  backed up, I ran across the street.  The car had stopped, the

13  tan car, and I ran one, two, three, the median.  I ran across

14  four lanes and then as I was, again, crossing the lane with

15  oncoming traffic, that's when I was hit.

16  Q    All right.  Now, you were hit by the police car that was

17  marked; correct?

18  A    Correct.

19  Q    So it had to be that the police car went into -- across

20  the median and went into the other side of the street?

21             MS. DEPOIAN:  Objection.

22             THE COURT:  Sustained.

23             MR. ANTOLLINO:  I'm trying to move it along.

24  Q    What did the police car do with respect to the direction

25  of traffic and you at this moment when it hit you?

1          MS. DEPOIAN:  Objection.

2          THE COURT:  Sustained.

3          MR. ANTOLLINO:  All right.

4          THE COURT:  What happened after the police car hit

5     you?

6          THE WITNESS:  After the police car hit me, I stood

7     up with my hands in the air and I was taken to the ground, and

8     I was taken to the ground.  My head was bashed into the road.

9     My face was smeared into the road.  The officer on top of me

10    kept saying why you -- this is exactly how he said it:  Why

11    are you resisting?  Why you resisting?  He kept beating me.

12    And the first thing he did was cuff me.  I did not resist.

13    After I was hit, I was -- and -- and in shock, I couldn't do

14    anything.  He put me in handcuffs, and from then, I blacked

15    out repeatedly.  I was hit in my head many times.

16         Again, my face was smeared into the pavement.  My

17    face rubbed into the pavement.  I just continued to be beat in

18    my face.  That's all I could see, remember.  I blacked in and

19    out.  At the time, I saw white light.  And I just kept yelling

20    stop, just please, stop, stop.  And partway through, I heard

21    Officer Belardo's voice say easy guys, easy guys, there's

22    cameras around, easy, easy.

23    Q    Now, I want to describe what exactly -- you say you put

24    your hands up, but what exactly happened to your body, if

25    anything different than what you testified to, exactly when

1   the car struck you?

2   A    Well, the car struck me and I kind of rolled up in the

3   air and landed on the ground.  My back hit the ground.

4   Basically my whole body just hit the ground, my elbow, my

5   back, my head, and I got up and I just surrendered.  I....

6              MR. ANTOLLINO:  All right.  Judge, do you intend to

7   end at 4:30?  I think this would be a good breaking point.

8              THE COURT:  That's fine.

9              Ladies and gentleman, let me just remind you of a

10  couple of things because we will be apart tomorrow.  We will

11  be back on Wednesday.  Remember, don't talk to anybody about

12  this case.  Don't post anything on any internet site about

13  this case, don't e-mail or tweet to anybody about this case.

14  People are watching potentially where we go on the internet,

15  you don't want to be one of those people that's watched.

16             Also, don't observe anything in the media.  If there

17  is anything on this case, don't do any research on your own

18  about this case.

19             We will see you back here Wednesday morning in that

20  room there at 9:30.  Please try to be prompt.  Have a good day

21  off or back at work, whatever the case may be.  See you then.

22             (Jury exits the courtroom.)

23             (Continued on next page.)

24

25

Proceedings                                                    92

1   (Continuing)

2            THE COURTROOM DEPUTY:  All rise.

3            (Jury exits.)

4            (In open court; outside the presence of the jury.)

5            THE COURT:  All right.  Is there anything else we

6   need to cover before we recess?

7            MS. DEPOIAN:  Can we just have an instruction to the

8   witness and the attorney not to speak about the testimony

9   during the break?

10            THE COURT:  The witness has not been passed to you

11   yet.

12            They can speak about it.  You can ask on

13   cross-examination if they spoke about it.  The jury might not

14   like it if they did; might not care.  It is up to plaintiff

15   and his attorney.

16            Is there anything else we need to cover?

17            MR. ANTOLLINO:  No.

18            MS. DEPOIAN:  Not from defendants.

19            THE COURT:  Okay.  See you Wednesday, 9:30.

20            ALL:  Thank you, Your Honor.

21            (Matter adjourned to Wednesday, June 14th, 2017 at

22   9:30 a.m.)

23                          ooo0ooo

24

25

                          VB        OCR        CRR

93

1

<u>I N D E X</u>

2

3  <u>WITNESS</u>                                                <u>PAGE</u>

4

5

6       OPENING STATEMENT

7       BY MR. ANTOLLINO                                   22

8       OPENING STATEMENT

9       BY MS. SMITH                                       40

10

11  **LERIN PIERCE**

12       DIRECT EXAMINATION

13       BY MR. ANTOLLINO                                   55

14

15

16

17

18

19

20

21

22

23

24

25