# Exhibit 2

94

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                    :
 LERIN PIERCE,                      :16-CV-05703 (BMC)
                                    :
          Plaintiff,                :
                                    :
                                    :United States Courthouse
     -against-                      :Brooklyn, New York
                                    :
                                    :
 ZEESHAN TAQI, ET AL.,              :Wednesday, June 14
                                    :9:30 a.m.
          Defendant.                :
                                    :
                                    :
                                    :
                                    :
- - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

For the Plaintiff:    ATTORNEY AT LAW
                         275 Seventh Avenue
                         Suite 705
                         New York, New York 10001
                      BY:GREGORY S. ANTOLLINO, ESQ.

For the Defendant:    NEW YORK CITY LAW DEPARTMENT
                         OFFICE OF THE CORPORATION COUNSEL
                         100 Church Street
                         New York, New York 10007
                      BY:CAROLYN KAY DEPOIAN, ESQ.
                         VALERIE ELIZABETH SMITH, ESQ.


Court Reporter:       VICTORIA A. TORRES BUTLER, CRR
                      225 Cadman Plaza East / Brooklyn, NY 11201
                      **VButlerRPR@aol.com**
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcription.

Proceedings                                    95

1                    (In open court.)

2          THE COURTROOM DEPUTY:  All rise.

3          THE COURT:  Be seated, please.

4          All right, Mr. Antollino is not here, but co-counsel

5    Ms. Nanau is here.  Just a couple of things I wanted to say

6    before we get the jury ready.

7               First, I do not know why Mr. Antollino keeps filing

8    witness lists.  The procedure we follow was that the parties

9    were told long before trial to exchange their witness lists

10   and if anyone would have an objection to persons on that list,

11   I would rule on the objections; and I did and we decided what

12   was going to happen with those witnesses and those are the

13   list of witnesses.

14              If he is filing lists with new witnesses I do not

15   even know, those witnesses are not going to be allowed unless

16   there are extraordinary circumstances, and then he has to make

17   a motion to allow me to allow him to call that witness.  I

18   have not had any such motion, so please do not file any more

19   witness lists.

20              Second, with regard to the examination of the

21   witness, I think the name is pronounced Trujillo?

22              MS. NANAU:  Yes, Your Honor.

23              THE COURT:  All right, here is what is going on with

24   that.

25              We received a call in chambers yesterday from

SAM      OCR      RMR      CRR      RPR

Proceedings                                              96

1   Ms. Trujillo's supervisor who said that Mr. Antollino had

2   called her and screamed obscenities at her in trying to get

3   Ms. Trujillo to attend trial.

4           Putting aside that that seems a counterproductive

5   way of getting a witness to cooperate in giving testimony and,

6   of course, I do not know that it is true because I only have

7   it from my staff, my staff told this supervisor to write a

8   letter and send it to the Court, and I will give you copies if

9   we get such a letter.

10          With regard to getting Ms. Trujillo here, the

11  problem with that is multifold.  It really has not been

12  handled in the proper way.  If there was any doubt about

13  Mr. Trujillo's willingness to come to court and testify, then

14  plaintiff's counsel should have taken her deposition so that

15  her refusal would constitute unavailability and we could use

16  the transcript.  I assume we do not have that, so we cannot do

17  that.

18          With regard to obtaining her presence, I understand

19  that about a week before trial plaintiff's counsel served her

20  with a subpoena, but it was not so ordered by me and she or

21  her supervisor, according to what Mr. Antollino had told me,

22  who has just entered the courtroom at 9:37, she wanted a

23  so-ordered subpoena.  The problem with that is, well, he gave

24  me that subpoena and I so ordered it the day I got it and that

25  is all fine; the problem, though, is that instead of serving

Proceedings                                      97

1   her with that subpoena he faxed it to her.  And if you are

2   going to consent to a witness not obeying an earlier subpoena

3   because it does not have a judge's signature, which

4   Mr. Antollino effectively did by getting another subpoena,

5   then you have to serve her properly and she has not been

6   served with that so-ordered subpoena.

7         So I do not know since there was an effective

8   withdrawal of the first subpoena that I have got a clear

9   enough record to allow me to hold her in contempt for not

10  appearing.

11        Assuming we can get over that hurdle, I have

12  received yesterday the plaintiff's motion to hold her in

13  contempt supported by affidavits.  The problem with that is it

14  is just a notice of motion and a notice of motion does not

15  compel her to come to the hearing.  Generally, the way

16  contempt is obtained is use of minute order to show cause and

17  the judge fills in the date and time of the hearing to hold

18  her in contempt.  And I will do what I can if I get such an

19  order to show cause, but I note that at this point we are

20  rather late in the proceedings and I am not sure anything as a

21  practical matter can be done, but I am certainly willing to

22  try.

23        And the final thing I have to say on that is that I

24  am not sure why the plaintiff feels the need to call

25  Ms. Trujillo.  I just want to foreclose one possibility, if

SAM        OCR        RMR        CRR        RPR

Proceedings                                                    98

1   that is what it is.  If the plaintiff's counsel is concerned

2   that plaintiff testifying about his emotional damages from the

3   effect of the arrest on him would open the door to disclosure

4   that he had previously been arrested as well and, thus, this

5   current arrest could not be as severe as he is painting it;

6   and if, therefore, the plaintiff wants to use Ms. Trujillo to

7   put in the effect of the arrest on his emotional status,

8   calling her to say it instead of him does not less open the

9   door.  That is all I am saying.  However the evidence is put

10  in to show emotional damage from the arrest, the defendants

11  will be able to show that this was not an isolated instance

12  for this plaintiff.

13          Now, the only thing that is worth discussing is

14  this:  Usually when prior arrests are put in to counter a

15  plaintiff's claim of damages in a 1983 action, there is a

16  claim of false arrest that supports the introduction of that

17  evidence.  And that is because it is the arrest, itself, which

18  causes the trauma.  And if a plaintiff has been arrested times

19  before, then it is at least arguable, an argument the defense

20  can make that there is less trauma.

21          Here we do not have a false arrest claim.  We only

22  have trauma, as I understand it, arising from the alleged

23  beating, not from the attempt to arrest the plaintiff.  If

24  that is the case, and I think it is, then I do not see how in

25  any event the defendants would be able to get in the prior

Proceedings                                        99

1   arrests unless, in fact, the plaintiff was or claimed to have

2   been beaten in connection with those arrests.

3          So I will hear from the defendants, but at this

4   point I am thinking there really is no basis for admitting the

5   fact of prior arrests based on the claims we have here.

6          So what do you think about that?

7          MS. DEPOIAN:  Your Honor, I think I agree with that,

8   our position.  I would just ask if there is anything

9   questionable we could take a sidebar before I ask those

10  questions and --

11         THE COURT:  Sure.

12         MS. DEPOIAN:  -- I will raise the issue then,

13  depending on how the testimony comes in.

14         THE COURT:  Okay, that is fine.

15         Okay, we were missing two jurors.  They may be here,

16  we will let you know.  We will be back in session shortly.

17         MR. ANTOLLINO:  Before you go, I take your point.  I

18  feel as though --

19         THE COURT:  I do not need to hear from you,

20  Mr. Antollino, unless there is something you want me to do.

21         MR. ANTOLLINO:  At this point I don't think so, but

22  I'll speak to my client.

23         THE COURT:  Okay.

24         (Judge exits.)

25         (Recess taken.)

Proceedings                                           100

1          THE COURTROOM DEPUTY:  All rise.

2          THE COURT:  All right, be seated.  Let's have the

3    jury.

4          (Jury enters.)

5          THE COURT:  All right, everyone, be seated.  Good

6    morning, ladies and gentlemen.

7          THE JURY:  Good morning.

8          THE COURT:  Let's try to be on time tomorrow,

9    please.  Try your best, thank you.

10         All right, we are ready to proceed.  Mr. Antollino.

11         MR. ANTOLLINO:  All right, thank you, Your Honor.  I

12   have a witness who was subpoenaed and needs to get to work.

13         THE COURT:  I wish you would have addressed this

14   with me earlier.

15         MR. ANTOLLINO:  I'm sorry.

16         THE COURT:  We are going to take another witness out

17   of turn, is that what you want to do?

18         MR. ANTOLLINO:  Just briefly, yes.

19         THE COURT:  Who is the witness?

20         MR. ANTOLLINO:  The witness is Brandon Tilghman.  He

21   is outside.

22         THE COURT:  Any objection from defendant?

23         MS. DEPOIAN:  Your Honor, yes.

24         THE COURT:  Sidebar, please.

25         (Sidebar held outside the hearing of the jury.)

1          (The following sidebar took place outside the

2     hearing of the jury.)

3          THE COURT:  What is the objection?

4          MS. DEPOIAN:  We prefer plaintiff finish his

5     testimony.  He is going to be listening to the testimony of

6     this witness and he is going to be able to change his

7     testimony based on what he hears this other witness say.

8          THE COURT:  If he had called him first, he could

9     have done it that way.  That is not a grounds.  I will allow

10    it.

11         MR. ANTOLLINO:  Thank you.

12         (Sidebar concluded.)

13         (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

```
                        Proceedings                    102

 1            (In open court - jurors present.)

 2            THE COURT:  All right, call the witness, please.

 3            MR. ANTOLLINO:  Your Honor, Ms. Nanau will get

 4    Brandon Tilghman.

 5            THE COURTROOM DEPUTY:  Please raise your right hand.

 6            (Witness sworn/affirmed.)

 7            THE COURTROOM DEPUTY:  Please state and spell your

 8    name for the record.

 9            THE WITNESS:  Brandon Tilghman, B-R-A-N-D-O-N.

10    T-I-L-G-H-M-A-N.

11            THE COURTROOM DEPUTY:  All right, you may be seated.

12            MR. ANTOLLINO:  Do this microphone have a switch?

13            THE COURT:  What is the issue, Mr. Antollino?

14            MR. ANTOLLINO:  The microphone.  Can everyone hear

15    me?  I can speak loud enough.

16            THE COURT:  Everyone can hear you.

17            MR. ANTOLLINO:  Okay, fine.

18            (Continued on the following page.)

19

20

21

22

23

24

25
```

SAM      OCR      RMR      CRR      RPR

1   B R A N D O N   T I L G H M A N,

2        called as a witness by the Plaintiff, having been

3        duly sworn/affirmed, was examined and testified as

4        follows:

5   DIRECT EXAMINATION

6   BY MR. ANTOLLINO:

7   Q    Good morning, Mr. Tilghman.

8   A    Good morning.

9   Q    Thank you for coming in.  Where do you live?

10  A    I live in the Bronx, 1020 Grand Concourse.

11  Q    What is your occupation?

12  A    I am a faculty services coordinator at John Jay College.

13  I also work at Starbucks as a barista.

14  Q    All right.  And do you live with anyone at the home?

15  A    Yes, my family, my wife and my two children.

16  Q    What is your highest level of education?

17  A    Master's of biomedical engineering.

18  Q    And how did you meet Lerin Pierce or -- withdrawn.

19        Did you at some point meet Lerin Pierce?

20  A    Yes, I did.

21  Q    When was that?

22  A    It was about a year after I got married and I got married

23  in 2011.  So I think maybe summertime of 2012, around then.

24  Q    Where was that?

25  A    It was at the Kings Church of Christ in Brooklyn.

Tilghman - direct - Antollino                          104

1   Q      How would you describe your relationship?

2   A      Our relationship?

3   Q      With Mr. Pierce.

4   A      Oh, we're like best friends.  He's like my brother, so...

5   Q      Do you talk to him often?

6   A      Yes, very often.

7   Q      How often?

8   A      Definitely every day.  He is like -- he is like my

9   brother.  I have family, but they don't live here, so he is

10  like my brother while I'm here.

11  Q      What are some of the things you talk about?

12  A      We talk about everything:  Family, kids, work, church,

13  traveling, fraternities, sororities, everything.  I mean

14  anything you can imagine.

15  Q      Just as an aside, what do you mean by fraternities and

16  sororities?

17  A      Oh, me and him are both in a fraternity.  We are in

18  different ones, but we are like fraternity cousins.  But we

19  have a lot of similarities, so like automatically we have

20  different, like, networks that just intertwine automatically.

21  Q      And would it be fair to assume that he talks about his

22  feelings to you?

23  A      Yes.

24  Q      All right, does he talk about good feelings?

25  A      Yes.

Tilghman - direct - Antollino                    105

1    Q    Bad?

2    A    Yes.

3    Q    Now, did there ever come a time that he told you that he

4    had an incident when he was hit by a police car and thereafter

5    some things happened with the police?

6              MS. SMITH:  Objection.

7              THE COURT:  Sustained.

8    BY MR. ANTOLLINO:

9    Q    Did he ever tell you about an incident that occurred with

10   the police?

11             MS. SMITH:  Objection.

12   Q    In -- in -- did he ever tell -- withdrawn.

13             Did he ever tell you about an incident that occurred

14   with the police on the street in Brooklyn?

15             MS. SMITH:  Objection.

16             THE COURT:  You can answer the question yes or no.

17   A    Yes.

18   Q    When did he tell you this?

19   A    He told me this earlier this year, I think in maybe

20   around February, might have been January.  I can't remember

21   honestly.  I just know it was this year, recent.

22   Q    Now, you're very close, but yet he didn't tell you for a

23   number of years before this happened?

24             MS. SMITH:  Objection.

25             THE COURT:  Sustained.

SAM    OCR    RMR    CRR    RPR

Tilghman - direct - Antollino                    106

1   BY MR. ANTOLLINO:

2   Q    Do you know why it took him so long to tell you?

3           MS. SMITH:  Objection.

4           THE COURT:  Sustained.

5   Q    Knowing Lerin as you do, did you form an opinion as a

6   person as to why it took two-and-some years to tell you about

7   this?

8           MS. SMITH:  Objection.

9           THE COURT:  Sustained.

10  Q    Did he explain to you why, just answer yes or no, it took

11  him so long to explain what happened to him?

12          MS. SMITH:  Objection.

13          THE COURT:  I will allow the yes or no answer.

14  A    Yes.

15  Q    Now, based on your knowledge of Mr. Pierce, and that

16  includes all of your conversations and all of the time you

17  spent together, is there a word that you could use to describe

18  why it took so long?

19          MS. SMITH:  Objection.

20          THE COURT:  Sustained.

21  Q    Did he tell you the entire incident that occurred to him,

22  and that's a yes or no question?

23          THE COURT:  No.  It may be a yes or no question, but

24  he does not know what he does not know.  In other words, he

25  knows what he was told --

SAM    OCR    RMR    CRR    RPR

Tilghman - direct - Antollino                 107

1          MR. ANTOLLINO:  That's true, withdrawn.

2          THE COURT:  -- but he could not tell if something

3    was left out.

4          MR. ANTOLLINO:  That's true.

5    BY MR. ANTOLLINO:

6    Q    Did he go into a fair amount of detail -- withdrawn.

7          How long did it take for him to tell you the story?

8          MS. SMITH:  Objection.

9          THE COURT:  I am going to sustain it.

10   Q    What was his demeanor when he was telling you the story?

11   A    He was angry and serious.  It was one of those moments,

12   it was kinda like a coming-to-Jesus moment where, it's like,

13   wow, you know, I had no idea.  Usually whenever we engage in

14   conversations, both I'm speaking and he's speaking, but during

15   this delivery I was just listening and he was kinda like, you

16   know, standing over me and just telling me everything.  So --

17   but he was angry and he had the floor.

18   Q    Did you understand why, in your mind, based on your

19   opinion of Lerin, it took him so long to tell you this story?

20          MS. SMITH:  Objection.

21          THE COURT:  Sustained.

22          Mr. Antollino, when I make a ruling, please do not

23   try to circumvent it.

24          MR. ANTOLLINO:  I am not trying to circumvent it,

25   Your Honor, I apologize.

SAM    OCR    RMR    CRR    RPR

Tilghman - direct - Antollino                    108

1          THE COURT:  All right, go on to the next question,

2     please.

3          MR. ANTOLLINO:  All right.

4     BY MR. ANTOLLINO:

5     Q    Now, since that time has he -- all right, so that was

6     February and now it is June, so that is approximately five

7     months, correct?

8     A    Yes.

9     Q    All right, and you talk every day?

10    A    Yes, that's correct.

11    Q    Has he spoken about any physical pain?

12         MS. SMITH:  Objection.

13         THE COURT:  Sustained.

14         MR. ANTOLLINO:  All right.

15    Q    What things has he talked about with regards to the

16    incident in question?

17         MS. SMITH:  Objection.

18         THE COURT:  Sustained.

19         MR. ANTOLLINO:  Okay.  I don't mean to suggest any

20    particular answer, simply -- any feelings --

21         THE COURT:  It is a hearsay problem.

22         MR. ANTOLLINO:  Feelings?

23         THE COURT:  It is a hearsay problem.

24         MR. ANTOLLINO:  All right.

25    BY MR. ANTOLLINO:

Tilghman - direct - Antollino                    109

1   Q    What feelings have you observed, without him saying

2   anything, have you observed him go through in the past two

3   years --

4             MS. SMITH:  Objection.

5             THE COURT:  Sustained.

6   Q    -- if any?

7             MR. ANTOLLINO:  All right.

8   Q    Is there anything that he has stopped doing during that

9   period of time?

10            MS. SMITH:  Objection.

11            THE COURT:  Hang on a minute.  Sustained.

12  BY MR. ANTOLLINO:

13  Q    Did he change his routine in any way that you noticed?

14            MS. SMITH:  Objection.

15            THE COURT:  Sustained.

16  Q    Did he have a routine with you, insofar as social events?

17            MS. SMITH:  Objection.

18            THE COURT:  Sustained as to form.

19            MR. ANTOLLINO:  Okay.

20  Q    Now, you mentioned that you socialize with him, correct?

21  A    Yes.

22  Q    All right.  What were the types of things that you did?

23            THE COURT:  When?

24  Q    All right, let's start now -- let me establish.

25            Do you know when this event actually took place as

Tilghman - direct - Antollino                    110

1     opposed to when he told you?

2              MS. SMITH:  Objection.

3              THE COURT:  Sustained.

4

5              (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Tilghman - direct - Antollino                      111

1   DIRECT EXAMINATION

2   BY MR. ANTOLLINO:    (Continuing)

3   Q    Do you know --

4             MR. ANTOLLINO:  Was that to form?

5             THE COURT:  Please go on to your next question, Mr.

6   Antollino.

7             MR. ANTOLLINO:  Okay.

8   Q    How did your relationship change, if any way, between

9   2012 and the time that he told you what happened?

10            MS. DEPOIAN:  Objection.

11            THE COURT:  I will allow it.

12  A    So the relationship changed because whenever we met, we

13  were always having fun and kind of always smiling and

14  everything was kind of a happy time, and then there was a

15  period of about maybe, I want to say maybe three months where

16  I wasn't seeing him at church regularly, and whenever I

17  reached out to him, I noticed that he wasn't responding, and,

18  so, I just figured that maybe he was going through something.

19  I mean, stuff happens in life, so.

20            MS. DEPOIAN:  Objection.

21            THE COURT:  Overruled.

22  Q    So you decided to ask him about this or just wait for him

23  to come to you and tell --

24  A    Well, I --

25            MS. DEPOIAN:  Objection.

Tilghman - direct - Antollino                    112

1          THE COURT:  Sustained.

2    Q    Did you wait for him to explain why this was happening?

3          MS. DEPOIAN:  Objection.

4          THE COURT:  Sustained.

5    Q    Did you ask him, yes or no?

6    A    Yes.

7    Q    At what point?

8    A    At what point --

9          MS. DEPOIAN:  Objection.

10         THE COURT:  I think you mean when did you ask him.

11         MR. ANTOLLINO:  Yes.

12   A    I don't know the exact dates or times.  I just remember

13   there was a period.  This was a couple years ago, and I just

14   remember that I wasn't seeing him regularly at church and I

15   asked him via phone calls and texts, you know, what's going on

16   and hadn't heard back from him.  I can't remember exactly

17   when.

18   Q    And after that three months, did there come a time that

19   you saw him again?

20   A    Did there come a time after?

21   Q    Yes.

22   A    Yes.  Yes.

23   Q    Did you notice anything different about him physically?

24         MS. DEPOIAN:  Objection.

25         THE COURT:  If he can't put a time period on it,

Tilghman - direct - Antollino          113

it's not relevant.

Q    Well, this three-month period of time, can you put a year

on it?

A    I'm not certain if it was 2015 or -- I can't -- I'm not

confident, but I believe that might have been the year.

Q    So it was definitely after 2012?

A    Yes, definitely.

Q    All right.  Was it after 2013 or you're not sure?

A    I mean, I'm sure it was after 2013.  We had known each

other for a while by then, so definitely, yeah.

Q    Okay.  So would it be fair to say that it was somewhere

between 2014 and 2015?

          MS. DEPOIAN:  Objection.

          THE COURT:  I will allow it.

A    Yes.

Q    Okay.  So there was a period of three months within those

two years in which he had withdrawn?

A    Yes.

          MS. DEPOIAN:  Objection.

          THE COURT:  Sustained.  The jury will disregard the

answer.

Q    This three-month period that you had testified before

your last answer ended and did you see him again?

A    Yes.

Q    And was there anything different about him physically

MDL   RPR

Tilghman - direct - Antollino                    114

1   when you saw him again?

2           MS. DEPOIAN:  Objection.

3           THE COURT:  Overruled.

4   A    Yes.

5   Q    Can you please describe to the jury what you noticed

6   about him different?

7   A    I noticed that my best friend had lost a lot of weight.

8   He used to be more muscular and seemed like he was healthy,

9   when I seen him after a while, it looked like he wasn't

10  eating.

11  Q    Can you estimate the number of pounds that he lost?

12          MS. DEPOIAN:  Objection.

13          THE COURT:  Sustained.

14  Q    All right.  What about his mood?  Had it changed in any

15  way?  And I am not talking about any words that he said,

16  simply how he acted.

17          MS. DEPOIAN:  Objection.

18          THE COURT:  Sustained.  Let's have a sidebar,

19  please.

20          MR. ANTOLLINO:  Sure.

21          (Continued on the next page.)

22

23

24

25

Tilghman - direct - Antollino                    115

1          (Sidebar held outside the hearing of the jury.)

2          THE COURT:  Mr. Antollino, you are having a hard

3    time asking questions in a way that conforms to the rules of

4    evidence.  I didn't want to say it in front of the jury, but I

5    wanted to give you notice that I am going to have to cut you

6    off from examining this witness if you can't do better.  Let's

7    proceed.

8          MR. ANTOLLINO:  I will just ask open-ended

9    questions.

10         (Sidebar concluded.)

11         (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Tilghman - direct - Antollino                116

1  Q    All right.  I am going to let you take the floor and

2  describe what you saw in Lerin.

3              MS. DEPOIAN:  Objection.

4              THE COURT:  Sustained.

5              Anything further, Mr. Antollino?

6              MR. ANTOLLINO:  Well, I want him to --

7              THE COURT:  Is there anything further?  Please put

8  questions to him.

9              MR. ANTOLLINO:  Okay.

10 Q    Can you describe -- and this is a yes-or-no question --

11 Mr. Pierce's emotional state after this period of three

12 months?

13             MS. DEPOIAN:  Objection.

14             THE COURT:  Overruled.

15 A    Yes.

16 Q    Had it changed in any way before the three-month period?

17 A    Yes.

18 Q    Describe as simply and accurately as you can to the jury

19 how it had changed.

20 A    After that period where Lerin was just MIA, he became

21 just very quiet and not smiling, negative.  I would constantly

22 try to, you know, make him laugh with some of our common jokes

23 that we would use, you know.  It was like an attempt from me,

24 but it wasn't the same.  So there was more of me doing a lot

25 more of the -- me putting a lot more of the work in the

Tilghman - direct - Antollino                117

1    relationship than we had before.  I just figured that he is

2    going through something, so, yeah.

3    Q    Has he gotten any better?

4             MS. DEPOIAN:  Objection.

5             THE COURT:  No, I will allow it.

6    A    Definitely much better than after I first saw him, yes.

7             MR. ANTOLLINO:  I have no further questions, Judge.

8             THE COURT:  Any cross?

9             MS. DEPOIAN:  One moment, Your Honor.

10            (Pause.)

11            MS. SMITH:  I have no questions, Your Honor.

12            THE COURT:  You may step down.  Thank you very much.

13            Plaintiff may call his next witness.

14            MR. ANTOLLINO:  Your Honor, at this time, I have

15   printed out, as an aid to the jury, the exact words, and I

16   have a better recording of Ms. Holloway's deposition, or, if

17   you would prefer, I can call Mr. Pierce to the stand again.

18            THE COURT:  It is your case.

19            MR. ANTOLLINO:  Then I would like to play the

20   deposition and hand to the jury the aids that I have printed

21   out.

22            THE COURT:  Have you shown those to the defendants?

23            MR. ANTOLLINO:  Yes.  I certainly have, last night

24   and today.

25            THE COURT:  And I will need a copy.  Hand it to my

1    clerk, please.

2              You may hand them out.

3              MR. ANTOLLINO:  Thank you, Judge.

4              THE COURT:  Ladies and gentlemen of the jury, the

5    transcript of Ms. Holloway's deposition that you are

6    receiving, they are not to be considered by you as evidence.

7    They are simply an aid to allow you to follow along with the

8    video as she testifies.  So don't look ahead of them, just

9    follow them as you see her on the screen.  If there is any

10   conflict between what appears in the deposition transcript and

11   what appears on the videotape, go with the videotape, not with

12   the transcript.

13             You may proceed, Mr. Antollino.

14             MR. ANTOLLINO:  Thank you, Judge.

15             THE COURT:  You are going to pick up at the point

16   that we left off at, right?

17             MR. ANTOLLINO:  Well, if you would like me to do

18   that, I will.

19             THE COURT:  Do you propose playing it again from the

20   beginning?

21             MR. ANTOLLINO:  It is -- we can start in the middle.

22   How is that?  Is that fair?

23             THE COURT:  You may start at any point subsequent to

24   the part we left off at on Monday.

25             MR. ANTOLLINO:  I think we were about halfway

Tilghman - direct - Antollino                    119

1    through.

2            Judge, may I look at your copy so I can direct the

3    jurors to where the testimony will pick up so they can --

4            THE COURT:  So you want me to give you back the copy

5    that I gave you?

6            MR. ANTOLLINO:  I will bring that back to you.  I

7    just want to make sure there is no flipping through pages.

8            THE COURT:  I am handing back the transcript.

9            MR. ANTOLLINO:  To the best of my ability, there

10   won't be any overlap.

11           (Videotape of deposition of Ms. Holloway played.)

12           THE COURT:  Would you want to direct the jury to a

13   particular page and line?

14           MR. ANTOLLINO:  Yes.

15           THE COURT:  What would that be?

16           MR. ANTOLLINO:  I am looking for winter because she

17   remembered it was cold.

18           All right.  This would be starting on page 35 and

19   the first line is going to be line 13.

20           THE COURT:  All right.  Please proceed.

21           (Video playing.)

22           THE COURT:  I have this section not allowed in.

23           MR. ANTOLLINO:  I'm sorry?

24           THE COURT:  I have this section not allowed in.  I

25   have it marked as not allowed in.

Tilghman - direct - Antollino                    120

1        MR. ANTOLLINO:  I was not aware of that.

2        THE COURT:  Does the defendants disagree with me.

3        MS. DEPOIAN:  No, Your Honor, we agree with you.

4        MR. ANTOLLINO:  I will fast forward.

5        THE COURT:  Please skip ahead to page 49, line 14.

6        (Video playing.)

7        THE COURT:  I don't have this in.

8        MS. DEPOIAN:  Objection.

9        MS. SMITH:  Objection.

10        THE COURT:  Mr. Antollino, please proceed page 49,

11   line 14.

12        The jury is to disregard the last piece of testimony

13   that occurred.

14        (Video playing.)

15        THE COURT:  No, keep going.

16        (Video playing.)

17        THE COURT:  Okay, please collect the transcripts,

18   Mr. Antollino.

19        MR. ANTOLLINO:  Thank you.  One thing that I would

20   like to discuss, to clear with you to avoid an objection or

21   confusion, if we could approach.

22        THE COURT:  You are requesting a sidebar?

23        MR. ANTOLLINO:  Yes.

24        THE COURT:  Let's have a sidebar.

25        (Continued on the next page.)

Sidebar                                    121

1        (Sidebar held outside the hearing of the jury.)

2        THE COURT:  Go ahead.

3        MR. ANTOLLINO:  Since Ms. Trujillo cannot come in

4   and since you said that Mr. Pierce could testify to particular

5   portions of his records and since she did write a report,

6   which has not been objected to, I am going to ask that that be

7   admitted and that he read from it.

8        THE COURT:  You want Trujillo's report admitted?

9        MR. ANTOLLINO:  Yes, and he be able to read from it.

10       THE COURT:  What is defendants' position?

11       MS. DEPOIAN:  We object.  It is hearsay.

12       MR. ANTOLLINO:  May he refer to it?

13       THE COURT:  No, he may not.

14       MS. DEPOIAN:  Mr. Antollino gave me a copy of the

15   transcript to follow along with.  It is incomplete.  We did

16   the best we can.  I am not 100 percent confident that I had

17   the full transcript here.  We were flipping back and forth.

18   We were both trying to do it, I am not 100 percent confident

19   the sections we wanted to get in were played.  I believe they

20   were.  I want to put on the record we weren't able to

21   completely follow along.

22       THE COURT:  Clearly the portions that I allowed to

23   be admitted were not entirely conformed in the version of the

24   transcript that was handed to the jury.  I saw it.  I have a

25   marked transcript.  I saw there were things read that should

Sidebar                                    122

1    not have been read and there were things not read that should

2    have been read.  So, I want the defendants's counsel to look

3    at that overnight and make a proposal how they want to proceed

4    with it tomorrow morning.

5              MS. SMITH:  Your Honor, if we can get a full copy of

6    what was given to the jury.  What we were given a copy of was

7    not given to the jury.

8              THE COURT:  You gave the defendants a different

9    version than you gave the jury?

10             MR. ANTOLLINO:  No.  I made the same keeps at Fed

11   Ex.

12             THE COURT:  Did all of the versions to the jury have

13   pasted on notes that are taped on by mask tape.

14             MR. ANTOLLINO:  There was one page that got slipped

15   in that was not part of.

16             THE COURT:  How were the jurors's versions different

17   from the one I gave the defendant?

18             MR. ANTOLLINO:  None.

19             I think you can compare them.

20             THE COURT:  Let me ask you again, did the versions

21   that the jury was given have a pasted on note secured by

22   masking tape?

23             Can I see the versions that the jury was given?

24             MS. NANAU:  Sure.

25             THE COURT:  They have been handed to me.

Sidebar                                        123

1            MR. ANTOLLINO:  On page --

2            THE COURT:  Stop, please.  This also have a note.

3    It is secured by Scotch tape, not masking tape.  All right.  I

4    am going to give this -- and I take it all of them have this;

5    is that right?

6            MR. ANTOLLINO:  Yes, that is because something

7    slipped into the printer and I wanted to redact it.

8            THE COURT:  I am going to give one copy of this to

9    defense counsel which I am doing now so they can review and

10   compare it to determine what motion they want to seek relief.

11           MS. DEPOIAN:  Thank you, Your Honor.

12           (Sidebar concluded.)

13           (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Pierce - direct - Antollino                    124

1          THE COURT:  Mr. Antollino, are you proceeding?

2          MR. ANTOLLINO:  Yes.  I am ready to recall, Mr.

3  Pierce.

4          Mr. Pierce, do you want to take the stand.

5          THE COURT:  Good morning, Mr. Pierce.

6          THE WITNESS:  Good morning, judge.

7          THE COURT:  All right.  Please proceed.

8          (Previously sworn.)

9  DIRECT EXAMINATION

10  BY MR. ANTOLLINO:

11  Q    All right.  Good morning, Lerin, how do you feel?

12  A    Good morning.  I feel okay.

13  Q    Speak up, speak slowly.  All right.  We were talking

14  yesterday about being hit by the police car.  Do you recall --

15  I'm just trying to bring you back to where we left off

16  yesterday.

17  A    Monday, yes.  Is this on?  Hello?

18          THE COURT:  It's on.  Jurors, you can hear him okay.

19          THE JURY:  Yes.

20  Q    Now, when you were hit by the car, you testified that, I

21  believe, you went up on to the roof of the car is that

22  correct?

23          MS. DEPOIAN:  Objection.

24          MR. ANTOLLINO:  The hood.

25          THE COURT:  I am going to let him bring him back to

1    where he was.  So let's just set the scene.  My recollection

2    of the testimony is he was hit, he rolled on to the roof, he

3    then fell on the ground, he then stood up.

4    Q    All right.  Would that be a basic characterization of

5    what happened?

6    A    Correct.

7    Q    All right.  And when you rolled up on the roof, about how

8    many feet from where you were standing did you go on to the

9    hood of the car?

10   A    Repeat that.

11         MS. DEPOIAN:  Objection.

12         THE COURT:  Overruled.

13   A    Repeat the question.

14         THE COURT:  How far on the -- I don't think we are

15   talking about the roof.  We are talking about the hood; right?

16         MR. ANTOLLINO:  The hood, yes.

17         THE COURT:  How far up on the hood did you go?

18         THE WITNESS:  Probably about no more than halfway.

19   I would say about a quarter of the way.

20   Q    So from the ground to halfway up the hood, approximately

21   how many feet is that?

22   A    It could be approximately three-and-a-half to four feet.

23   Q    Okay.  And did you go up in the air?  Were you suspended

24   in the air at any point after you were hit?

25   A    On my way down, yes.

1   Q    Okay.  If you went down, would it be fair to say that you

2   also went up?

3              MS. DEPOIAN:  Objection.

4   A    Yes, upon rolling on the hood.

5              THE COURT:  I will allow it.

6   A    When I came on the ground, I landed to the ground from --

7   Q    So you held your hands up.  Did you stand up and hold

8   your hands up, or vice versa?

9   A    It took me a couple seconds do get up.  I stood up and I

10  held my hands in the air as I stood there and waited.

11  Q    Okay.

12             (Continued on following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. ANTOLLINO:

2   Q     Did you say anything at that time?

3   A     I don't recall.  I might have said, Jesus, what am I

4   into?  Or what's -- I can't really recall.

5   Q     Now, you ran from the police and then ran across the

6   street, correct?

7   A     Yes.

8   Q     But you are asking the jury to award you damages for

9   that.

10  A     That's correct.

11  Q     Can you explain why?

12  A     Because I was chased down and hit by a police car and I

13  was never arrested.  And from the conversation that we had to

14  which caused me to run, I don't feel I should have been chased

15  down by a police car and hit by a police car for them to stop

16  me when they knew I did not do a crime.  That was the reason

17  for the long conversation, and it was said many times, no,

18  you're not being arrested.

19          So, I asked them to please explain the difference,

20  why you're trying to cuff me and take me back to the store

21  when the manager just told you what you will find?  I tried to

22  be reasonable, I tried to be respectful.  We talked, we

23  argued, I made points.  And no reason to arrest me.  After --

24          MS. DEPOIAN:  Objection.

25          THE COURT:  Sustained.

1          I need to give a corrective instruction.  As we told

2     you at the outset of the case, there is no claim of false

3     arrest in this case.  The police were entitled to take

4     Mr. Pierce into custody.

5          That is because the law does not require the police

6     to arrest only people who have committed crimes.  They are

7     allowed to arrest people who did not commit crimes as long as

8     they reasonably believe that there was probable cause to

9     believe that the person committed a crime.  So, whether the

10    person committed the crime or not is not determinative as to

11    whether the police have the right to arrest someone.  And that

12    issue is not before you.

13         Generally speaking, if police receive advice from a

14    citizen that says that a subject committed a crime, the police

15    are allowed to arrest that person who has been identified by

16    the citizen.  The police do not act as judge or jury in order

17    to determine whether the person who they are arresting is

18    guilty or innocent.  They just have a complaint from a

19    citizen, and that allows them under the law to arrest the

20    person and let a judge or jury determine whether the person

21    actually committed a crime.

22         So, again, there's nothing wrong with the arrest

23    here.  The only question -- and I'll instruct you more on this

24    at the end of the case -- is whether the force that the police

25    used to effect the arrest was excessive.  And I'll tell you

1    what that means at the end of the case.

2            Please proceed.

3    BY MR. ANTOLLINO:

4    Q    And in this case, you were not arrested until after you

5    were hit by the car, correct?

6    A    Repeat that?

7    Q    You were not arrested until after you were hit by the

8    car; is that correct?

9    A    Correct.

10   Q    Now, I believe that you testified that there was some

11   force used in arresting you.  Can you describe to the jury

12   what happened to you when you were put in handcuffs and

13   arrested?

14           MS. DEPOIAN:  Objection.

15           THE COURT:  Well, I'll strike the whole question.

16           The question to you is:  What happened after you

17   rolled down on the ground from the hood of the car and you

18   stood up?  What happened next?

19           THE WITNESS:  I stood up and I was slammed to the

20   ground.  Handcuffs were placed on me.  I did not resist.  I

21   did not have a hand under my body.

22           And after the handcuffs were placed on me, the

23   officer that was beating me, Officer Taqi, the one to the end,

24   kept saying:  Why you resisting?  Why you resisting?  Why you

25   resisting?  And I was punched in my face that I told you on

1   Monday.  My face was rubbed against the pavement and the

2   asphalt, the front of my face was rubbed against the face of

3   the pavement.  I was continually being punched in my face, I

4   continued being kicked, and I just kept screaming:  Please

5   stop.  Oh, Jesus, stop, stop, stop.

6           And there was a time I shouted:  I cannot breathe.

7   Could have been someone maybe sitting on top of me as they

8   were punching me, but I did yell I could not breathe.

9           And I was continued to be punched until Officer

10  Belardo mentioned cameras in the area and advised them to be

11  easy and the guy stopped to be easy.  Then I was picked up,

12  placed in the backseat of the police car, the same car that I

13  was hit with.  And even being placed in the car with cuffs on,

14  Officer Taqi still continued to verbally abuse me, calling me

15  a stupid fuck:  Boy, you stupid as fuck, right in front of the

16  police.  Who do you think you are, you dumb fuck?  Boy, you

17  stupid as fuck.

18          He was laughing, getting basically -- basically,

19  getting off on it.  And from then I was taken to the precinct

20  after about what seemed like forever but to be exact, like,

21  five minutes of being beaten.

22  Q    Did you recognize the same -- did you recognize Officer

23  Taqi's voice?

24  A    Yes.

25  Q    From outside?

Pierce - Direct - Antollino                       131

1   A    I recognized Officer Taqi's voice, I recognized Officer

2   Belardo's voice.

3   Q    Was Mercado present at the arrest?

4   A    Yes, he was present.

5   Q    Now, Ashley Holloway testified as to some --

6         THE COURT:  Mr. Antollino, don't refer him to other

7   testimony, just ask him questions.

8   Q    Let me show you what has been premarked as Pierce Trial

9   52?

10         MR. ANTOLLINO:  If I may show that to the witness.

11         MS. DEPOIAN:  Exhibit what?

12         MR. ANTOLLINO:  This has been premarked as Pierce

13   Trial 52.

14         THE COURT:  Show it to the Defendant, please.  Do

15   not show it to the jury.

16         MS. DEPOIAN:  What exhibit is it?

17         MR. ANTOLLINO:  This exhibit...

18         I'm sorry this is Exhibit C-54 and C Pierce Trial

19   50.

20         THE COURT:  Mr. Antollino, we do need to move on.

21         MR. ANTOLLINO:  I'll start with 50.  You do have 50,

22   right?

23         I'll show this to the witness and ask if this --

24   Q    If you recognize what is marked as Pierce Trial 50.

25   A    Yes.

LAM       OCR       RPR

Pierce - Direct - Antollino                    132

1   Q    And what is that?

2   A    It's a picture of my knee with abrasions on it that I got

3   from, like I said, being on the ground, I guess being ruffled

4   up, there were scrapes on my knee.  And that picture was taken

5   at the very next evening, which Ashley got off work.

6            MR. ANTOLLINO:  I ask that Pierce Exhibit 50, which

7   I've stickered as C-1, be admitted into evidence.

8            THE COURT:  I don't know what that means.  What's

9   the exhibit you're offering?

10            MR. ANTOLLINO:  It's part of C.

11            THE COURT:  There is no part.  Every exhibit has a

12   number.

13            What number is this one?  You can give it any number

14   you want.

15            MR. ANTOLLINO:  Okay.  This would be C, and it's

16   Bates stamped Pierce Trial 50.

17            THE COURT:  I don't care about the Bates stamp.

18            Any objection?

19            MS. DEPOIAN:  No objection, your Honor.

20            THE COURT:  Received.

21            (Plaintiff's Exhibit C so marked.)

22            MR. ANTOLLINO:  May I put this --

23            THE COURT:  You want to display the exhibit to the

24   jury?

25            MR. ANTOLLINO:  Yes.

Pierce - Direct - Antollino                              133

1           THE COURT:  Go ahead.

2           MR. ANTOLLINO:  All right.

3           (Exhibit published to the jury.)

4    Q    So, this fairly and accurately represents the marks that

5    you received at the time you were hit -- after you were hit by

6    the car?

7    A    Say the question again, please.

8    Q    This fairly and accurately represents the contusions that

9    you received after you were hit by the car, correct?

10   A    Correct.

11   Q    Now, did there come a time that you were head butted in

12   this face with a basketball?

13   A    Yes, yes, I was hit in my lip from another kid's head

14   from chasing after a basketball.

15           THE COURT:  I'm confused, does that have anything to

16   do with this incident?

17           THE WITNESS:  No.

18           THE COURT:  No?

19           THE WITNESS:  No.

20   Q    That was which lip, the upper lip or lower lip?

21   A    It was my upper lip.

22   Q    When you say that your -- were there any bumps on your

23   lip as a result of this incident?

24   A    The basketball incident?

25   Q    No, no, this incident that we're in court for today.

LAM        OCR        RPR

Pierce - Direct - Antollino                              134

1   A     Yes.

2   Q     And what was that on?

3   A     It was on my lower lip.

4   Q     Okay.  Can you describe that bump to the jury?

5   A     Well, from being punched in the face and my face being

6   rubbed in the asphalt, my lip was swollen.  And about a week

7   later, there seemed to be I guess an infection or bump on my

8   lip.  And when I went to go get checked out by my primary care

9   doctor, he referred to it as a term I don't remember.  But he

10  sent me to a dermatologist and I got a shot in my lip to calm

11  it down.  It would rise up and down as it -- I don't mean to

12  gross you out, but busts.  And the dermatologist gave me a

13  shot and referred me to a surgical dentist to have it cut and

14  cleaned and removed and stitched up.

15          MR. ANTOLLINO:  Excuse me, your Honor.  I'm just

16  getting a couple of documents.

17  Q     I'm going to show you Exhibit D, Bates stamped --

18          THE COURT:  You don't need to recite the Bates

19  stamp.

20          MR. ANTOLLINO:  Okay.  Exhibit D.

21          (Pause in proceedings.)

22          THE COURT:  Mr. Antollino, I'm going to have to ask

23  you to go on to something else.  We can't take the jurors'

24  time.

25          MR. ANTOLLINO:  I understand, but they said they

Pierce - Direct - Antollino                    135

1  didn't have things that they did.

2  Q    All right, now, the lip bruise developed over time.  Can

3  you describe to the jury how that happened?

4           MS. DEPOIAN:  Objection.

5           THE COURT:  He just did that.  Let's go on to the

6  picture, if you're going to use the picture.

7  Q    So, I'm going to show you Exhibit C --

8           THE COURT:  Mr. Antollino, do not approach the

9  witness.  You can show him the exhibit from the podium.

10           MR. ANTOLLINO:  Oh, okay.

11           THE COURT:  And we can save the time of you walking

12  back and forth.

13  Q    I'm going to show you these exhibits that have been

14  marked as Plaintiff's Exhibit D?

15           THE COURT:  Is this a composite exhibit?

16           MR. ANTOLLINO:  This is a composite exhibit.

17           THE COURT:  How many photographs are there?

18           MR. ANTOLLINO:  Six.

19           THE COURT:  All right.  Go ahead.

20           Can you see this photograph.

21           THE WITNESS:  Yes.

22           THE COURT:  What is the photograph?

23           THE WITNESS:  It's a photograph of the bump on my

24  bottom lip that came up about a week later and kept getting

25  bigger and bigger.

LAM      OCR      RPR

Pierce - Direct - Antollino                      136

1          THE COURT:  Does it fairly and accurately reflect

2    the appearance of your lip at that time?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  Next?

5    BY MR. ANTOLLINO:

6    Q    And did that eventually pop, that bump?

7    A    Yes, it did.  And then it came back.

8    Q    I'm going to put on the Elmo machine this and ask you if

9    this fairly and accurately represents what it looked like when

10   it popped.

11   A    Yes.

12   Q    When you went to the dermatologist, was there a procedure

13   other than the pain shot that he gave you --

14         MS. DEPOIAN:  Objection.

15         THE COURT:  Sustained.

16   Q    Did you go to a doctor more than once for this mark or

17   bump on your lip?

18   A    Yes.

19   Q    All right.  The first time you said, I believe, he gave

20   you a pain shot; is that right?

21         MS. DEPOIAN:  Objection.

22         THE COURT:  Sustained.

23   Q    What did he do the first time?

24   A    The dermatologist after my primary care doctor, he

25   referred me to the dermatologist, and he gave me a steroid

1    shot in it to, in laymen's terms, to calm it down until I went

2    to go see a dental surgeon.

3    Q     And what did the dental surgeon do?

4    A     He checked it out, he said it can only be removed by

5    surgery, and he gave me a date to come back to have it

6    removed.

7    Q     Okay.  And did you, in fact, have it removed?

8    A     Yes.

9          I was given several shots in my lip to numb it for

10   pain and they, I guess, cut it, they did what they did,

11   cleaned it out, all kind of stuff, and they stitched it up and

12   gave me a prescription for stuff.  And I just had a checkup to

13   come back to see them after I think three weeks, four weeks.

14   Q     And did they put some type of a stitch there?

15   A     Yes, they stitched it up.

16   Q     What did the stitch look like?

17   A     It was about three dissolving stitches, three dissolving

18   stitches that had a string attached to it.

19   Q     And did it look anything different than a regular stitch

20   or did it look just like a regular stitch?

21          MS. DEPOIAN:  Objection.

22          THE COURT:  Sustained.

23   Q     What did it look like?  Try to describe it as accurately

24   as possible.

25   A     It was basically three stitches in my mouth, from what

Pierce - Direct - Antollino                     138

1   they said, and there was a thread coming, and they said it

2   would dissolve on its own as it heals.

3   Q    And did having the stitch make it difficult in any way

4   for you to use your mouth?

5   A    Yes.

6         I was only supposed to eat soups, cold foods.  Not

7   really hot foods as it could dissolve the stitches and affect

8   the area.  I could not chew, so for a couple of weeks I was to

9   eat basically soft foods, not hot, yogurt and such, and drink

10  plenty of fluids.

11        MR. ANTOLLINO:  Counsel, you have 80 in D; is that

12  correct?

13        MS. DEPOIAN:  Yes.

14  Q    I'm going to show you, is this what the stitch looked

15  like?

16  A    Yes.

17  Q    And that was in for how long?

18  A    About three to four weeks.

19  Q    Now, I found a document that I hadn't intended to offer

20  earlier, Pierce 53 from C.  I'm going to show you this and ask

21  you -- this is kind of dark, but if you can identify this for

22  the jury.

23  A    This is a picture of the --

24        MS. DEPOIAN:  Objection.

25        THE COURT:  Well, you can ask him what it's a

1   picture of.  Go ahead.

2   A    It's a picture of the side of my face, the other scrapes,

3   while describing that the side of my face was rubbed into the

4   road, to the asphalt.

5            MR. ANTOLLINO:  May I ascertain -- let me try to

6   make this a little brighter, if I can.  I don't know how to do

7   that.

8            THE COURT:  Mr. Antollino, you understand no one is

9   seeing this but you, the witness, defense counsel, and me

10  because you have not moved them into evidence.

11           MR. ANTOLLINO:  Okay.  I was under a misimpression;

12  therefore, I would ask that this be admitted into evidence.

13           THE COURT:  Any objection?

14           MS. DEPOIAN:  No objection, your Honor.

15           THE COURT:  You need to give it a number.

16           MR. ANTOLLINO:  This is Pierce C, Bates stamped 53.

17           THE COURT:  I don't want to hear the Bates stamp.

18  Stop telling me the Bates stamp.

19           MR. ANTOLLINO:  But some of the collective exhibits

20  have more than one.

21           THE COURT:  If you're offering them separately and

22  not collectively, they each have to have a number.

23           MR. ANTOLLINO:  All right.

24           THE COURT:  Ladies and gentlemen, we're going to

25  take our morning recess so as not to take your time with this.

Pierce - Direct - Antollino                    140

1   We will reconvene at 11:25.  Please feel free to go anywhere

2   you want; you can go downstairs, you can go out.  Don't talk

3   about the case, don't do any research about the case, don't

4   even think about the case.  We'll see you in a few minutes.

5              (Jury exits.)

6              THE COURT:  You may step down, Mr. Pierce.

7              Mr. Antollino, this case is not going in

8   effectively.  The purpose of giving defense counsel and the

9   Court advance exhibit binders is so you just go through each

10  separate tab, offering them one at a time, however you have

11  numbered the exhibits.  You can give whatever numbers you

12  want.

13             But what we can't do is tear apart previously

14  identified collective exhibits and offer them one at a time

15  with no numbers on them.  Now, you have to do better at this

16  or I'm going to have to stop you from doing this because we're

17  taking too much of the jury's time through just lack of

18  planning to do the trial.  So, please, get it together during

19  this break and let's try it again when we come back.

20             MR. ANTOLLINO:  I apologize.

21             (Recess taken.)

22             THE COURT:  Let's have Mr. Pierce back on the stand

23  and bring in the jury, please.

24             MR. ANTOLLINO:  Should I take the...

25             THE COURT:  Please.

LAM       OCR       RPR

Pierce - Direct - Antollino                    141

1          (Jury enters.)

2          THE COURT:  Please proceed, Mr. Antollino.

3          MR. ANTOLLINO:  Thank you for the break, your Honor.

4          I believe you admitted, and you don't care about the

5    Bates stamp, but what we're calling Plaintiff's Exhibit 1.

6    There's been no objection.  Can I put it on the Elmo machine

7    to have the jurors see it?

8          THE COURT:  Wait.  I don't think I admitted an

9    Exhibit 1.  I think I admitted an Exhibit C.

10          MR. ANTOLLINO:  Well, we called it C and you told

11   us -- and you suggested we change it to numbers, and that's

12   what we've done.

13          THE COURT:  Mr. Antollino, I did not suggest you

14   change it to numbers.  You can call it Exhibit Frank or

15   Exhibit Bob.  Whatever you want to call it is fine, just tell

16   us what it is and use it.

17          MR. ANTOLLINO:  For the record, we changed Exhibit C

18   to Exhibit 1.

19          Did the jury see that?  Was the screen turned on for

20   the jurors for C?

21          THE COURT:  I don't know.  If you asked for it to be

22   displayed to the jury and it was in evidence, then it was

23   displayed to the jury.

24          MR. ANTOLLINO:  It was?

25          THE COURT:  If you asked for it to be admitted in

LAM       OCR       RPR

1    evidence and it was received and you then asked for it to be

2    displayed to the jury, then it was displayed to the jury.

3    That's what I can tell you.

4              MR. ANTOLLINO:  Great.

5    BY MR. ANTOLLINO:

6    Q    With respect to Exhibit 2, which is this picture --

7              MR. ANTOLLINO:  Since it's a little dark, may I ask

8    that I just publish this to the jury the old-fashioned way

9    since it's a little dark?

10             THE COURT:  You have to get it admitted into

11   evidence first.

12             MR. ANTOLLINO:  I'm asking for it to be admitted

13   into evidence.

14             THE COURT:  Is there any objection?

15             MS. DEPOIAN:  No objection.

16             THE COURT:  It's received.

17             (Plaintiff's Exhibit 2 so marked.)

18             THE COURT:  You may display it in whatever manner

19   you think best.

20             MR. ANTOLLINO:  Thank you, Judge.

21             (Exhibit published to the jury.)

22             THE COURT:  Mr. Antollino, you don't have multiple

23   copies?

24             MR. ANTOLLINO:  Not for that one.  I didn't expect

25   for it not to show up on the Elmo machine.  I apologize.

1          I would ask that Exhibit 3, which is Pierce 56, be

2     admitted into evidence.

3          Is there an objection?

4          MS. DEPOIAN:  I need to see it.

5          MR. ANTOLLINO:  That's the lip.

6          MS. DEPOIAN:  We just need to know which document.

7          THE COURT:  Mr. Antollino, put the picture on the

8     Elmo and we'll display it to the parties.

9          THE COURT:  Any objection?

10         MS. DEPOIAN:  No objection, your Honor.

11         THE COURT:  Exhibit 3 is admitted.

12         (Plaintiff's Exhibit 3 so marked.)

13         MR. ANTOLLINO:  May it be shown to the jurors?

14         THE COURT:  Yes.

15         (Exhibit published to the jury.)

16         MR. ANTOLLINO:  I'm going to ask that Exhibit 4 be

17    admitted, and that is Bates stamp 57.

18         THE COURT:  Are you putting it on the Elmo so

19    counsel can see it?

20         MR. ANTOLLINO:  Okay.

21         MS. DEPOIAN:  No objection, your Honor.

22         THE COURT:  Four is admitted.

23         (Plaintiff's Exhibit 4 so marked.)

24         MR. ANTOLLINO:  May it be shown to the jurors?

25         THE COURT:  Yes.

Pierce - Direct - Antollino                144

1              (Exhibit published to the jury.)

2              MR. ANTOLLINO:  I'm going to take this off and I'm

3      going to show it to counsel, Exhibit 5.

4              Is there an objection?

5              MS. DEPOIAN:  No, your Honor.

6              THE COURT:  Exhibit 5 is received.

7              (Plaintiff's Exhibit 5 so marked.)

8              MR. ANTOLLINO:  May it be shown to the jurors.

9              THE COURT:  Yes.

10             (Exhibit published to the jury.)

11             MR. ANTOLLINO:  I'm taking this off now and showing

12     to counsel and to the witness Exhibit 6, and I ask that this

13     be moved into evidence.

14             MS. DEPOIAN:  No objection.

15             THE COURT:  Received.

16             (Plaintiff's Exhibit 6 so marked.)

17             MR. ANTOLLINO:  May it be shown to the jurors?

18             THE COURT:  Yes.

19             (Exhibit published to the jury.)

20     BY MR. ANTOLLINO:

21     Q    What was this exactly, to explain it to the jurors, just

22     to remind them what you were talking about before.

23     A    That is a picture of my lip after it was stitched up

24     after the surgical process of being cut and cleaned out and

25     whatever they did.  They gave me stitches and for -- they

Pierce - Voir Dire - Antollino                    145

1    lasted about three to four weeks.

2              THE COURT:  He's just asking --

3              MR. ANTOLLINO:  Try to answer the question only.

4              THE COURT:  -- what the picture is.

5              MR. ANTOLLINO:  Sorry.

6              THE COURT:  Try not to talk over me, Mr. Antollino.

7    It's very hard for the court reporter.

8              Next, please.

9              MR. ANTOLLINO:  I'm taking that off.  All right.

10             And I'm showing to counsel Exhibit 7 and ask if

11   there is an objection.

12             MS. DEPOIAN:  Yes, your Honor.

13             THE COURT:  The objection is sustained.

14   Q    Let me ask you, Lerin, you were testifying earlier that

15   Officer Belardo said something to the officers while you were

16   on the ground, correct?

17   A    Correct.

18   Q    She mentioned something about what?

19   A    That there were video cameras in the area.

20   Q    Did there come a time that you were able to ascertain

21   whether there were video cameras in the area at the time and

22   later take pictures?

23   A    Yes.  When I was picked up off the ground, I saw video

24   cameras in the area.  I saw the streets and I looked up and I

25   saw cameras.

Pierce - Voir Dire - Antollino                146

1   Q    Does this picture that you see in front of you fairly and

2   accurately represent the security camera that was there at the

3   time of the occurrence?

4   A    Yes.

5             MR. ANTOLLINO:  Okay.  I ask that it be admitted.

6             MS. DEPOIAN:  Permission to voir dire the witness,

7   your Honor.

8             THE COURT:  Go ahead.

9   VOIR DIRE EXAMINATION

10  BY MS. DEPOIAN:

11  Q    Mr. Pierce, this photograph was taken just last month,

12  right?

13  A    Correct.

14  Q    And it was taken by your attorney, correct?

15  A    Correct.

16  Q    And you don't know how far away this photograph was taken

17  from where you were hit by the car, do you?

18  A    I mentioned it was taken approximately in the area that I

19  was hit by the police car.

20  Q    But you don't know how far away it was taken from where

21  you were hit by the police car, do you?

22  A    Not the exact distance, but you could see it.  As I said,

23  when you turn around, you could see the camera from where you

24  were standing at.  I don't know the exact yardage.

25  Q    So, you can't approximate the distance at all, right?

Pierce - Voir Dire - Antollino                147

1  A    Not by numbers, but, as I said, if you measure it by

2  eyesight, if you turn around from the approximate area that I

3  was hit, you can see the camera.  It was less than a half

4  block.

5  Q    You don't know if this photograph was zoomed in at all,

6  do you?

7  A    It looks like it was zoomed in from where we were

8  standing.  He had to have zoomed it in from where we were

9  standing at.

10 Q    And the building behind this camera, that's Atlantic

11 Terminal, right?

12 A    I don't know for sure.  It's in that area.  It's at the

13 corner of Atlantic and Ashland.  It's in that area.

14 Q    But you testified on Monday that you were nowhere near

15 Atlantic Terminal, right?

16          MR. ANTOLLINO:  Objection.

17          THE COURT:  Sustained.  Next question.

18          MS. DEPOIAN:  No more questions.

19          We move to keep this evidence out, your Honor.

20          THE COURT:  The objection to the admission of the

21 photograph is sustained.

22          MR. ANTOLLINO:  Are there any more questions I could

23 ask to establish foundation or should I move on?

24          THE COURT:  It's your case, Mr. Antollino.

25          (Continued on next page.)

LAM      OCR      RPR

Pierce - direct - Antollino                    148

1    (Continuing)

2    Q    Are there any more questions I could ask to establish

3    foundation or should I move on?

4            THE COURT:  It's your case, Mr. Antollino.

5    Q    Can you estimate in terms of the distance between you and

6    something else in this room how far that camera was from where

7    you were hit by the car?

8            MS. DEPOIAN:  Objection.

9            THE COURT:  Sustained.

10   Q    You indicated that there was a half a block?

11   A    Less than a half a block.

12   Q    What?

13   A    Less than a half a block.

14   Q    Less than a half a block.

15           And what was the cross street at Flatbush where you

16   were hit?

17   A    The next cross street would have been State Avenue.

18   Q    All right.  And I'm just going to show you this to

19   refresh your recollection.

20           Do you need your recollection refreshed as to where

21   exactly this camera is?

22           MS. DEPOIAN:  Objection.

23           THE COURT:  Sustained.

24   Q    All right.  Do you know where this camera is?

25   A    The camera that's up now?  The NYPD security camera?

Pierce - direct - Antollino                    149

1   Q    Yes.

2   A    Yes, I know where it is.

3   Q    I'm sorry?

4   A    Yes, I know where it is.

5   Q    Do you know what street it's on?

6   A    It is at Flatbush and Atlantic.

7   Q    Okay.  And was it there at the time you were hit by the

8   car?

9   A    Yes, it was.

10  Q    All right.

11        MR. ANTOLLINO:  Judge, I ask it be admitted now.

12        THE COURT:  Is there any objection?

13        MS. DEPOIAN:  Same objection, Your Honor.

14        THE COURT:  Sustained.

15        MR. ANTOLLINO:  All right.

16  Q    Whether we are able to introduce the picture or not --

17        THE COURT:  Mr. Antollino, please, just ask a

18  question.

19  Q    You did see the camera at the time?

20  A    Yes, I did.

21  Q    All right.  You did see the camera a month ago when we

22  took pictures; correct?

23  A    Yes.

24  Q    All right.  And you heard Officer Belardo say that there

25  were cameras in the area; correct?

Pierce - direct - Antollino                         150

1          THE COURT:  Mr. Antollino, we need to move on, you

2    have got all this already.

3          MR. ANTOLLINO:  All right.

4          Now, I want to show the witness a picture and this

5    is Exhibit 8 and ask --

6    Q    -- if you can identify what this is.

7    A    It is Flatbush Avenue.  It is the, on the left far part

8    of the picture, that's the sidewalk that I was running down,

9    and it is the three lanes, and the median that I ran across.

10   Q    Okay.  And does this fairly and accurately represent the

11   area in which you were hit by the car?

12   A    Yes.

13   Q    Okay.  And has it changed in any significant way since

14   the time you were hit by the car, even though it was taken

15   last month?

16   A    Significant how?

17   Q    Is there any way that you can notice that it has changed?

18   A    No, not from this picture, no.

19   Q    Does it fairly and accurately represent Flatbush Avenue?

20   A    Yes.

21   Q    At the place where you were hit by the car?

22   A    Yes.

23         MR. ANTOLLINO:  All right, I ask that this be

24   admitted into evidence.

25         THE COURT:  Is there any objection?

VB        OCR        CRR

Pierce - direct - Antollino                    151

1              MS. DEPOIAN:  No, no objection.

2              THE COURT:  Received.

3              (Plaintiff's Exhibit 8 was received in evidence.)

4              MR. ANTOLLINO:  All right, can it be shown to the

5   jurors?

6              THE COURT:  Yes.

7              (Exhibit published to jury.)

8   Q    All right.  The cars on that picture are going in what

9   direction, towards what borough?

10  A    The cars are going in the opposite way of downtown.

11  Q    Okay.  For those jurors who might not know which way

12  downtown is, are they going toward Manhattan or towards

13  Long Island?  Or do you not know?

14  A    I would say they would be heading toward Manhattan.  I

15  don't know where Long Island is, but they're going away from

16  downtown.  Yes, toward Manhattan, if anything.

17  Q    All right.

18             MR. ANTOLLINO:  I'm going to move on to -- you can

19  turn that off and let me show the witness Exhibit 9.

20  Q    Now, Exhibit 9 is kind of long, but at the bottom there

21  is the name of a street.

22             Can you see the name of the street without naming

23  it?

24             MS. DEPOIAN:  Objection.

25             THE COURT:  Well, I do not hear anything

VB        OCR        CRR

Pierce - direct - Antollino                    152

1   objectionable yet.

2   Q    Can you see the name of the street without naming the

3   street?

4   A    Yes.

5   Q    Okay.  And is this near the vicinity in which you were

6   hit by the car?

7   A    Yes.

8             THE COURT:  All right, let's have a side-bar.

9             (Side-bar conference held on the record out of the

10  hearing of the jury.)

11

12             (Continued on following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Side-Bar                                                      153

1              (Side-bar.)

2              THE COURT:  For these pictures to have sufficient

3     probative value to outweigh any unfair prejudice, you would

4     have to provide testimony that when you took them you were

5     standing in the approximate spot of where he was hit.  You

6     cannot zoom up to the fixture you are trying to photograph and

7     get a copy of that fixture because that is not how it looked

8     to the police or to him from the location they were at in the

9     street.

10             These are zoomed shots, okay?  You cannot establish

11    that, so you cannot use them.

12             MR. ANTOLLINO:  Well, he did admit they were zoomed

13    shots.

14             THE COURT:  Yes, he did, put that is the problem.

15    They are zoomed shots.

16             MR. ANTOLLINO:  I accept...

17             THE COURT:  I do not care whether you accept or not.

18    Go ask another question and go beyond these pictures.

19             (Side-bar end.)

20

21             (Continued on following page.)

22

23

24

25

VB         OCR         CRR

Proceedings                                                    154

1           (In open court.)

2    BY MR. ANTOLLINO:  (Continuing)

3    Q    All right.  Mr. Pierce, I believe that you testified that

4    you recall a, some construction that was occurring when you

5    crossed the street; is that correct?

6    A    Yes.

7    Q    Do you remember any of the colors of the construction?

8    A    The colors.  There was a long green fence on the opposite

9    side of the street that I was running toward.

10   Q    All right.  And at the time of the construction to now,

11   has the green fence diminished in any way?

12   A    Yes.  I guess, that's two years from now, they're still

13   doing some construction, but that long green fence is partly

14   there and more of the building has been built since then.

15   Q    All right.  I am just going to put this on the visual for

16   you to see.

17           Can you recognize the green fence or do you

18   recognize anything on this picture?

19   A    Yes.  There's a part of the green fence and there is, I

20   guess, barricades that are clear so you can see more of the

21   construction that has been built.

22   Q    All right.  Was this picture taken at or approximately --

23           MR. ANTOLLINO:  Withdrawn.

24   Q    Was this picture taken at approximately, to the best of

25   your recollection, the place where you were hit on Flatbush?

VB        OCR        CRR

Proceedings                                      155

1    A    Yes.  Approximately.

2    Q    Okay.  Does it fairly and accurately represent that space

3    but for the fact that there is more of construction that has

4    been completed?

5    A    Yes.

6    Q    Okay.

7              MR. ANTOLLINO:  I offer this to be admitted.

8              THE COURT:  Is there any objection?

9              MS. DEPOIAN:  None, Your Honor.

10             THE COURT:  It is received.

11             (Plaintiff's Exhibit received in evidence.)

12             MR. ANTOLLINO:  All right.

13             Could the jurors see the picture?

14             (Exhibit published to jury.)

15             MR. ANTOLLINO:  Okay.

16   Q    So, the green fence is right here where my finger is

17   pointing; correct?

18   A    Correct.

19   Q    There was more of it a couple years ago; correct?

20   A    Yes.

21   Q    All right.  And I notice that there is a sign that says

22   Premier Rentals at 300 Ashland.

23             Do you see that?

24   A    Yes.

25   Q    All right.  Is this on Ashland Street?

Proceedings                                          156

1   A    No, this is Flatbush Street.

2   Q    Okay.  Have you been able to inspect a map to find out

3   where Ashland Street is?

4   A    Ashland Street is the cross street that's adjacent to

5   Flatbush, it's like basically, next street over, so.

6   Q    All right, so, that building is named Ashland, but it is

7   the part of the building that faces Flatbush; correct?

8   A    Correct.

9   Q    All right.

10        MR. ANTOLLINO:  All right, I am finished with this.

11  Q    Now, during the course of the period after the weight

12  training incident and after the Labor Day incident, have you

13  seen any medical providers, including mental health providers,

14  physical health providers?

15  A    Yes.

16  Q    All right.  And can you just tell me the names of the

17  types of providers you have seen not related to this lawsuit?

18        THE COURT:  What kinds of practices and

19  professionals have you've seen?

20        THE WITNESS:  Orthopedics, physical therapy,

21  chiropractor, neurological, dermatologist.  What else, what

22  else?  Pain management.  I think it's all I can recall right

23  now, thank you.

24  Q    Okay.  Have you seen any mental health providers?

25  A    Oh, yes.  Yes.

Proceedings                                          157

1    Q    Okay.  What is the name of your mental health care

2    provider?

3    A    Ms. Vanessa Trujillo.

4    Q    Okay.  And how often do you see Ms. Trujillo?

5    A    How often?  I see her about twice a week.  Sometimes once

6    a week, depending on her schedule and my schedule, but for the

7    most part, twice a week.

8    Q    Okay.  And what kinds of things, in general, do you talk

9    about with Ms. Trujillo?

10   A    Talk therapy, we talk about my emotions.  We talk about

11   skills to be mindful.  We talk about how to, how I can

12   understand, better analyze how I feel at a given time and

13   assess those emotions.  How to make good decisions, wise

14   decisions, wise mind, being rational.  How to cope with being

15   angry and sad, and how to understand that being angry and sad

16   is normal, and how I can deal with that and manage it.

17   Q    All right.  Now, is there any tool that she has given you

18   to help manage your feelings?

19   A    She's given me many tools but the one tool that has been

20   very useful for me has been an emotional wheel.  I had a habit

21   of saying this or that annoys me and she always has to go in

22   detail and to dissecting that and say, I don't understand what

23   you mean by annoying, annoying to be could be anything.

24          So, she found this wheel and she said, instead of

25   you saying that this annoys you, just point to how you feel.

Proceedings                                    158

1   And we broke it down to -- and it helped me understand how

2   angry I was at a given time and how sad I would be at a given

3   time.  And if I, there are times where I would be sad, but at

4   a given point, I would actually think I'm angry and display

5   anger instead of how I truly felt.  So, that has been one of

6   my greatest assets that she has given me.

7   Q    All right.  And what does this wheel look like?

8   A    It's a circle wheel that breaks down three different

9   levels.  In the middle it has six different emotions, anger,

10  sadness, fear and on the other side it has joyfulness,

11  happiness, surprise.  And then on the outer level it breaks

12  down those terms.  And then on the outside it just breaks it

13  down into simplified terms.  It could be scared, if you're

14  feeling scared for the most part, it breaks down into being

15  fearful.  Like, feeling secluded it breaks down into being

16  fearful.  If I feel agitated, it breaks down into basically

17  being angry.

18  Q    So, it helps you decide what you are feeling at any given

19  time?

20  A    It helps me understand how I'm feeling at any given time

21  and how I may be feeling at any given time is normal, it's

22  okay, as long as I can identify with it.  It helps me to

23  become mindful, meaning that I'm in the courtroom right now in

24  front of all these people and I may feel ashamed and that may

25  make me feel fearful or I may be angry, but I can understand

Proceedings                                                159

1   that I feel angry and I will be mindful that I am not in the

2   place that initially made me angry and fearful and scared.  I

3   know that I am not at that place and it's okay to understand

4   that those feelings will be with me for the rest of my life

5   and that if I could be attentive to them, then I could

6   actually experience the other side of the wheel.  That's

7   joyful and pleasant feelings and stuff like that.  But it's a

8   hell of a challenge to do.

9   Q    All right.  It's a hell of a challenge.  Are you

10  attempting to overcome the challenge?

11  A    I have been.

12  Q    Okay.  And is it your hope that you will eventually get

13  to the other side of the wheel at some point?

14  A    That, that, that, that, that is definitely my, my goal.

15  I do not like being pissed off and angry or sad or numb all

16  the time.

17  Q    Okay.

18  A    It's not who I am.

19  Q    Now, in addition to Dr. Trujillo, is there another mental

20  health provider that you see?

21  A    Yes.  Dr. Aromin.

22  Q    And who is Dr. Aromin and what is his function?

23  A    He is my psychiatrist.  He manages my medication and I

24  see him every two-and-a-half months or every three months.

25  Q    Okay.  And is that also at the same location where

Proceedings                                                    160

1   Ms. Trujillo works?

2   A    No, no.  They're in different buildings, but under the

3   Institute of Family Health.

4   Q    All right.  To the best of your ability, what are the

5   prescriptions that Dr. Aromin gives you to cope with your

6   feelings?

7   A    Clonidine, sertraline and there was another recent one.

8   For side-effects.  I can't pronounce it, it starts with a R,

9   robundance [sic], robux [sic], but there's two consistent ones

10  and one in case of side-effects.

11  Q    All right.  Well, what were the side effects you were

12  experiencing?

13  A    Just a lot of stomach irritation.  The medication is

14  really upsetting to your stomach, so he helped me with

15  prescribing me that.

16  Q    What is the clonidine for?

17            MS. DEPOIAN:  Objection.

18            THE COURT:  Sustained.

19            MR. ANTOLLINO:  All right.

20  Q    How does the clonidine affect you?

21  A    How does it affect me?

22  Q    Yes.

23  A    You mean good or bad?

24  Q    Sorry?

25  A    How does it affect me?

VB          OCR          CRR

Proceedings                                        161

1   Q    Yes.

2   A    It helps me to sleep.  Before, I was having nightmares,

3   insomnia; meaning, I would stay up very, very late and so,

4   that was prescribed to me to basically, I guess, it kind of

5   lowers your blood pressure and it makes you feel drowsy and

6   puts you to sleep.  And from there, you're knocked out.  You

7   don't dream, you just sleep.

8   Q    And did you ever have a need for clonidine before

9   September 1st, 2014?

10  A    No.

11  Q    All right.  Have you ever used any clonidine before that

12  time?

13  A    No.

14  Q    Have you ever seen a mental health provider before that

15  time?

16  A    No.

17  Q    What about your father's death?

18  A    My father's death in college?  I saw my primary doctor.

19  That was in a different city.  When I was home, I was

20  experiencing some issues with school.  I saw my doctor and he

21  said I was feeling very sad and depressed and he gave me, I

22  guess, instructions for when I go back to campus, the

23  resources that I could use as I could be depressed.

24  Q    Did those issues resolve themselves?

25  A    Yes, when I returned back to school I talked to a

Proceedings                                          162

1   counselor and I went to some group therapy sessions with other

2   students and, you know, I since then put aside my father's

3   death and continued going to school.

4   Q    And I don't think you told us when you graduated from

5   school.

6             What year it was?

7   A    I graduated over the summer of 2010.

8   Q    Okay.  Between 2010 and the time you saw Trujillo and

9   Aromin, you had never seen any mental health provider;

10  correct?

11  A    That's correct.

12  Q    And did you have any need to see any mental health

13  provider before Trujillo and Aromin?

14  A    No.  My father's death was in 2003.

15  Q    Okay.  And the, your father's death was in 2003 and you

16  were in college at that time?

17  A    Yes, I was.

18  Q    So, it took a little bit longer to get your degree than

19  the four years?

20  A    I took a break and that's when I saw my doctor and I

21  got -- and I went back to school, yes.

22  Q    Okay.  Now, did there come a time that you didn't have a

23  refill of your clonidine, you noticed a difference?

24  A    Yeah, yeah.  I was really busy and I ran out of my

25  prescriptions and me and Vanessa basically, you know, part of

Proceedings                                                   163

1   our assessment, we talk about my medication and she asks me

2   how do I feel about them.  And I tell her that I did notice a

3   difference.  That the one week that I was not taking my

4   clonidine, I would have nightmares and the nightmares wouldn't

5   particularly be about the NYPD or my incident, they would just

6   be disturbing nightmares.  So, I did notice a big change from

7   not taking my clonidine and when taking it.

8   Q    All right.  And how does the sertraline affect you?

9   A    Sertraline is basically to help with my moods.  It's for

10  depression.

11          MS. DEPOIAN:  Objection.

12          THE COURT:  Sustained.

13          MR. ANTOLLINO:  All right.

14  Q    Do you -- well.

15          What are some of the negative feelings that you

16  suffer, if any?

17  A    The negative feelings that I suffer?

18  Q    Yes.

19  A    Because of the medication or just in general?

20  Q    No, no.  Without the medication that prompted you to get

21  medication.

22  A    I can't focus as much.  It takes me a lot to concentrate.

23  My moods, particularly at work if I'm given a task, I'm just

24  not really in good moods or focus, so it takes me some time to

25  just do away with my thoughts during a given day.  So, the

                    VB       OCR       CRR

Proceedings                                        164

1  sertraline helped with that.  But in general, day-to-day, I

2  can be very moody or just sad or just not wanting to just

3  intertwine with anybody.  People at work, friends in general.

4  Q    Were you humiliated by this in any way?

5            MS. DEPOIAN:  Objection.

6            THE COURT:  Sustained.

7            You have to stop leading him.

8            MR. ANTOLLINO:  All right, sorry.

9  Q    Can you think of any other negative feelings as a result

10  of this incident on September 1st, 2014?

11  A    Just being angry.  Angry and sad a lot.  And what stems

12  from that, I mean from that, that's just basic for me, but as

13  far as that, being ashamed.  It honestly took me over a year

14  for Ms. Trujillo to get me to say you're sad.

15            She said, are you sad.

16            I said, yes.

17            She said, can you say it.

18            I said, yes.

19            She said, well, are you going to say it.

20            I said, yeah.

21            And it took me a while to basically admit and say

22  I'm sad.  And the situation really pissed me off and I felt

23  humiliated and I felt ashamed.  That's why I spent so long not

24  telling a soul.  If it helped me to not tell my doctors what

25  happened, I would do so.  And even then, responses that I got

                    VB        OCR        CRR

Proceedings                                                      165

1    I felt judged, I felt shame.  I felt humiliated, I guess.

2    Q    All right.  So, where did you seek pain management?

3    A    I began to seek pain management after doing a lot of

4    physical therapy, about 40 sessions of physical therapy, about

5    30 sessions of chiropractory.  It was definitely helping, but

6    my back pain didn't go away.  It still stayed the same after I

7    did a visit or in between visits.  And I sought out pain

8    management and that was my, basically, the next step after

9    seeing those specialists.

10   Q    Did the pain management help?

11   A    Still temporarily.  We went through a series of

12   treatments, two epidural shots and then the next step was

13   talking about surgery, which I was afraid of, so I got second

14   opinions.

15   Q    Have you received all of the opinions you need now for

16   surgery or not?

17   A    No.  Not ideally.  This was during when, I guess, this

18   case honestly took on -- took off.  So, I haven't bared down

19   to someone to do it.  I want to stay away from it, but as far

20   as my pain is concerned with my back and I have a herniated

21   disc.

22            MS. DEPOIAN:  Objection.

23            THE COURT:  Sustained.

24            Ask another question, please.

25            MR. ANTOLLINO:  All right.

Proceedings                                        166

1   Q    What scares you about surgery?

2   A    Where I would end up, how my body would be five years

3   down the road and then ten years down the road and then so on.

4   Even little smallest of incision, there is a 50/50 percent

5   chance that it would help me.

6   Q    Let me stop you here.  Have you done this research on

7   your own?

8   A    I have talked to --

9           MS. DEPOIAN:  Objection.

10  A    I talked about it with doctors.

11          THE COURT:  Sustained.

12          MR. ANTOLLINO:  Okay.

13  Q    And is there any other reason that you are afraid of

14  surgery?

15  A    Just going through the pain of it.  It's a scary thing.

16  Down the road I could very well need a major surgery.  Now

17  they're talking just minor surgery.

18          MS. DEPOIAN:  Objection.

19          THE COURT:  Sustained.

20  Q    The dermatologist, you've already talked about the lip

21  issue.

22          Is there any other reason you went to the

23  dermatologist?

24  A    No.

25  Q    Okay.  Now, are you still seeing a physical therapist?

                    VB      OCR      CRR

Proceedings                                    167

1   A     I am seeing a physical therapist, yes, regarding my

2   shoulder.

3   Q     All right.  Now, your shoulder was not something that was

4   in perfect condition when you were hit by the car; is that

5   correct?

6   A     That is correct.

7   Q     All right.  So, that you originally obtained a surgery

8   for that when you were in -- when?

9   A     Right after high school.  In 2001 I received a surgery.

10  Q     In between 2001 to the present, when did your shoulder

11  start bothering you such that you went to physical therapy for

12  it?

13  A     My shoulder began to bother me weeks after the incident

14  on September 1st, 2014.

15

16              (Continued on following page.)

17

18

19

20

21

22

23

24

25

Pierce - direct - Antollino                        168

1    EXAMINATION CONTINUING

2    BY MR. ANTOLLINO:

3    Q    What about an orthopedist, who is your orthopedist?

4    A    I don't recall his name.  He's not technically my

5    orthopedist.  I saw two and I can't think of their names.

6    Q    All right.  And so you only saw them twice?

7    A    No, I saw them several times, but I can't think of their

8    names.  I just saw two different ones.

9    Q    All right.  Were they able to resolve the problem in any

10   way, your -- the pain that you or -- withdrawn.

11          Were they able to solve any of the reason you went

12   to the orthopedist for?

13          MS. DEPOIAN:  Objection.

14          THE COURT:  Sustained.

15          Did they fix your shoulder?

16          THE WITNESS:  No, sir.

17          THE COURT:  Next question.

18   BY MR. ANTOLLINO:

19   Q    All right, you also mentioned a neurologist, I believe?

20   A    Yes, I did see a neurologist.

21   Q    And was there one or more neurologists?

22   A    I saw two neurologists.

23   Q    And was the first one able to diagnose your -- any

24   problems?

25   A    Mildly.  She gave -- she diagnosed me with carpal

Pierce - direct - Antollino                     169

1    tunnel --

2          MS. DEPOIAN:  Objection.

3    A    -- and --

4          THE COURT:  Sustained.

5          MR. ANTOLLINO:  All right.

6    BY MR. ANTOLLINO:

7    Q    And did you see another neurologist recently?

8    A    Yes.

9    Q    All right.  And were you satisfied with that care?

10   A    Again, she -- she diagnosed me --

11   Q    Don't say what she diagnosed you with.

12   A    Okay.  She was helpful, and then she referred me to a --

13   what's the word, a physiologist.

14   Q    Physiatrist?

15   A    A physiatrist, yes, a doctor/physical therapist who has

16   been very helpful.

17   Q    What do you do with the physiatrist?

18   A    We are just working on finding what's directly wrong with

19   my shoulder and while -- my shoulder and elbow, and

20   disfigurity [sic] between the other one.  Basically, one side

21   is bigger than the other and they are helping me to understand

22   why and how to lift weights and if anything, if it could -- if

23   it could be fixed.

24   Q    So you don't know at this point whether it has any

25   effect?

SAM      OCR      RMR      CRR      RPR

Pierce - direct - Antollino                    170

1   A    Say that again.

2   Q    You don't know whether it has had any effect on you or

3   not?

4   A    I don't understand your question.  Has what had any

5   effect on me, the therapy?

6   Q    The physiatrist.

7   A    It's been helpful.  So I don't know.  I don't know

8   what's -- what's the bottom line yet.

9   Q    Okay.  Now, I understand you must have some insurance

10  from the City of New York?

11          MS. DEPOIAN:  Objection.

12          THE COURT:  Sustained.

13  BY MR. ANTOLLINO:

14  Q    Do you have any insurance?

15          MS. DEPOIAN:  Objection.

16          THE COURT:  Sustained.

17  Q    All right, have you had to pay any money as a result of

18  seeing all of these doctors?

19  A    Yes.

20  Q    All right.  Approximately how much money?

21  A    About $10,000.

22  Q    And that's since 2014?

23  A    Correct.

24  Q    All right, now, I believe that in this case there were

25  two collections of bills that we were able to get, is that

SAM      OCR      RMR      CRR      RPR

Pierce - direct - Antollino                    171

1    correct?
2            MS. DEPOIAN:  Objection.
3            MR. ANTOLLINO:  Withdrawn.
4    BY MR. ANTOLLINO:
5    Q    Did there come a time where you collected together the
6    bills that were being collected from you and the ones that you
7    had paid the co-pays?
8    A    Yes.
9    Q    And when was that, approximately?
10   A    The first time?
11   Q    Yes.
12   A    Was it winter of 2016 I think I gave you all of my bills
13   that I had in the mail; November, December 2016 possibly.
14   Q    All right.  And did there come a time that we recorded
15   the bills?
16   A    Yes.
17   Q    Okay, and I am just going to show you Plaintiff's
18   Exhibit 12 and ask you if this refreshes your recollection as
19   to the bills that you recorded in handwriting form?
20   A    Yes.
21   Q    And how was this summary made?
22   A    We were at your office and I had a big stack of bills and
23   it was easier for you to read them off to me and I write them
24   down so you can get a -- I guess an estimate of -- of what
25   they were.

Pierce - direct - Antollino                    172

1   Q    Okay.  Is that your handwriting?

2   A    Yes.

3   Q    And what did I have in my hand when I was reading these

4   numbers to you that you were writing down?

5   A    You were going through the bills that I had received in

6   the mail.

7   Q    And you gave me those, correct?

8   A    Correct.

9   Q    All right.  Have you been collecting them over the years?

10  A    Yes, I -- I -- when I got them I just threw them in a

11  bag.  I did -- after I got a few of them, I got tired of

12  looking at them, so this just at a point in time where I did

13  not want to deal with anything related to this case.  Things

14  in the mail, bills, it just stressed me out and bugged me out,

15  so I put them aside.

16  Q    All right, so Exhibit 12 is just part of the bills that

17  you had received, correct?

18  A    Correct.

19  Q    All right.

20            MR. ANTOLLINO:  I ask that plaintiff's Exhibit 12 be

21  admitted.

22            MS. DEPOIAN:  No objection.

23            THE COURT:  Received.

24            (Plaintiff's Exhibit 12 was received in evidence.)

25            MR. ANTOLLINO:  And briefly it is just a list of

SAM      OCR      RMR      CRR      RPR

Pierce - direct - Antollino                 173

1   numbers, but if I could show it to the jury.

2            (Exhibit published.)

3            MR. ANTOLLINO:  Okay, that is enough.

4   BY MR. ANTOLLINO:

5   Q    Did there come a time that you produced another stack of

6   bills to me to summarize?

7   A    Yes.

8   Q    All right, and let me ask you something.

9            Did you -- you have the backups for all these bills

10  in actual paper form, correct, the ones on Exhibit 12 that you

11  hand wrote?

12  A    Yes, I have copies somewhere, thrown somewhere.

13  Q    Did you get more bills since the time that you made this

14  summary, Exhibit 12?

15  A    Yes, I get a lot of bills.

16  Q    All right.  And did we make -- did you produce those to

17  me to make another summary?

18  A    Yes, I gave a stack of bills to you.

19  Q    And approximately --

20           MR. ANTOLLINO:  Do you have the -- we'll give it a

21  try anyway.  Okay.

22  Q    Can you describe approximately how much in the stack of

23  bills there was?

24  A    In the new stack?

25  Q    In the new stack, yes.

SAM      OCR      RMR      CRR      RPR

Pierce - direct - Antollino                    174

1   A    A couple thousand, 2,000.  I forget.

2   Q    Okay.

3   A    I gave them to you and I didn't want to deal with them

4   again.

5   Q    All right.  Do you get a lot of calls from bill

6   collectors?

7   A    Yes --

8              MS. DEPOIAN:  Objection.

9              THE COURT:  Sustained.

10  BY MR. ANTOLLINO:

11  Q    Do you get any calls from bill collectors?

12             MS. DEPOIAN:  Objection.

13             THE COURT:  Sustained.

14  Q    Are you indebted to any medical care providers?

15             MS. DEPOIAN:  Objection.

16             THE COURT:  Well, are there other bills pending

17  besides the ones that we have been discussing that you have

18  not paid?

19             THE WITNESS:  Yes, sir, there is.

20             THE COURT:  How much?  What is their approximate

21  total?

22             THE WITNESS:  Since the -- since the ones I gave

23  him, maybe like $200.  There are like a few co-pays of $30

24  each that I haven't given him yet.

25             THE COURT:  Okay.

SAM      OCR      RMR      CRR      RPR

Pierce - direct - Antollino                    175

1          MR. ANTOLLINO:  I will just double check with

2     counsel.

3          (Pause.)

4          MR. ANTOLLINO:  Okay, Your Honor, at this time I

5     have no further questions for Mr. Pierce.

6          THE COURT:  All right, ladies and gentlemen, let's

7     take a slightly early lunch break.  We will come back here at

8     1:15, please.  If Ms. Clarke has not done it, she will give

9     you a list of restaurants or we have a good cafeteria

10    downstairs.

11         Please do not talk about the case.  Do not do any

12    research into the case.  Keep an open mind.  Have a good

13    lunch.  See you.

14         (Jury exits.)

15         THE COURT:  All right, you can sit down.

16         THE WITNESS:  Thank you.

17         THE COURT:  Everyone can sit down.

18         (Witness steps down.)

19         THE COURT:  What is your plan after Mr. Pierce, what

20    do you have?

21         MR. ANTOLLINO:  Well, Ms. Trujillo didn't come.  I

22    don't believe --

23         THE COURT:  Mr. Antollino.

24         MR. ANTOLLINO:  I am calling -- I am not thinking,

25    I'm sorry, Judge.

Pierce - direct - Antollino                176

1              I am going to call Mr. Mercado tomorrow,

2    Dr. Sternberg and Ahsin Rafiq were subpoenaed to come in both

3    at 9:30.  So I think there is enough to take us to almost to

4    4:30 because they are going to cross Mr. Pierce, I assume, and

5    I am going to redirect.

6              THE COURT:  Right, but you are going to do Officer

7    Mercado this afternoon?

8              MR. ANTOLLINO:  Yes.

9              THE COURT:  Okay, that's fine.

10             MR. ANTOLLINO:  Thank you.

11             THE COURT:  See you after lunch.  Please be promptly

12   back.

13             MS. DEPOIAN:  Briefly, can we ask you about the

14   charge?

15             You had said at your pretrial conference that you

16   wanted us to submit our objections or a supplemental charge?

17             THE COURT:  And/or.

18             MS. DEPOIAN:  Okay, and/or, that was my question.

19             THE COURT:  Whichever you want.

20             MS. DEPOIAN:  Okay, thank you.

21             (Luncheon recess taken.)

22             (Continued on the following page.)

23

24

25

Pierce - cross - Depoian                            177

1                    AFTERNOON SESSION:

2              (In open court.)

3              (Judge BRIAN M. COGAN enters the courtroom.)

4              THE COURTROOM DEPUTY:  All rise.

5              THE COURT:  Okay, let's have the jury, please.

6              THE COURTROOM DEPUTY:  All rise.

7              (Jury enters.)

8              THE COURT:  All right everyone, be seated.

9              Welcome back, ladies and gentlemen, I hope you had a

10   nice lunch.

11             Cross-examination.

12             MS. DEPOIAN:  Yes, Your Honor.

13             THE COURT:  Mr. Pierce, back up here.

14             (Witness resumes stand.)

15             THE COURT:  You may inquire.

16             MS. DEPOIAN:  Thank you.

17   CROSS EXAMINATION

18   BY MS. DEPOIAN:

19   Q    Good afternoon, Mr. Pierce.

20   A    Good afternoon.

21   Q    I have a lot of questions for you, but first of all, let

22   me ask you this.

23             You injured your back three-days before

24   September 1st, 2014; correct?

25   A    When you say injured, I inquired to the doctor.

Pierce - cross - Depoian                    178

1          THE COURT:  You don't know what she means by

2     injured?

3          Did you injure your back three-days before

4     September 1st?

5          THE WITNESS:  I went to the doctor regarding my back

6     about lifting weight the, yes.

7     Q    So, the answer is yes, you did injure your bank three

8     days before; is that right?

9     A    Well, no, I wouldn't say injured because the doctor

10    didn't give me a diagnosis the.  I felt I injured my book and

11    went to the doctor to inquire about did, from lifting weights

12    previously, yes.

13    Q    I'm not sure I understand that.

14         Was there an injury to your back that you went to

15    the hospital for on September, I'm sorry, before

16    September 1st, 2014?

17    A    Yes.

18    Q    So, there was an injury to your back.

19    A    That's the point, I can't say it was an injury.  He never

20    said I had an injury, he never diagnosed me with an injury,

21    but I was hurt and I did go to the doctor and asked him to

22    look at my back, yes.

23    Q    Okay.  I'd like to show you what's been previously marked

24    as Plaintiff's Exhibit X.  It's a couple-page Exhibit, DF309

25    to DF317.

Pierce - cross - Depoian                    179

1          Would you like a copy of those to have in front of

2    you?

3               THE COURT:  He has them.

4               MS. DEPOIAN:  A full copy?

5               THE COURT:  You want him to thumb through them?

6               MS. DEPOIAN:  If he wouldn't mind.  I can show him

7    each page at a time.

8               THE COURT:  As you please.

9               MS. DEPOIAN:  Okay.

10   Q    Do you recognize these records?

11   A    Yeah.

12   Q

13   A    Yes.

14   Q    What do you recognize them to be?

15   A    Medical records from the institute of family health about

16   an appointment.

17   Q    Okay.  And do you see the date of those records?

18   A    Yes.

19   Q    What is that?

20   A    August 2nd, 2014.

21   Q    All right.  And will you agree that that's three days

22   before September 1st, 2014?

23   A    Yes.

24   Q

25               MS. DEPOIAN:  Your Honor, I'd like to offer

Pierce - cross - Depoian                    180

1   Plaintiff's Exhibit X into evidence at this time.

2           THE COURT:  Any objection?

3           MR. ANTOLLINO:  No.

4           THE COURT:  Received.

5           (Plaintiff's Exhibit X received in evidence.)

6           MS. DEPOIAN:  And we could just publish that to the

7   jury.

8           THE COURT:  Okay.

9           (Exhibit published to jury.)

10          MS. DEPOIAN:  I direct your attention to page 312 of

11  this.

12          THE COURT:  Hang on a second.

13          Melonie, why is that so unfocused?  It is supposed

14  to auto-focus.  I wonder if the auto-focus is off.

15          (Pause in the proceedings.)

16          THE COURTROOM DEPUTY:  I just turned it on.

17          THE COURT:  There we go.  Okay.

18          MS. DEPOIAN:  Thank you, perfect.

19          THE COURTROOM DEPUTY:  One second.

20          MS. DEPOIAN:  Okay.

21  Q    On page 312, do you see on the top left-hand corner where

22  it says reason for visit?

23  A    Yes.

24  Q    And that says back pain, right?

25  A    Yes.

VB        OCR        CRR

Pierce - cross - Depoian                181

1   Q    And right under that it says pain information.  Four,

2   hurts awe whole lot, back.  Right?

3   A    Yes.

4   Q    And right under that it says patient presents with back

5   pain since last night; correct?

6   A    Correct.

7   Q    And it says LBP pain four of five, right?

8   A    Yes.

9   Q    You will agree that LBP stands for letter back pain?

10  A    Correct.

11  Q    And while we are on these records, you will see on page,

12  I will direct your attention to page 314, you were prescribed

13  ibuprofen on August 29th, 2014, for your back pain; is that

14  right?

15  A    Yes.

16  Q    And you were also prescribed a muscle relaxer on that

17  day, right?

18  A    Yes.

19  Q    Okay.  Okay, so you had an injury to your back on

20  August 29th, 2014; correct?

21  A    I had back pain, not back injury, but I did go to the

22  doctor for back pain.

23  Q    Okay, so it's your testimony when you went to the doctor

24  for back pain on August 9th, 2014, your back wasn't injured at

25  awe?

Pierce - cross - Depoian                    182

1          MR. ANTOLLINO:  Objection.

2          THE COURT:  Overruled.

3          THE WITNESS:

4     Q

5     A    Correct.

6     Q    Okay.  And you were actually asked at your deposition

7     whether you had any back trouble in August of 2014; correct?

8     A    I believe so, yes.

9     Q    And you said no; correct?

10    A    Right.

11    Q    Was that the truth?

12    A    It's the same testimony as now.  I never had any back

13    injury.  Going, being a personal trainer, going to the doctor

14    for back pain and saying it's an injury totally different.

15    I'm in the saying I was not injured because the doctor did not

16    give me an diagnosis of being injured.  I was going there to

17    see if I was injured so I went there for back pain.  That's

18    what I am admitting.  I did go to the doctor for back pain and

19    my back did hurt a lot from doing squats and power cleans the

20    day before.

21    Q    Okay?

22    A    Two days before.

23    Q    So, let's talk about what happened on September 1st,

24    2014.

25          That was Labor Day, right?

VB          OCR        CRR

Pierce - cross - Depoian                          183

1   A      Yes.

2   Q      And you were off from work that day; correct?

3   A      Yes.

4   Q      And you decided to head to the shopping area locate

5   willed near the Fulton mall in Downtown Brooklyn, right.

6   A      Yes.

7   Q      You were all by yourself?

8   A      Yes.

9   Q      The Fulton mall is a very busy shopping area; correct?

10  A      It can be.

11  Q      Okay.  And there were holiday sales going on at that

12  time, right?

13  A      Yes.

14  Q      So, it was busy that day, right?

15  A      That morning I went, it wasn't busy as the New York

16  streets are, but it was fairly business.  It was.

17  Q      Okay.  And so, when you arrived there, the first stop you

18  made was at Radio Shack, right.

19  A      Yes.

20  Q      And the Radio Shack is located was located right on

21  Fulton Street, right?

22  A      Yes.

23  Q      And while you were inside the Radio Shack, a store

24  employee asked you if you were trying to steal something,

25  right?

VB        OCR        CRR

Pierce - cross - Depoian                              184

1   A    Yes, ma'am.

2   Q    And after that.  Sharoon Samuel, he testified, right?

3   A    Yes, that's correct did.

4   Q    And there came a point where you left the store, right?

5   A    Yes.

6   Q    And after you left the store you were approached by a

7   male police officer when you were walking down flat burn

8   avenue; is that right?

9   A    Yes, ma'am.

10  Q    And that was Sergeant Mercado; is that correct; is that

11  right?

12  A    Correct.

13  Q    And Sergeant Mercado asked you if you had stolen a cell

14  phone case; correct?

15  A    Yes.

16  Q    And at some point during your conversation with Mr. I'm

17  sorry Sergeant Mercado, a female officer was also present,

18  right?

19  A    Yes.

20  Q    And that officer was Sonia bell, sitting right at that

21  table over there, right?

22  A    Yes, ma'am.

23  Q    All right.  And at some point during your conversation

24  with Sergeant Mercado, Sharoon Samuel was also present, right?

25  A    Yes.

Pierce - cross - Depoian                    185

1   Q    And you heard Mr. Samuel tell the officers that you had

2   tried to steal the cell phone, right?

3   A    He said quite a few things, but he didn't say that I

4   stole the tremendously cell phone.  He said I was going to

5   steal this, I was going to steal this.

6   Q    Okay.  But he said something about you stealing cell

7   phone, right?

8            MR. ANTOLLINO:  Objection.

9            THE COURT:  Overruled.

10  A    No, he said I was going to steal this, I was going to

11  steal the cell phone case.  He didn't say I stole the cell

12  phone case, he said I was going to steal the cell phone case.

13  Q    So that's a yes, he told the officers something about you

14  stealing a cell phone case, right?

15           MR. ANTOLLINO:  Arguing with the witness.

16           THE COURT:  Overruled.

17           THE WITNESS:  No, ma'am, he said I was going to

18  steal the cell phone case, he said I was going to steal a cell

19  phone case and he said a whole bunch of other stuff.  If you

20  want me to tell you, I can elaborate on it.

21  Q    So, Officer Belardo spoke to Mr. Samuel as well; is that

22  right?

23  A    We all in the conversation, yes.

24  Q    And Sergeant Mercado then went and spoke to Mr. Samuel

25  off to the side, right?

Pierce - cross - Depoian                    186

1    A    Yes, for a period of time those two had went to the side

2    and they were talking about something and me and

3    Officer Belardo was standing there.

4    Q    And at the point where Sergeant Mercado and Mr. Samuel

5    were speaking, you couldn't hear what they were saying, right?

6    A    No, not entirely.

7    Q    And at this point, a third officer approached you on a

8    New York City Police Department scooter; is that right?

9    A    Correct.

10   Q    And that officer on the scooter was Officer Taqi, who is

11   sitting at that table right there, right?

12   A    Yes, ma'am.

13   Q    And when Officer Taqi came up, he said you should be

14   arrested, right?

15   A    No, no, ma'am.

16   Q    Okay.  Did you give a 50-h hearing in this case?

17   A    Yes, I did.

18   Q    And that was on January 20th, 2015, right?

19   A    Yes.

20   Q    I'm looking at page 36.  Okay.  On page 36, line 12, were

21   you asked these questions and did you give these answers?

22        QUESTION:  Then what happened?

23        ANSWER:  At that point I was talking to the female

24   officer and like I said, the other officer that came on the

25   scene I guess the third officer when he came, everything just

VB        OCR        CRR

Pierce - cross - Depoian                    187

1   really went kind of hectic.

2         QUESTION:  Well I need you to get a more detailed I

3   need to get a more detailed explanation from you, I don't know

4   what that means.

5         ANSWER:  Like I said, he came up, he was rude and

6   cocky.  He is like, just who cares what this guy says?  Just

7   cuff him, handcuff him, look at the tape and if it looks

8   like -- I won't read that part -- then cut the wire -- I'm

9   sorry.

10        MS. NANAU:  Objection.

11        MS. DEPOIAN:  If it looks like that, then arrest

12  him.

13        THE WITNESS:  Could you read it please.

14        THE COURT:  First of all, I want only one lawyer per

15  witness.  So, you two decide who is going to be the lawyer

16  defending this cross.

17        MR. ANTOLLINO:  I'm sorry about that, Judge.

18        THE COURT:  Mr. Since Mr. Antollino did the direct,

19  I only want to hear from him.

20        MR. ANTOLLINO:  Okay, I object to her.

21        THE COURT:  All right, I've got it.

22        Read it.

23        MS. DEPOIAN:  Yes, okay, read the entire answer,

24  Your Honor.

25        THE COURT:  That's right.

Pierce - cross - Depoian                    188

1              MS. DEPOIAN:  Okay.

2              ANSWER:  Like I said, he came up, he was rude and

3    cocky, he is like, just who cares what this guy says?  Just

4    cuff him, handcuff him, look at the tape and if it looks like

5    he cut the wire, then arrest him.

6    Q    Were you asked those questions and did you give those

7    answers?

8    A    Yes.

9    Q    Was that the truth?

10   A    It was a synopsis of what happened and I said the same

11   thing in my other deposition from what I recall.

12             THE COURT:  The question is when you gave that

13   testimony, was it true?

14             THE WITNESS:  Yes.

15             THE COURT:  Okay.

16             Go ahead.

17   Q    So, when Officer Taqi came up, he said you should be

18   arrested, right?

19             MR. ANTOLLINO:  Objection.

20             THE COURT:  Overruled.

21             THE WITNESS:  No, he did not say I should be

22   arrested.

23   Q    At your 50-h hearing did you testify that Officer Taqi

24   said you should be arrested when he came up to you?

25   A    That's not what I said at my 50-h hearing.  I said.

Pierce - cross - Depoian                    189

1           THE COURT:  It's okay.  The jury has heard what you

2     said and they will make their own determination of what it

3     means.

4           Go on.

5     Q    You were told when you were at the scene that the

6     officers were going to go back to the store and look at their

7     surveillance video from the store, right?

8           MR. ANTOLLINO:  Objection to who told whom.

9           THE COURT:  I don't know what under the rules of

10    evidence who told whom what rule that fits under.  The

11    objection is overruled.

12    Q

13    A    Repeat the question, please.

14    Q    Sure.

15          You were told that the officers were going to go

16    back to the Radio Shack and look at surveillance video from

17    the store; correct?

18          MR. ANTOLLINO:  Vague.

19          THE WITNESS:  Was I told.

20          THE COURT:  Let's have a side-bar, please.

21          (Side-bar conference held on the record out of the

22    hearing of the jury.)

23

24          (Continued on following page.)

25

VB        OCR        CRR

1           (Side-bar.)

2           THE COURT:  Mr. Antollino, I cautioned the parties,

3      the attorneys before trial that I did not want any speaking

4      objections.  I do not want the jury to know what you think is

5      wrong with a question.  So, just object.  If you feel

6      compelled to say more, then cite a rule of evidence because

7      they will not know what rule you are citing.  If you do not

8      like my ruling on it and you feel the need to argue it ask for

9      a spar.  But do no tell the jury that in your opinion the

10     question is vague.

11          Overruled.

12          (Side-bar end.)

13

14

15          (Continued on following page.)

16

17

18

19

20

21

22

23

24

25

Proceedings                                          191

1           (In open court.)

2    Q    Okay.  Mr. Pierce, you were told that the officers were

3    going to go back to the Radio Shack and look at the

4    surveillance video from the store, right?

5    A    No, that's not what I was told.  There was, there was a

6    lot of conflict regarding that because before Officer Taqi

7    came up.

8           THE COURT:  Mr. Pierce, that's okay.  Explosive no

9    that's not what he was told.  Next question.

10          MS. DEPOIAN:  Okay.

11   Q    Okay, so I'm going to go back to your 50-h hearing on

12   January of 2015, page 37, line 2.

13          QUESTION:  Did he say go get the tape?

14          ANSWER:  No, he said we'll look at the tape.

15   Q    Were you asked that question and did you give that

16   answer?

17   A    Can you read it in a sense that I would understand it?

18   Q    Of course.

19          Were you asked these questions and did you give

20   these answers he is?

21          QUESTION:  Did he say go get the tape.

22          ANSWER:  No, he said we'll look at the tape.

23          QUESTION:  Was he referring to the video

24   surveillance in Radio Shack.

25          ANSWER:  Yes.

                    VB        OCR        CRR

Proceedings                                              192

1   Q    Were you asked those questions and did you give those

2   answers?

3   A    I was asked those questions and I gave those answers.

4   Q    Okay.  So, did the officers tell you they were going to

5   go back and look at this video surveillance from the Radio

6   Shack?

7   A    Not in those words, no.  You're not reading -- you're not

8   saying what they said correctly.  That's not what they said.

9   Q    Okay.  After the officer had said something about the

10  surveillance video, that's when you ran away from the

11  officers, right?

12  A    No.

13  Q    Okay.  You gave a deposition this matter; correct?

14  A    Yes, ma'am.

15  Q    That was on January 6th of this year, right?

16  A    Yes, ma'am.

17  Q    Were you asked these questions and did you give these

18  answers.  I'm starting at page 134, line 24?

19          QUESTION:  Are you handcuffed at this point?

20          ANSWER:  No, I wasn't handcuffed at all.  I wasn't

21  handcuffed at all.

22          QUESTION:  Okay.

23          ANSWER:  It wasn't clear that they were going to

24  arrest me.  It wasn't clear if they were actually going to go

25  back to the store and view the, view the tape.

Proceedings                                                    193

1    Q    Were you asked those questions and did you give those

2    answers?

3    A    Yes, ma'am.

4    Q    Okay.  So, you ran away from the officers because you

5    thought they were going to go back to look at the video

6    surveillance from inside the store, right?

7    A    No.  I would not have had a problem with them looking at

8    the video surveillance and that was my question to them.  And

9    that's what we were debating about because from the

10   conversation them going back to look at the tape, they would

11   not find anything in those accusations.

12          THE COURT:  Mr. Pierce, like I said, to you on

13   Monday, I know you don't do this for a living, but if the

14   question can be fairly answered with a; yes or no answer, you

15   should just say; yes or no.

16          THE WITNESS:  Okay.

17          THE COURT:  The answer is no.

18          THE WITNESS:  So, no.

19   Q    Okay.  But you ran away after they mentioned looking at

20   the tape, you ran away, right?

21   A    No.

22   Q    Okay.  You ran away because you thought you were about to

23   be arrested, right.

24   A    No.

25   Q    After you ran away from the police officers, you

VB        OCR        CRR

Proceedings                                              194

1    continued to rundown Flatbush Avenue, right?

2    A    Yes.

3    Q    And you were running away from the officers, right?

4    A    Correct.

5    Q    And at first you ran down the sidewalk, right?

6    A    Correct.

7    Q    And while you were running on the sidewalk, you heard a

8    noise that you recognized at coming from a police car;

9    correct?

10   A    Yes.

11   Q    Okay.  And then it was coming from behind you, right?

12   A    On the side of me and sooner or later I then heard

13   regular sirens.

14   Q    At some point was it first coming from behind you?

15   A    To the side of me.  That was the tan car with the drill

16   noise.

17   Q    But you knew it was a police car that was making that

18   noise, right?

19   A    That's fair enough, yes.

20   Q    And you didn't stop running when you heard that noise,

21   did you?

22   A    No.

23   Q    Instead you decided to run across Flatbush Avenue, right?

24   A    That's fair to say, yes; correct.

25   Q    Now, Flatbush Avenue has two lanes of traffic going each

Proceedings                                                        195

1   way, right?

2   A    No, that's incorrect.

3   Q    How many lanes of traffic does Flatbush Avenue have?

4   A    Three.

5   Q    Three lanes going each way?

6   A    Yes.

7   Q    So, Flatbush Avenue has three lanes of traffic going each

8   way?

9   A    And a median.

10  Q    And a median.  So, it has six lanes of traffic and a

11  median?

12  A    Yes.

13  Q    You would describe that as a major avenue a major street,

14  right?

15  A    Yes.

16  Q    And this was in the middle of the day, right?

17  A    About 11:30, eleven 45, early in the day.

18  Q    And you didn't run across Flatbush Avenue in a cross

19  walk, did you?

20  A    No.

21  Q    And just to be clear, you were running across the street

22  in the direction of Atlantic terminal, right?

23  A    No, that's not accurate at all.  I was running directly

24  across the street, straight in a straight line against the

25  green wall right in front of me, a construction site.

Proceedings                                              196

1   Q    All right.  And where that construction site is, that's

2   on the same side of the road as Atlantic terminal, right?

3   A    On the same side as Atlantic terminal?  That could be

4   fair to say.

5   Q    Okay.  So, that's a yes?

6   A    Atlantic terminal may be three streets down but to where

7   in the vicinity to where I was.

8   Q    But the construction is on the same side of Flatbush

9   Avenue as Atlantic terminal, right?

10  A    Okay, that's true.

11  Q    So, you were crossing the direction towards the

12  construction?

13  A    Why he.

14  Q    And the construction is on the same side of the street as

15  Atlantic Terminal, right?

16           THE COURT:  I think we've got it.

17           THE WITNESS:  Two blocks down.

18  Q    And Atlantic Terminal is a major subway station, right?

19  A    I can't attest to that.

20  Q    You're not familiar with Atlantic Terminal?

21  A    I can't attest to it being a major subway station.  It's

22  a subway station.

23  Q    I'm sorry, I didn't hear you?

24  A    It's a subway station, I can't say it's a major subway

25  station.

Proceedings                                              197

1   Q    Okay.  And just to be clear, it was at the time when you

2   were running across the street when you were hit by the police

3   car, right?

4   A    Repeat that, please.

5   Q    It's at the time that when you were running across the

6   street that you were hit by the police car, right?

7   A    Yes.

8   Q    And the car that you were hit by was traveling in the

9   same direction as you, right?

10  A    Yes.  In the opposite way of traffic.

11  Q    Is that a yes?

12  A    Yes, with the object sit opposite lane of traffic.

13  Q    Okay.  And you didn't sigh how fast the police car was

14  going when it hit you, did you?

15  A    See how fast they were going?

16        MR. ANTOLLINO:  Objection.

17        THE COURT:  Overruled.

18  Q

19  A    I can't tell how fast they were going.

20  Q    So, that's a no, you did not know how fast the plies car

21  was going when it hit you, right?

22  A    No, not exactly.

23  Q    In fact, before you filed this lawsuit, you didn't even

24  know who was driving the vehicle when it hit you, did you?

25  A    It was, I know it was either Officer Belardo, officer

Proceedings                                                    198

1   America.

2   Q     Okay.  But you -- okay.  You didn't know that before you

3   filed this lawsuit, did you?

4   A     Not entirely, but I know it was their patrol carry, they

5   were in the car.

6   Q     You didn't see who was diving driving the vehicle, did

7   you?

8   A     I got a glimpse of it, but I didn't pay attention to who

9   it is, whether it was male or female, so, no.

10  Q     Okay.  At your deposition were you asked this question

11  and did you give this answer.  Page 157, Line 9?

12          QUESTION:  Did you see who was driving the vehicle

13  that hit you?

14          ANSWER:  No, I can't recollect who was driving the

15  vehicle.

16  Q     Did you were you asked that question and did you give

17  that answer?

18  A     Yes.

19          MR. ANTOLLINO:  Objection.  Can I give a reason?

20          THE COURT:  Overruled.

21  Q     So, you also don't know if the police car slowed down

22  before it hit you, do you?

23  A     I don't know?  Slowed down.  I mean, at I'm sorry point

24  she braked, but to my recollection, the vehicle did not slow

25  down as I was I was running across the street and I saw the

VB        OCR        CRR

Proceedings                                                          199

1   vehicle, I, I saw the vehicle speed up to hit me.

2   Q    Okay.  You just testified that you had no idea how fast

3   the police car was going when it hit you, though, right?

4   A    I could not tell you the exact miles per hour that the

5   car was going, but the car was going fast and as I was

6   running, I saw the car speed up.  I, honestly cannot tell you

7   how fast the car was going but I can tell you that I know the

8   car sped up to hit me and I couldn't avoid it.

9   Q    Okay.  You testified on direct that after you were hit by

10  the police car you were punched, kicked and lost

11  consciousness, right?

12            MR. ANTOLLINO:  Objection.

13            THE COURT:  Overruled.

14  A    Yes, I testified to being punched and I blacked out in

15  and out, I saw white light, heard ringing noises and backed in

16  and out.

17  Q    And you testified that when you stood up after you were

18  in handcuffs, you looked around for surveillance cameras; is

19  that right?

20  A    I looked around for what Officer Belardo had mentioned.

21  I looked around to make sure I knew where I was.

22  Q    It's a; yes or no question?

23  A    Yes.

24  Q    You testified earlier that when the police car hit you,

25  you rolled up in the air over the car; is that right?

VB        OCR        CRR

Proceedings                                    200

1   A    Yeah, in a way I rode up on the hood and plopped down to

2   the floor, to the road.

3   Q    You went to Brooklyn Hospital following this incident,

4   right?

5   A    Yes, ma'am.

6            MS. DEPOIAN:  I'd like to show the witness what's

7   been previously -- I've previously marked for identification

8   as Defendant's Exhibit I.

9   Q    Mr. Pierce, do you recognize these records?

10  A    I never seen them before, no.

11  Q    Okay.  Were you treated at Brooklyn Hospital on

12  September 1st, 2014?

13  A    Yes.

14  Q    Do you have any reason to believe these are not your

15  medical records from that date?

16  A    Do I have a reason to believe it or not?  I would say no.

17  I did get treated there.  I never seen the records, nor did I

18  retrieve them, so this is my first time seeing them.

19            MS. DEPOIAN:  I move these records into evidence.

20            MR. ANTOLLINO:  I have an objection.  I can bring it

21  up at side-bar or ask questions.

22            THE COURT:  You are objecting?

23            MR. ANTOLLINO:  No, I will bring it up --

24            THE COURT:  Do you have an objection?

25            MR. ANTOLLINO:  No, I do not have an objection,

                    VB        OCR        CRR

Proceedings                                    201

1    Judge.

2              THE COURT:  Then the document is admitted.

3              (Defendants' Exhibit I received in evidence.)

4

5              (Continued on following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Pierce - cross- Depoian                              202

1   CROSS-EXAMINATION (Continuing)

2   BY MS. DEPOIAN:

3   Q    I direct your attention to page 142, where it says

4   additional HPI.  Do you see where it says he says he was

5   running from police when he was clipped on his left side by a

6   car.  Do you see that?

7   A    Uh-hum.  Yes.

8   Q    Okay.  Did you tell the people at the hospital that you

9   were clipped by a car?

10  A    Yes.

11  Q    Okay, so you didn't tell the people at the hospital that

12  you flipped over a car, did you?

13  A    Did I tell them I flipped over a car?  No.

14  Q    You didn't tell the people at the hospital that you

15  rolled over the hood of a car, did you?

16  A    No, but clipped was basically saying the same thing.

17  Q    So that's a no, you didn't tell them you rolled over a

18  car; right?

19  A    No.

20  Q    Getting clipped by a car would be an accurate way to

21  describe someone who collided with a car that was stopped?

22  A    No.

23  Q    It would not?

24  A    No.

25  Q    You testified on direct that you blacked out several

MDL   RPR

Pierce - cross- Depoian                                       203

1   times; right?

2   A    Yes.

3   Q    At someone point you said you even saw a white light;

4   right?

5   A    Yes.

6   Q    And you testified that you hit your head; right?

7   A    Yes.  On my landing to the ground.

8   Q    But you actually told the people at Brooklyn Hospital

9   that you didn't lose consciousness; right?

10  A    Dizziness, losing consciousness was all the same thing.

11  Being clipped was the same way of saying hit by a cop car.  I

12  felt very lightheaded, very dizzy.

13            THE COURT:  She is not asking you about that.  She

14  is asking you about the statement in the medical notes that

15  says, quote, he says he did not lose consciousness or hit his

16  head on anything, close quote.  Go ahead and put your question

17  about that.

18  Q    Did you tell the staff at Brooklyn Hospital that you did

19  not lose consciousness?

20  A    I did not lose consciousness?  I suppose so.

21  Q    And was that the truth?

22  A    It depends on how you describe losing consciousness and

23  blacking out.

24  Q    You testified that you lost consciousness; right?

25  A    I testified that -- yes, I testified that I blacked in

MDL   RPR

Pierce - cross- Depoian                              204

1    and out.  I never used the word consciousness.

2    Q    When you went to the hospital on September 1, 2014, you

3    told the hospital staff that you did not lose consciousness;

4    right?

5    A    That's probably what they asked me, but I did say that I

6    blacked out.

7    Q    So that's a yes, you told the hospital staff at Brooklyn

8    Hospital that you did not lose consciousness; right?

9    A    Yes.

10   Q    Okay.  And you told them that you did not hit your head?

11   A    She might have asked me did I hit my head on anything, I

12   said no.

13   Q    Okay, and was that the truth?

14   A    Not the accurate truth.

15   Q    So you lied to the hospital staff?

16   A    I didn't lie to the hospital staff.  I gave them the best

17   information that I could.  Them saying did I lose

18   consciousness, me saying I lost consciousness, being that I

19   lost consciousness.

20           She didn't ask me did I lose consciousness and gain

21   consciousness or whatnot.  Me saying did I lose consciousness,

22   from my understanding of it was that I was out.  I said that I

23   blacked out repeatedly.

24   Q    So you did tell the hospital staff that you blacked out?

25   A    To a certain extent.

Pierce - cross- Depoian                              205

1   Q     And they wrote down that he denies loss of consciousness;
2   right?
3   A     Yes.
4   Q     After the car hit you, you testified that you were
5   punched; right?
6   A     Yes.  I was handcuffed and I was punched in my face.
7   Q     But you didn't tell the hospital staff that you were
8   punched; right?
9   A     I probably told the doctor that, yes.
10  Q     Okay.  I am going to read --
11  A     There were bruises on my face, so I did mention being
12  hit.  There were obvious scars on my face and he looked at
13  them.
14  Q     I am going to read where it says visit reason, chief
15  complaints.  It says right knee pain, second to MVC.  Patient
16  stated he was hit by a car.  Denies loss of consciousness.  CO
17  feeling dizzy.  Abrasions noted to right knee and right
18  temporal, and then it says something about a tetanus shot.
19         Does that say anything about you being punched?
20  A     No it doesn't.
21  Q     Does that say anything about you being kicked?
22  A     No, it doesn't.
23  Q     Does that say that you had any abrasions or bruises on
24  your body?  I'm sorry, contusions is what I meant to say, or
25  bruises on your body?

Pierce - cross- Depoian                                    206

1    A    It says abrasions noted.

2    Q    It says abrasions noted.  But it doesn't say anything

3    about bruises; right?

4    A    I think they are the same thing, but, no, it does not say

5    the word you're using.

6    Q    Okay.  And you testified that you were yelling that he

7    couldn't breathe when you were assaulted; right?

8    A    Yes, ma'am.

9    Q    But you have asthma; right?

10   A    Yes, ma'am.

11   Q    And you had just run from the police; right?

12   A    Yes, ma'am.

13   Q    And you testified that you had run faster than you

14   normally would; right?

15   A    Yes, ma'am.

16   Q    Okay.  And you also didn't tell the hospital staff that

17   you were experiencing any back pain when you went to the

18   hospital on September 1, 2014, did you?

19   A    On that day, no, I did not mention it.  It was a really

20   quick process.

21   Q    And, in fact, they examined your back and they found

22   there was nothing wrong with it; right?

23   A    That is incorrect.

24   Q    I will direct your attention to 145.  It says additional

25   PE.  You'll agree that that stands for physical examination;

Pierce - cross- Depoian                                207

1    right?

2    A    Okay.

3    Q    And it says, at the bottom line right here, back, no

4    midline tenderness in thoracic, lumbar or sacral areas.  Is

5    that what that says?

6    A    That's what that says.

7    Q    So they examined your back in a physical examination and

8    they found there was no tenderness; right?

9    A    That's what that says.

10   Q    And there is nothing else in these records about any

11   injury to your back, is there?

12   A    No, there's not.

13   Q    And at the hospital the doctor just gave you some

14   Tylenol; right?

15   A    Yes.

16   Q    And they told you to follow up with your primary care

17   doctor in a couple days; right?

18   A    They said to follow up with my primary care doctor, yes.

19   Q    You didn't actually see your primary care doctor for over

20   a month and a half later, did you?

21   A    A month later, yes.

22   Q    That was October 4, 2014; right?

23   A    October when?

24   Q    October 4, 2014; correct?

25   A    It might have been sooner than that.

Pierce - cross- Depoian                                    208

1   Q    I'm sorry?

2   A    It might have been sooner than that from what I recall.

3   Q    But it was October 2014; right?

4   A    Yes.

5   Q    You didn't see the doctor the next week, did you?

6   A    No.

7   Q    You didn't see the doctor at any time in September at

8   all, did you?

9   A    No.

10  Q    And you testified on direct that it is very important to

11  see a doctor as soon as possible when you're injured; right?

12  A    Yes.

13  Q    And you know that because of your experience with

14  physical training; right?

15  A    Correct.

16  Q    But in this case you didn't see a doctor for an entire

17  month after this happened; right?

18  A    I called the doctor to --

19  Q    But you didn't see the doctor; right?

20  A    Correct.

21  Q    And, in fact, when you had sustained your weight lifting

22  injury in August of 2014, you actually saw the doctor the very

23  next day, after that injury?

24  A    Days later, yes.

25  Q    And that was the same doctor facility; right?

Pierce - cross- Depoian                                    209

1   A    Yes, same facility.

2   Q    Okay.  But you did happen to e-mail your nurse

3   practitioner at your doctor's office the day after Labor Day;

4   right?

5   A    Yes.

6   Q    And in that e-mail you asked for your asthma medication;

7   right?  Is that a yes?

8   A    Yes.

9   Q    And you asked for your ibuprofen that you had been

10  prescribed from the weightlifting injury; right?

11  A    I asked for some of that, yes.

12  Q    And you asked for your muscle relaxer that you had been

13  prescribed from the weightlifting injury; right?

14  A    Yes.

15  Q    And you didn't ask anything about an appointment, did

16  you?

17  A    Actually, I did.  I called to set an appointment with my

18  doctor.

19  Q    In that e-mail, did you mention anything about trying to

20  get an appointment?

21  A    Not in that e-mail.

22  Q    And in that e-mail did you mention anything about the

23  fact that you were hit by a car the day before?

24  A    No.

25  Q    Did you mention anything that you were punched repeatedly

Pierce - cross- Depoian                           210

1   by the police officers the day before?

2   A    No, I did not --

3   Q    And did you mention anything in that e-mail about losing

4   consciousness and blacking out multiple times the day before?

5   A    No, ma'am.

6   Q    You just asked for your asthma medication; right?

7   A    I asked for my asthma medication, muscle relaxer,

8   ibuprofen to hold me over until I could see my doctor.

9   Q    You filed this lawsuit on October of 2016; right?

10  A    My attorney filed it then.  I actually filed a claim

11  90 days.

12  Q    You filed this lawsuit in October of 2016; right?

13  A    I guess that's fair to say, yes.

14  Q    But you testified on direct that you saw a chiropractor

15  -- the first time you saw a chiropractor was November of 2015;

16  right?

17  A    If it's in my notes, I believe so.

18  Q    The first time you saw a chiropractor was over a year

19  after this happened; correct?

20  A    That's fair to say, yes.

21  Q    And the first time you saw a neurologist was July of

22  2016; right?

23  A    I don't recall, no.  I can't say yes.

24  Q    You didn't see a neurologist any time in 2014, did you?

25  A    No.

Pierce - cross- Depoian                                    211

1   Q    You didn't see a neurologist at any time in 2015, did

2   you?

3   A    In 2015?  I did see a neurologist in 2015.

4   Q    Okay.  Did you give those records to your attorney?

5   A    A neurologist in 2015?

6   Q    Yes.

7   A    They should be.

8   Q    Okay.  Did you see -- the first time you saw an

9   orthopedist was actually also almost two years after this

10  incident in 2016; right?

11  A    No, I should have seen an orthopedic sometime in 2015,

12  from my recollection.

13  Q    Okay.  You testified that your one shoulder is weaker

14  than the other shoulder?

15  A    Yes, ma'am.

16  Q    And that's your left shoulder; right?

17  A    Yes, ma'am.

18  Q    And that's the same surgery -- the same shoulder that you

19  had the surgery on before; right?

20  A    Yes.

21  Q    And by the way, you didn't complain of shoulder pain when

22  you went to Brooklyn Hospital after this incident, did you?

23  A    No, ma'am.  I complained of pain all over my body to be

24  correct.

25  Q    You testified that you had an injury to your lip and we

Pierce - cross- Depoian                          212

1  saw those photos; right?  But you didn't even notice your lip

2  was injured, according to you, until a few days after this

3  incident; right?

4          MR. ANTOLLINO:  Objection to form.

5          THE COURT:  Overruled.

6  A    My lip was swollen at the time, but, no, the injury that

7  formed, the little bubble that kept coming and going did not

8  come until weeks later.

9  Q    And you were head-butted in the mouth while you were at

10 work at some point in 2015; right?

11 A    No.

12 Q    No?

13 A    No.

14 Q    Okay.  You listened to the testimony of your

15 ex-girlfriend this morning; correct?

16 A    Yes.

17 Q    Did you hear her say that she testified that you were

18 head-butted in the mouth in 2014?

19 A    She said that she did not know when it was.  She only

20 knew that it was cold, and she was correct, it was cold, but

21 it was December 2013.  It was around Christmastime.

22 Q    Okay.  And she testified that your lip was swollen from

23 the head-butting incident; right?

24 A    No, she said my lip was swollen the night I came home

25 from September 1, 2014.  My lower lip, she mentioned.

Pierce - cross- Depoian                          213

1   Q    She didn't mention that.  You heard her mention your

2   lower lip?

3   A    She said my lower lip was swollen when I came home.

4   Q    By the way, you never mentioned any injury to your lip

5   when you went to Brooklyn Hospital right after this incident;

6   right?

7   A    No, ma'am.  Because the injury I had to my lip, it was

8   swollen, but the injury that came on on the inside that needed

9   surgery, it flared up weeks later, a week later and it kept

10  coming and going.  As I busted it, it then go away.

11  Q    Okay.  Your ex-girlfriend, she moved out of New York City

12  in September of 2014; right?

13  A    Yes, late September.

14  Q    And you broke up a few months after that?

15  A    January 1st, 2015.

16  Q    Okay.  And you testified that you've had certain mental

17  issues before September 1, 2014; right?

18  A    Say that again.

19  Q    You testified that you had issues with your mental health

20  before September 1, 2014; right?

21  A    Issues with mental health?  No not on this level.

22  Q    Did you testify that you had to take a break from college

23  for some mental issues?

24  A    Because I was sad.  My dad had passed away.

25  Q    Is that a yes?

Pierce - cross- Depoian                                214

1   A    No.

2   Q    You had to take a break from college to deal with mental

3   health issues?

4   A    I would not label that in the same category as mental

5   health.

6   Q    You testified that you went to a counselor before

7   September 1, 2014; right?

8   A    Yeah, to cope with my dad.

9   Q    And you went to some group therapy; right?

10  A    As I was instructed, yes.

11  Q    Okay.  You injured your right knee in August of 2014

12  playing flag football; right?

13  A    Yes.

14  Q    If I understood your testimony correct on direct, you

15  testified that you also suffered an injury to your knee from

16  your interaction on September 1st; right?

17  A    I told them that I have pain in my knee.

18  Q    So that was also your right knee; right?

19  A    Yes.

20  Q    You testified that your -- the car actually hit your left

21  side; right?

22  A    Yeah.

23  Q    That's a yes?

24  A    Yes.

25  Q    You also said that you hurt your elbow; right?

Pierce - cross- Depoian                                    215

1   A    My elbow was impact on landing.

2   Q    You didn't mention your elbow was injured when you went

3   to Brooklyn Hospital, did you?

4   A    No, ma'am, I did not mention that.

5   Q    Okay.  I am going to show you what has been marked as

6   Defendants' Exhibit F-1, F-2, and F-3.  I will start with F-1.

7        Do you recognize this photograph?

8   A    Yes.  That's me, definitely.

9   Q    I'm sorry?

10  A    I said oh, yes, that's me, definitely.

11  Q    Okay.  And that was taken on September 1, 2014; right?

12  A    Yes.

13       MS. DEPOIAN:  I'd like to offer this photograph into

14  evidence.

15       MR. ANTOLLINO:  Just one?

16       MS. DEPOIAN:  I will do one at a time.

17       THE COURT:  Any objection?

18       MR. ANTOLLINO:  No objection.

19       THE COURT:  Received.

20       (Defendants' Exhibit F-1 was received in evidence.)

21  Q    This is the left side of your face, Mr. Pierce?

22       MS. DEPOIAN:  Oh, I would like to publish that to

23  the jury.  Is that up there?

24  Q    That's the left side of your face; correct?

25  A    Yes.  That's accurate to say.

Pierce - cross- Depoian                    216

1   Q    And this was taken after you said you were repeatedly

2   punched in the face on September 1, 2014; right?

3   A    Yes.

4   Q    There's no visible bruises from this photograph, are

5   there?

6   A    Yes, there is.

7   Q    Where do you see that?

8   A    If you look at the corner where my -- I guess facial hair

9   is, I guess between my mustache and facial hair there is a

10  small red mark.

11       THE COURT:  You can touch the screen and show where

12  you are pointing to.

13  A    Me.  Okay.

14  Q    It's your testimony that that's a bruise?

15  A    It is a small blemish.  I mean, as compared to the right

16  side, it is small.  She saw it and took a picture of it.

17  Q    It's a small blemish, is that what you just said?

18  A    Yes, ma'am.  It's a small blemish.

19  Q    There are no cuts in this picture, is there?

20  A    A little bit of skin off of my face.

21  Q    And that's the same spot that you are referring to as a

22  cut?

23  A    Can I see -- I can't see the red arrows.  They see red

24  arrows on your screens?

25       THE COURT:  Yes, you see it's up there.

Pierce - cross- Depoian                          217

1   A    The arrows that you are pointing at, it is small skin off

2   my face.  It is not pink, but it is not brown.

3   Q    That's from repeatedly being punched in the face?

4   A    That's probably my face being slid from one side to the

5   other.  My face was more so on the right side banging it, but

6   I guess trying to avoid all of that, that's how I got a little

7   scraped up.

8   Q    So that is from being punched in the face?

9   A    No.  That's from my face probably being slid on the

10  pavement.

11  Q    So are there any marks on your face from being punched in

12  the face in this photo?

13  A    On that photo, no, ma'am.

14  Q    There's no visible swelling to your lip in this photo, is

15  there?

16  A    Not that you can actually see from that angle.

17  Q    Okay.

18       MS. DEPOIAN:  Now, if I could get it just to show

19  the witness.  Thank you.

20  Q    This is what has marked for identification as Defendants'

21  F-3.  Mr. Pierce, do you recognize this photograph?

22  A    Yes, ma'am.

23  Q    Do you recognize it to be a photo of you taken on

24  September 1, 2014; right?

25  A    Same time as the other.

Pierce - cross- Depoian                    218

1    MS. DEPOIAN:  I would like to offer this into

2   evidence at this time.

3    MR. ANTOLLINO:  No objection.

4    THE COURT:  Received.

5    (Defendants' Exhibit F-3 was received in evidence.)

6    MS. DEPOIAN:  If we can show that to the injury.

7   Q    This is the right side of your face; correct?

8   A    Yes, ma'am.

9   Q    And you say this photograph was taken after you were

10  repeatedly punched in the face; right?

11  A    Yes, ma'am.

12  Q    There is no bruising shown in this photograph, is there?

13  A    You mean bruising?  Bruises or scrapes?

14  Q    Bruises.

15  A    Like black eye or anything?

16  Q    Exactly.

17  A    No, ma'am, I didn't have a black eye.

18  Q    You don't have any bruises on this side of your face, do

19  you?

20  A    The -- the -- I'm really confused about what you're

21  getting at between bruises and abrasions or scrapes.

22  Q    I will ask it a different way.  Do you have any marks on

23  your face that were caused by being punched?

24  A    Being punched?  No, ma'am.

25  Q    Okay.  There is just a small red mark that you have

Pierce - cross- Depoian                                    219

1   already marked for the jury; right?

2   A    I would say a medium size red mark.

3   Q    That wasn't caused by being punched?

4   A    It was not caused by being punched.

5   Q    And there came a time when that little cut healed; right?

6   A    There came a time, yes.

7   Q    You don't still have a scar or anything?

8   A    No, I took very good care of it.  I didn't want to see a

9   scar for the rest of my life on my face.

10  Q    And there is no swelling to your lip in this photograph,

11  is there?

12  A    Not from the angle you can see.

13  Q    Again, this was taken on September 1, 2014, right?

14  A    It was taken the next evening after my girlfriend got off

15  work.

16       MS. DEPOIAN:  If I could have it just for the

17  witness again.  Thank you.  I am showing the witness what has

18  been marked as Exhibit F-2.

19  Q    Do you recognize this photograph?

20  A    Yes, ma'am.

21  Q    This is a photograph of your knee right?

22  A    Yes, ma'am.

23       MS. DEPOIAN:  I would like to offer this into

24  evidence.

25       MR. ANTOLLINO:  No objection.

Pierce - cross- Depoian                    220

1          THE COURT:  Received.

2          (Defendants' Exhibit F-2 was received in evidence.)

3   Q    Mr. Pierce, this is a photograph of your right knee taken

4   on September 1, 2014; right?

5   A    Yes, ma'am.

6   Q    And there's some small abrasions to your knee noted;

7   right?

8   A    Yes.

9   Q    Okay.  And when you went to the hospital, they actually

10  did note there were abrasions to your knee; right?

11  A    My knee and my face.

12  Q    Okay.  And these were the abrasions that they were

13  talking about; right?

14  A    Yes.

15  Q    And these were the only abrasions that you had on

16  September 1, 2014; right?

17  A    As I recall, my knee and my face were the ones, yes.

18          MS. DEPOIAN:  If I could just have one moment, Your

19  Honor.

20          THE COURT:  All right.

21          MS. DEPOIAN:  I don't have any additional questions.

22          THE COURT:  All right.  Any redirect?

23          MR. ANTOLLINO:  Yes.

24  REDIRECT EXAMINATION

25  BY MR. ANTOLLINO:

Pierce - redirect - Antollino                    221

1   Q    Okay, Lerin, show the jury where you had an injury to

2   your lip that Ashley testified to that Ms. Deponian just

3   referred to?

4   A    Which one?

5              MR. ANTOLLINO:  Let me just show the witness, if I

6   may.

7   Q    This is Plaintiff's Exhibit 13.  Do you recognize this

8   picture?

9   A    Yes.

10  Q    All right.  And what is this picture?

11  A    It's a picture of a pretty nasty gash by playing

12  basketball with the youth teams at my rec center.

13  Q    You heard Ashley testify about that and Ms. Deponian

14  asked her about that; correct?

15  A    Yes.

16  Q    You never complained that the police caused this injury,

17  did you?

18  A    No, that injury happened as I said in the winter of 2013.

19  That's when it happened.  It happened at work.

20             MR. ANTOLLINO:  Judge, I'd ask that 13 be admitted.

21             THE COURT:  Any objection?

22             MS. DEPOIAN:  Objection, yes.

23             THE COURT:  Overruled.

24             It is admitted.

25             (Plaintiff's Exhibit 13 was received in evidence.)

Pierce - redirect - Antollino                    222

1          MR. ANTOLLINO:  May it be shown to the jury?

2          THE COURT:  Yes.

3   Q    Okay.  Did you have that stitched up and repaired?

4   A    Yes.

5   Q    So it doesn't show in the pictures that Ms. Deponian

6   showed you a few minutes ago; correct?

7   A    Say that --

8   Q    This injury does not show up in any of those pictures,

9   correct, that happened on September 1, 2014?

10  A    No, I never seen any of these pictures about --

11  Q    It has nothing do with this case?

12  A    No.

13         MR. ANTOLLINO:  I am finished with this.

14  Q    All right.  Now, I just want to ask you, the --

15  Defendants' Exhibit F-1, if you take a look, F-2 and F-3, were

16  those taken at the hospital or were those taken by Ashley?

17         MS. DEPOIAN:  Objection.

18         THE COURT:  Sustained.

19  Q    Are these the same set of pictures that were taken by

20  Ashley or did someone else take this picture?

21  A    You know what?  This picture might have been taken by

22  officers at the precinct, now that I think about it.

23  Q    All right.  In fact, what were you wearing on the day

24  that it occurred?

25  A    I honestly do not remember, but I do recall that the

Pierce - redirect - Antollino                    223

1    officers did take pictures of me at the center and I was

2    looking in the background at this bar here in the wall and I

3    don't -- that's not in Ashley's house, our home, but it is a

4    picture and there's like a small blemish on my cheek.  That's

5    pink.  It's not big or anything.  I think that's what the

6    officers took of me, now that I think about it.

7    Q    All right.  Now, Ms. Deponian was asking you about

8    bruises.  In your experience, how long does it take a bruise

9    to develop?

10                MS. DEPOIAN:  Objection.

11                THE COURT:  Sustained.  As to form.

12   Q    Have you had bruises before?

13   A    Yes, I had bruises before.

14   Q    All right.  And even black skin you can see a bruise

15   sometimes; correct?

16   A    Yes, brown skin.

17   Q    Thank you.  And a bruise occurs when?

18   A    It can occur immediately or days later after, depending

19   on the bruise, if it's a black eye or a punch, it depends.

20   Q    So there were no bruises on the day that you were

21   arrested; correct?

22   A    No, there's scrapes and abrasions, yes, whatever terms

23   that fit.

24                (Continued on following page.)

25

Pierce - redirect - Antollino                          224

1    EXAMINATION CONTINUING

2    BY MR. ANTOLLINO:

3    Q    Now, Ms. Depoian asked you --

4         MR. ANTOLLINO:  I need the records from the

5    institute and Exhibit X and the Emergency Room records.

6         (Pause.)

7         MR. ANTOLLINO:  Can I borrow your Exhibit X?

8         MS. SMITH:  Sure.

9         MR. ANTOLLINO:  I will put it on the screen.  All

10   right.

11        MS. DEPOIAN:  I think it's Exhibit I.

12        MR. ANTOLLINO:  Exhibit I and I will start.

13   BY MR. ANTOLLINO:

14   Q    All right, now Ms. Depoian asked you some questions about

15   the Institute of Family Health.

16        In your experience how long does it take to get a --

17   actually, I have the Brooklyn -- no, I don't.

18        How long does it take to get an appointment at the

19   institute for family health?

20        MS. DEPOIAN:  Objection.

21        THE COURT:  Sustained.

22        MR. ANTOLLINO:  All right.

23   Q    Can you always get an immediate appointment at the

24   Institute of Family Health?

25   A    No.

SAM       OCR       RMR       CRR       RPR

Pierce - redirect - Antollino                     225

1          MS. DEPOIAN:  Objection.

2          THE COURT:  Sustained.

3   BY MR. ANTOLLINO:

4   Q    When you called the day after you left Brooklyn Hospital,

5   would it have been your preference to see Dr. Kitson

6   immediately?

7          MS. DEPOIAN:  Objection.

8          THE COURT:  Overruled.

9   A    Yes.

10  Q    And you saw him as soon as he was available as you were

11  told?

12  A    Yes.

13  Q    And in the meantime, you sent an e-mail asking for

14  refills to tide you over until that time, would that be a fair

15  characterization?

16  A    The muscle relaxer Ibuprofen and my asthma medicine I

17  needed, so I asked the last doctor who sent it -- who sent it,

18  we were going back and forth and something was missing

19  actually from the prescription she previously gave me.  So

20  yes, I inquired about it until I met with my primary doctor.

21  Q    This was a nurse practitioner, correct?

22  A    Yes, something of that matter, yes.  Someone that you see

23  if you're -- you know, your doctor is unavailable.

24  Q    All right.  Did you have any reason to go into lengthy

25  discussion with your nurse practitioner about what happened

Pierce - redirect - Antollino                    226

1    the day before, if you couldn't see Dr. Kitson?

2    A    No, I did not feel comfortable sitting down to talk with

3    her about what I just experienced.

4    Q    Okay.  Now, there seems to be a lot of discussion about

5    consciousness, blacking out, dizziness.  Are all of those the

6    same in your mind or --

7              MS. DEPOIAN:  Objection.

8              THE COURT:  Sustained.

9    BY MR. ANTOLLINO:

10   Q    -- Or are they -- all right.

11             Can you distinguish between dizziness as you mean it

12   and blacking out?

13             MS. DEPOIAN:  Objection.

14             THE COURT:  I will allow it.

15   A    Dizziness is just as it is, I felt like -- I felt very

16   dizzy.  It's like standing still and you barely can -- can

17   stand up on your own.  Like you need to have a seat.

18             Blacking out is exactly what I said.  I saw a white

19   light.  I was punched.  I'm not sure if anyone has had a head

20   injury or hit against something, but you -- there was white

21   light and there is a pin noise and it just came in and out.

22   Every time I was punched hard to my head I would see white

23   light and I would hear a pin noise, and that happened

24   repeatedly.

25             I didn't lose consciousness.  I wasn't in a coma.

SAM      OCR      RMR      CRR      RPR

Pierce - redirect - Antollino                   227

1   Again, I woke up and I was in the hospital.  I just blacked

2   out.

3   Q    Okay.  So you just described the difference between

4   blacking out and unconsciousness, correct?

5   A    To the best of my ability.

6   Q    All right.  And there was no time that you were

7   unconscious on September 1st, correct?

8   A    Unconscious, like just out?

9   Q    Yeah, just out.

10  A    No, no, I blacked out repeatedly.

11  Q    Okay.  Now, there seems to be some discussion about the

12  reason for your visit on the 29th and whether it was pain or

13  injury.  How did you describe it to the doctor?

14  A    I describe it as pain.  It hurt a lot.  Being different

15  words I could use, I was very sore, that's pain.  I was hurt.

16  And I will not -- well, I cannot say it was an injury because

17  I could continue doing what I was doing, but me being

18  cautious, yes, I would rather get an opinion before I injure

19  myself.  That was the reason why I went and checked with the

20  doctor, and I was adamant about them maybe giving me an X-ray

21  or an MRI, although they were telling me --

22  Q    All right, let's try to just focus on the question and

23  the answer.  Keep it tight.

24          So at that time the advice was, as I recall, that

25  you --

SAM     OCR     RMR     CRR     RPR

Pierce - redirect - Antollino                    228

1   A     The doctor just encouraged me --

2               MS. DEPOIAN:  Objection.

3               THE COURT:  Sustained.

4               MR. ANTOLLINO:  All right.

5   BY MR. ANTOLLINO:

6   Q     What was the advice at the time you went, August 29th?

7   A     The doctor just encouraged me to take it easy for a

8   couple days.  He even gave me muscle relaxers.  I never had

9   muscle relaxers before, but he gave them to me to say if I

10  need them, they -- he said I was very tight.  I need to

11  stretch and start stretching before I do activity, even

12  lifting weights.  And that -- that was basically it.

13  Q     And did you intend to follow that advice?

14  A     I did.  I took it easy.  I didn't do anything and days

15  later I was fine.  I'm not trying to be a smart ass, but I ran

16  from the cops and I felt fine when I was running.  I took a

17  day -- a few days off and I was fine.

18  Q     Now, do you know the dictionary definition of clipped

19  versus hit?

20              MS. DEPOIAN:  Objection.

21              THE COURT:  I will allow it.  Do you know the

22  dictionary definition?

23              THE WITNESS:  Dictionary, no.

24              MR. ANTOLLINO:  All right.

25  BY MR. ANTOLLINO:

SAM      OCR      RMR      CRR      RPR

Pierce - redirect - Antollino                    229

1  Q    Do you know if you used -- all right, now, let's see.

2         How many people were taking notes when you went to

3  the Brooklyn Hospital Center after you were hit by the car?

4         MS. DEPOIAN:  Objection.

5  A    Just --

6         THE COURT:  Well --

7         MR. ANTOLLINO:  Withdrawn.

8         THE COURT:  Sustained.  Sustained.

9  BY MR. ANTOLLINO:

10 Q    Was there only one person talking to you and taking notes

11 or was there more than one person?

12 A    There was one, a male.

13 Q    There was one, a male.  And there was someone by the name

14 of Sylvie D'Souza, do you remember her?

15 A    Unless that's a unisex male name, I honestly do not.  I

16 just remember a male helping me during that time period.

17 Q    How long were you there for?

18 A    Not very long, about 20 minutes, I want to say.

19 Q    All right.

20 A    20, 25 minutes.  Should I elaborate or should I just

21 leave it at that?

22 Q    No, just answer the question.  You were there for

23 approximately 20 to 25 minutes?

24 A    Yes, not very long.

25 Q    All right.  Did you want to have more examination done on

Pierce - redirect - Antollino                230

1    your back?

2              MS. DEPOIAN:  Objection.

3              THE COURT:  Sustained.

4              MR. ANTOLLINO:  All right.

5    BY MR. ANTOLLINO:

6    Q    Did you ask to have further examination done?

7    A    Yes.

8    Q    All right.  And what kind of examination did you want?

9              MS. DEPOIAN:  Objection.

10             THE COURT:  Sustained.

11             MR. ANTOLLINO:  All right.

12   Q    Were you told by anyone other than a doctor that you

13   could get that at another time?

14             MS. DEPOIAN:  Objection.

15             THE COURT:  Sustained.

16   Q    What was the response when you asked for additional

17   examination?

18             MS. DEPOIAN:  Objection.

19             THE COURT:  Sustained.

20   Q    Were you given the additional examination that you

21   wanted?

22             MS. DEPOIAN:  Objection.

23             THE COURT:  Sustained.

24   Q    Were you given an X-ray?

25   A    No.

Pierce - redirect - Antollino                    231

1    Q    Were you given an MRI?

2    A    No.

3    Q    All right, now, the first time you saw a chiropractor was

4    in November of 2015 is what you told Ms. Depoian.  Do you

5    recall that?

6    A    Yes, to the best of my recollection that's probably

7    around the time I saw him.

8    Q    And why did it take that long for you to see a

9    chiropractor?

10              MS. DEPOIAN:  Objection.

11              THE COURT:  Overruled.

12   A    Because I had to complete physical therapy.  I had a -- a

13   doctor overseeing me at the medical center that I was at and

14   he wanted me to go through several series of physical therapy

15   and see if that had helped.  And then from there, he referred

16   me to the chiropractor.

17   Q    All right.  And your original shoulder surgery was in

18   what year again?

19   A    My shoulder surgery had been in 2001.

20   Q    Okay.  And was that at or about the time your father

21   died?

22   A    No, that was --

23              MS. DEPOIAN:  Objection.

24   A    -- before my father died.

25              THE COURT:  Sustained.  Sustained.

Pierce - redirect - Antollino                                232

1  BY MR. ANTOLLINO:

2  Q    When did your father die?

3  A    2003.

4  Q    And was that when you received the group therapy to cope

5  with the grief from his loss?

6  A    Yes, there are just different services.  If you were at

7  the institution, they have different fliers around, how to

8  cope, called grief and loss.  Do you have anxiety?  Just,

9  basically, services and resources that students can use, and I

10  saw that's what my doctor referred me to.  There are different

11  methods of -- that you can cope and -- okay.

12  Q    All right, did your father's death have anything to do

13  with your taking time off from college?

14  A    A little.  I was not doing good with my grades and I was

15  not -- I was not, how do they say, satisfied with my workload

16  that I was carrying, and so I just talked to some professors

17  and they, you know, they instructed me on what to do after I

18  told them that my dad died and I was just not, you know, not

19  in a good mood.  So they understood.

20  Q    All right, how long did you take off because of your

21  father's death?

22            MS. DEPOIAN:  Objection.

23            THE COURT:  Overruled.

24  A    One semester, and I had to repeat a couple classes from

25  that semester.  So it -- it totaled like two semesters I had

Pierce - redirect - Antollino                    233

1    to make up, that's why.

2    Q     Okay, it was no more than that time?

3    A     No, just one semester.

4              MR. ANTOLLINO:  Let me just consult with counsel.

5              (Pause.)

6              MR. ANTOLLINO:  Again, no further questions, Your

7    Honor.

8              THE COURT:  All right.  Anything else?

9              MS. DEPOIAN:  Nothing Your Honor.

10             THE COURT:  All right, you may step down,

11   Mr. Pierce.

12             THE WITNESS:  Thank you, Judge.

13             (Witness steps down.)

14             THE COURT:  All right, let's take our afternoon

15   break, ladies and gentlemen.  We will take until a quarter of

16   3.  Please remember not to talk about the case.  You are free

17   to move anywhere you want around the courthouse, just be back

18   in that room in 15 minutes.  Thank you very much.

19             (Jury exits.)

20             THE COURT:  All right, recess, 2:45.

21             (Recess taken.)

22             THE COURTROOM DEPUTY:  All rise.

23             THE COURT:  All right, let's have the jury, please.

24             (Jury enters.)

25             THE COURT:  All right, be seated, please.  The

Pierce - redirect - Antollino                    234

1   plaintiff may call his next witness.

2          MR. ANTOLLINO:  Thank you, Your Honor, the plaintiff

3   calls Ivan Mercado.

4          THE COURTROOM DEPUTY:  Please raise your right hand.

5          (Witness sworn/affirmed.)

6          THE COURTROOM DEPUTY:  Please state and spell your

7   name for the record.

8          THE WITNESS:  Ivan Mercado, I-V-A-N, M-E-R-C-A-D as

9   in David O.

10         THE COURTROOM DEPUTY:  Thank you.  You may be

11   seated.

12         THE COURT:  All right, you may inquire.

13         MR. ANTOLLINO:  Thank you, Judge.

14         (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

                SAM     OCR     RMR     CRR     RPR

1   I V A N   M E R C A D O,

2       called as a witness by the Plaintiff, having been

3       duly sworn/affirmed, was examined and testified as

4       follows:

5   DIRECT EXAMINATION

6   BY MR. ANTOLLINO:

7   Q    Good afternoon, sergeant.

8   A    Good afternoon.

9   Q    Last we met, you were a sergeant.  Are you still a

10  sergeant?

11  A    Yes, I am.

12  Q    Now, this arrest occurred in 2014 that we are talking

13  about, correct?

14  A    Yes.

15  Q    You had been out of the academy about six years, is that

16  correct?

17           MS. SMITH:  Objection.

18           THE COURT:  Overruled.

19  Q    How long had you been out of the academy?

20  A    Twenty years.

21  Q    Twenty years, big mistake, okay.  So you graduated in

22  1994 or 1984?

23  A    '97.

24  Q    '97?

25  A    I went into the academy in '97, I graduated in 1998.

SAM      OCR      RMR      CRR      RPR

Mercado - direct - Antollino                          236

1   Q     '98, so 16 years, okay.

2             And after you graduated from the academy --

3             THE COURT:  Mr. Antollino, it is 20 years.

4             MR. ANTOLLINO:  What?

5             THE COURT:  It is 20 years.  It is now 2017.

6             MR. ANTOLLINO:  Oh, well, that's as of today, I was

7   talking about 2014.  Thank you, Judge.

8   BY MR. ANTOLLINO:

9   Q     All right, so at the time you graduated from the academy,

10  that was when you were assigned a badge, correct?

11  A     Yes.

12  Q     And a badge is the same as a shield, correct?

13  A     Yes.

14  Q     All right, and having a badge gives you certain police

15  powers, correct?

16  A     I'm a police officer.

17            MS. SMITH:  Objection.

18            THE COURT:  Overruled.

19  BY MR. ANTOLLINO:

20  Q     You were allowed to arrest people, correct?

21  A     As a police officer, yes.

22  Q     Okay.  When you graduated from the academy you also took

23  oaths, correct?

24  A     Yes, I did.

25  Q     All right.  You took an oath to uphold the Constitution,

Mercado - direct - Antollino                237

1    correct?

2    A    Uphold the law.

3    Q    Up --

4    A    Uphold the law.

5    Q    Uphold the law.

6         And did your oath include the Constitution or just

7    the law generally?

8    A    Yes, the Constitution, too.

9    Q    All right.  Now, when you tell someone that they are

10   going to be under arrest, you use the word arrest, correct?

11   A    Could you repeat that?

12   Q    All right, if you are going to arrest someone, you say,

13   Sir, you are under arrest, correct?

14        MS. SMITH:  Objection.

15        THE COURT:  It is cross-examination because he is an

16   adverse witness, so it is okay.  Overruled.

17        Do you always tell people you are arresting, You are

18   under arrest; do you use those words?

19        THE WITNESS:  Depending on the situation.

20   BY MR. ANTOLLINO:

21   Q    More often than not, correct?

22   A    Yes.

23   Q    All right, you don't say, I'm gonna cuff you until I see

24   a video, correct?

25   A    I'm gonna cuff you until I see a video?

Mercado - direct - Antollino                238

1    Q    Yes.

2    A    If he is a under arrest, he's under arrest, he gets

3    cuffed.

4    Q    But you don't say, I'm gonna cuff you until I see a video

5    and really mean that you're under arrest, correct?

6    A    He can be cuffed for my safety, he doesn't have to be

7    under arrest.

8    Q    Okay.  Did you feel danger from Mr. Pierce -- you didn't

9    feel danger from Mr. Pierce when he was on the sidewalk when

10   you were inquiring with all the people there, were you?

11   A    No.

12   Q    Okay.  Now, you were taught at the academy that a misuse

13   of police powers could subject you to charges, correct?

14   A    Yes.

15   Q    And that would include, in general, departmental charges,

16   correct?

17          MS. SMITH:  Objection.

18   BY MR. ANTOLLINO:

19   Q    In general.

20          THE COURT:  Overruled.

21   Q    In general.

22          THE COURT:  Were you aware that you could be subject

23   to departmental charges for abusing your police powers?

24          THE WITNESS:  Yes.

25   Q    And it could also subject you to liability in court,

SAM     OCR     RMR     CRR     RPR

1   correct?

2   A    Yes.

3   Q    And they taught you that at the academy, correct?

4   A    Yes, it was -- it was -- it was taught to us, yeah.

5   Q    All right.  And you knew that when you graduated and took

6   the job, correct?

7            THE COURT:  Yes, we got that.  It was taught to him,

8   he knew it.

9            MR. ANTOLLINO:  All right.

10  BY MR. ANTOLLINO:

11  Q    And you also were taught about the criminal laws of the

12  State of New York, correct?

13  A    Yes.

14  Q    All right, now, you've worked your way up to sergeant

15  now, correct?

16  A    Yes.

17  Q    And you have an assignment as a community relations

18  officer, is that correct?

19  A    No.

20  Q    No?  Did you at one time?

21  A    No.

22  Q    All right.  You're working now as a security guard, is

23  that correct --

24  A    No.

25  Q    What is your assignment now?

Mercado - direct - Antollino                240

1   A    I'm a sergeant at Metrotech Center.

2   Q    Yes.  And community relations has nothing to do and never

3   had anything to do with your job?

4   A    It had something to do with my job, but not what I'm

5   doing now.

6   Q    Okay.  And you were a community relations officer when we

7   met for a deposition earlier this year, is that a fair

8   statement?

9   A    No, that's not a fair statement.

10  Q    All right.  When did you stop being a community relations

11  officer?

12  A    I was never a community relations officer.

13  Q    All right, what was your role within the community

14  relations department?

15  A    I had no role, I was a sergeant in the NYPD.

16  Q    All right.  Okay, so your first job was patrol, and then

17  did you do anything between patrol and being a security guard

18  at Metrotech Center?

19           MS. SMITH:  Objection.

20           THE COURT:  Overruled -- well, sustained.

21  Sustained.

22  BY MR. ANTOLLINO:

23  Q    Your first job was regular patrol, correct?

24  A    My first job in the NYPD was regular patrol in the South

25  Bronx.

Mercado - direct - Antollino                    241

1   Q    Okay.  And after the South Bronx you went to Brooklyn and

2   you were still on patrol?

3   A    I was promoted to sergeant and I went to Brooklyn.

4   Q    And as a sergeant you worked at Metrotech, correct?

5   A    As a sergeant when I was promoted I went to the 84th

6   Precinct.

7   Q    Okay, so there are different duties that different

8   officers have at different ranks, is that correct?

9   A    Yes.

10  Q    Now, a few months ago we were at a deposition as we've

11  established, correct?

12  A    Yes.

13  Q    And we were talking about the events that occurred on

14  Labor Day in 2014, correct?

15  A    Yes.

16  Q    All right.  And I believe you had some memo book entries

17  that you were asked questions about?

18  A    Yes.

19  Q    All right.  I am holding in my hand Plaintiff's

20  Exhibit 14.

21       MR. ANTOLLINO:  If I can show this to the witness.

22       THE COURT:  Okay.

23       MR. ANTOLLINO:  And this is also marked as

24  Plaintiff's A at the deposition.  Do you want me to take that

25  off?

Mercado - direct - Antollino                242

1   BY MR. ANTOLLINO:

2   Q    Do you recognize this cover sheet?

3   A    Yes.

4   Q    And that is your cover sheet for your memo book entries?

5   A    That's the cover sheet for my memo book.

6   Q    And that is your handwriting?

7   A    Yes.

8   Q    And page 2, defendant 1446, do you recognize all of this

9   as your handwriting?

10  A    Yes.

11  Q    And page 1448, do you recognize all of this as your

12  handwriting?

13  A    Yes.

14  Q    Okay.  And then finally, 1447 appears on the unlined

15  portion --

16          MS. SMITH:  Objection.

17          THE COURT:  Overruled.

18  Q    -- does this appear to be your handwriting?

19  A    Yes.

20  Q    Okay.  Now, can you read that from where you are?

21  A    You want to turn that around so I can --

22  Q    Sure.

23  A    It says --

24          MS. SMITH:  Objection.

25          THE COURT:  Sustained.

Mercado - direct - Antollino                          243

1          MR. ANTOLLINO:  The objection is --

2    A     Lieutenant to maintenance --

3          THE COURT:  Stop, stop.  Once I sustain, you cannot

4    answer.

5          THE WITNESS:  Sorry.

6          MR. ANTOLLINO:  Can I admit this into evidence?  I

7    apologize.

8          THE COURT:  Are you offering it?

9          MR. ANTOLLINO:  I am offering it.

10         THE COURT:  What exhibit number is it?

11         MR. ANTOLLINO:  This is Exhibit 14.

12         THE COURT:  Any objection?

13         MS. SMITH:  Yes, Your Honor, we do have an

14   objection.

15         THE COURT:  All right, sidebar.

16

17         (Continued on the following page.)

18

19

20

21

22

23

24

25

Side-Bar                                            244

1          (Side-bar.)

2          THE COURT:  What is the objection?

3          MS. SMITH:  First and foremost, there is not a copy

4    provided in our binder.

5          Second, I brought my own copy with me.  What

6    plaintiff is now attempting to have him read into the record

7    or refer to specifically refers to the IAB log number, which

8    was precluded, we mentioned, regarding the IAB information.

9          THE COURT:  Correct.

10         MR. ANTOLLINO:  I would be happy to redact that.

11         THE COURT:  You have not.

12         Do you have a redacted copy?

13         MR. ANTOLLINO:  I can redact it in seconds.

14         THE COURT:  You have to show the witness what you

15   intend to offer into evidence.

16         MR. ANTOLLINO:  Yes.

17         THE COURT:  You are showing him a copy now that

18   says, because I see it IAB, investigation, which I excluded

19   from this trial.  So, you cannot admit this Exhibit.

20         Do you want to offer something else?  Offer

21   something else.

22         The objection is sustained.

23         MR. ANTOLLINO:  Can I offer --

24         THE COURT:  I am not giving you advice.

25         (Side-bar end.)

```
                       Side-Bar                    245
```

1          (In open court.)

2          THE COURT:  Do you have any further questions,

3    Mr. Antollino?

4          MR. ANTOLLINO:  Yes.

5          THE COURT:  Please, proceed.

6          MR. ANTOLLINO:  I would ask that Plaintiff's

7    Exhibit 15, which is properly redacted, be admitted into

8    evidence, and I will show it to Counsel.

9          (Pause in the proceedings.)

10         MR. ANTOLLINO:  I don't know if you want us to show

11   you at side-bar.

12         THE COURT:  Are you offering the Exhibit?

13         MR. ANTOLLINO:  Yes, I am offering the Exhibit.

14         THE COURT:  Is there an objection?

15         MS. SMITH:  Yes, Your Honor.

16         THE COURT:  All right, side-bar, please.

17         (Side-bar conference held on the record out of the

18   hearing of the jury.)

19

20         (Side-bar.)

21         THE COURT:  What is the objection?

22         MS. SMITH:  Your Honor, these are not proper

23   redactions what he is showing us.  Putting a piece of paper

24   over these redactions.

25         MR. ANTOLLINO:  Stickers.

```
                           Side-Bar                        246
```

 1          MS. SMITH:  Which can be lifted and can be removed

 2    as easily as that.

 3          THE COURT:  Can I see the document, please.

 4          MS. SMITH:  Additionally, all of it is hearsay.  The

 5    witness is here and can testify.

 6          THE COURT:  It is an admission.

 7          MR. ANTOLLINO:  Every single --

 8          THE COURT:  Mr. Antollino.

 9          MR. ANTOLLINO:  The reason --

10          THE COURT:  These can be removed as easily as

11    Counsel just did.  This is your witness.  You had to know in

12    advance of trial what documents you were going to use and have

13    them in the proper form to be admitted.  I am not admitting a

14    document with excluded matter that is covered only by a

15    Post-It stamp that the jury could lift at any time.

16          You have not been prepared for this trial and it

17    shows in everything you are doing.

18          Now, the objection is sustained, do not use this

19    Exhibit.

20          MR. ANTOLLINO:  All right.

21          (Side-bar end.)

22

23          (Continued on following page.)

24

25

Mercado - direct - Antollino                    247

1            (In open court.)

2            MR. ANTOLLINO:  Can I ask the --

3            THE COURT:  I am not giving you advice.

4            Proceed, please.

5   BY MR. ANTOLLINO: (Continuing)

6   Q    Now, in course of reviewing these, you are required to

7   fill out certain paperwork during the day; correct?

8   A    Yes.

9   Q    All right.  And during the course of the day on 9/1/14

10  you noted in police paperwork that plaintiff complained of

11  injuries; correct?

12  A    I noted in the my paperwork work what?  What was that?

13  Q    In police paperwork that plaintiff complained of

14  injuries.

15  A    No, I don't recall, I don't remember.

16  Q    All right.

17           MR. ANTOLLINO:  I would just show you this to

18  refresh your recollection.

19           THE COURT:  Just put it on the ELMO and only he will

20  see it.

21           MR. ANTOLLINO:  Yes, of course.  Oh, on the ELMO.

22  Okay.

23  Q    Now, does this --

24           THE COURT:  Does this refresh your recollection that

25  the plaintiff complained of injuries?

SAM      OCR      RMR      CRR      RPR

Mercado - direct - Antollino                    248

1          THE WITNESS:  This happened like, three years ago.

2          THE COURT:  Does it refresh your recollection?

3          THE WITNESS:  It does not refresh my recollection,

4     no.

5          THE COURT:  Okay.

6     Q    All right.  So, it's your recorded recollection at the

7     time.

8          You did write down the word injured; correct?

9          MS. SMITH:  Objection.

10         THE COURT:  Sustained.

11         MS. SMITH:  Move to strike, Your Honor.

12         THE COURT:  Granted.

13    Q    All right.  Now, when you arrived at the sidewalk you had

14    after Ahsin Rafique in the back of your car; correct?

15    A    When I arrived at the sidewalk where?

16    Q    All right.  There was a sidewalk where you stopped and

17    you started speaking to Mr. Pierce; correct?

18    A    Yes.

19    Q    All right.  And you had one of the Radio Shack employees

20    in the back of your car; correct?

21    A    Yes.

22    Q    All right.  And you don't know what he knew; correct?

23    A    What he knew?

24    Q    Yeah.

25    A    No.

SAM     OCR     RMR     CRR     RPR

Mercado - direct - Antollino                    249

1   Q    Okay.  He was going along with the ride; correct?

2   A    He was going along to ID the perpetrator.  At that time

3   it was Mr. Pierce.

4   Q    And you don't know whether he was told to ID him or

5   whether he had independent knowledge; correct?

6        You don't know where his knowledge of identification

7   came from; correct?

8   A    He was in the store, Radio Shack.

9   Q    Are you sure of that?

10  A    He was with the manager, in the store at Radio Shack.

11  Q    He could have been out on the street; correct?

12  A    He could have.

13  Q    All right.  Now, when you had Mr. Rafique in the back of

14  the car and you were speaking to Mr. Pierce, Officer Belardo

15  was there, too; correct?

16  A    Mr. Rafique is the store employee?  I don't know him by

17  name.

18  Q    Okay.  The store employee was in the back of your car;

19  correct?

20  A    Yes.

21  Q    And you can't open the back of the car without it being

22  unlocked by a police officer; correct?

23  A    No.  It could be opened if the child safety locks are

24  off.

25  Q    All right.  So, you have to know how to operate the child

Mercado - direct - Antollino                    250

1   safety lock when you get out; correct?

2   A    No.  We leave it with no child safety locks.  When we put

3   a perpetrator inside the vehicle, we put the child safety

4   locks on.

5   Q    When you say perpetrator, the word perpetrator refers to

6   someone who has done something; correct?

7   A    Perpetrator of the crime.

8   Q    Okay.  But it's not you who determines whether there's a

9   crime.  You determine whether it's probable cause for a crime;

10  correct?

11  A    Probable cause to arrest.

12  Q    Yes, probable cause to arrest for a crime; correct?

13  A    Yes.

14  Q    All right.  And you don't make the determination as to

15  whether or not the person you refer to as a perpetrator

16  actually perpetrated a thing; correct?

17          MS. SMITH:  Objection.

18          THE COURT:  Sustained.

19          MR. ANTOLLINO:  All right.

20  Q    The perpetrator, whether or not someone you arrest

21  actually perpetrated a crime, is something that is adjudicated

22  in court; correct?

23  A    The final determination will be in court.

24  Q    Okay.  Is there an initial determination?

25          MS. SMITH:  Objection.

Mercado - direct - Antollino                              251

1              THE COURT:  Sustained.

2    Q    Now, when Mr. Pierce, you, Ms. Belardo and the Radio

3    Shack employee were standing out on the sidewalk on Labor Day,

4    do you remember that moment?

5    A    Yes.

6    Q    All right.  In fact, you were talking to the witness

7    Mr. Pierce, who's a witness in this case, and perhaps other

8    witnesses and Ms. Belardo for about 15 minutes on the

9    sidewalk; correct?

10   A    On the sidewalk?

11   Q    Yes.

12   A    No, it wasn't that long.

13   Q    It wasn't that long, okay.

14              Do you remember testifying at your deposition that

15   it was approximately 15 minutes?

16   A    No, the whole incident from the stop to the arrest was

17   15 minutes.  15, 20 minutes.

18   Q    From the stop to the arrest.  So, there must have been a

19   lot of time that was -- or some minutes that was taking place,

20   discussing the arrest or discussing the situation on the

21   sidewalk; correct?

22   A    Yes, it's all approximations when I say 10 to 15 minutes,

23   15 to 20 minutes I'm approximating.

24   Q    You're approximating.

25   A    Okay.

SAM      OCR      RMR      CRR      RPR

Mercado - direct - Antollino                    252

1  Q    We're not holding you to stop-watch time, but it was

2  approximately 15 to 20 minutes?

3  A    Correct.

4  Q    All right.  And you had a discussion on the street with

5  Mr. Pierce, the Radio Shack employee or at least one of them,

6  Ms. Belardo and yourself; correct?

7              THE COURT:  Mr. Antollino, you have to move on.  We

8  have gone through this already, let's go on to something else,

9  please.  They were on the sidewalk, they were talking, we

10  know.

11  Q    All right.  While you were talking, Mr. Pierce was not

12  under arrest; is that correct?

13  A    He was not handcuffed, but he was not free to go.

14  Q    Was he -- could you answer the question as to whether he

15  was under arrest at that point?

16  A    At that point, he was not in full custody, no.

17  Q    Okay.  So, the answer is yes, he was not under arrest;

18  correct?

19  A    He was not handcuffed, no.  He was not under arrest, no.

20  Q    Could you --

21  A    He was not handcuffed, he was not under arrest.

22  Q    Okay.  Thank you.

23              You thought the evidence that a crime had occurred

24  was iffy; correct?

25              MS. SMITH:  Objection.

Mercado - direct - Antollino                    253

1        THE COURT:  Sustained.

2   Q    You have an obligation to assess probable cause while you

3   are on the street and encountering people who make

4   allegations; correct?

5   A    Yes.

6   Q    All right.  If someone has just, for example, simple one,

7   someone just standing there with a white pants and shirt and

8   someone else said he just stabbed me and you don't see any

9   evidence of that, that would be an iffy probable cause to

10  arrest for stabbing someone; correct?

11       MS. SMITH:  Objection.

12       THE COURT:  Sustained.

13       MR. ANTOLLINO:  All right.

14       THE COURT:  There is no question in this case that

15  there was probable cause, all right?

16       MR. ANTOLLINO:  I understand that.

17       THE COURT:  We have no false arrest claims, so these

18  questions are not relevant.

19       MR. ANTOLLINO:  I believe that, just for the record,

20  the Defense can get into it.

21       THE COURT:  The Defense did not get into it.

22       MR. ANTOLLINO:  All right.

23  Q    Now, one thing that you can do as a result of having a

24  badge is obtain a search warrant and search someone's person,

25  property; correct?

SAM      OCR      RMR      CRR      RPR

Mercado - direct - Antollino                    254

1   A    That all depends on the unit you're in.  You have to be

2   in a specialized unit and you have that, like a, an FIO

3   officer.

4   Q    And Mr. Pierce allowed you to inspect him; correct?

5   A    Inspect him?

6   Q    Yes.  He allowed you to search him, I should say;

7   correct?

8   A    No.

9   Q    He did not.

10  A    No.

11  Q    Did he refuse?  Did you ask him?

12  A    I never asked to search him.

13  Q    Sorry?

14  A    I never asked to search him.

15  Q    You never asked to search him?

16  A    No.

17  Q    So, he didn't have an opportunity to offer it?

18  A    He didn't offer to be searched.

19  Q    Okay.  He didn't offer to be searched and you never asked

20  him.

21  A    I never asked to search him, his person.

22  Q    Okay.  Did you -- okay.  And there was no one else that

23  you would be interested in searching; correct?

24            MS. SMITH:  Objection.

25            THE COURT:  Sustained.

```
                    Mercado - direct - Antollino              255
```

 1   Q    Okay.  So, you didn't search anyone at that time;

 2   correct?

 3   A    I did not search him.

 4   Q    Okay.  Now, while you are on the street you were in full

 5   uniform; correct?

 6   A    Yes.

 7   Q    Okay.  And you had your firearm with you; correct?

 8   A    Yes.

 9   Q    All right.  And your flexible baton; correct?

10   A    My flexible?

11   Q    Baton.

12   A    No, I don't have a flexible baton.

13   Q    Do you have a nightstick or some other type of --

14   A    I have a nightstick.

15   Q    You had a nightstick, okay.

16         And do you also carry a Taser?

17   A    The night stick was not on me.

18   Q    The night stick was not on you.  Was the Taser on you?

19   A    I don't remember.

20   Q    Okay.  But you do carry a Taser; correct?

21   A    On patrol, yes.

22   Q    All right.  Now, when Mr. Pierce ran, you called in an

23   APB?

24   A    I don't know what an APB is.

25   Q    All points bulletin?

1  A     We don't use that.

2  Q     You don't use that.

3         Did you call in any other backup when Mr. Pierce

4  ran?

5  A     When he ran?

6  Q     Yes?

7  A     No.

8  Q     No, all right.  You've heard testimony in this trial, I

9  believe, tell me if I'm wrong, about a tan or a beige car;

10  correct?

11  A     I think yesterday mentioned a tan or beige car, yeah.

12  Q     All right.  Do you remember anything about that?

13  A     Of a tan or beige car?

14  Q     Yes.

15  A     During the incident --

16  Q     Yes.

17  A     -- there was an unmarked NYPD vehicle.  I believe, like I

18  said, it happened three years ago, I believe it was beige or

19  tan.

20  Q     All right.  And do you know how that car got there?

21         MS. SMITH:  Objection.

22         THE COURT:  Overruled.

23  A     No, I do not.

24  Q     All right.  Do you know who told that unmarked car to be

25  there?

Mercado - direct - Antollino                    257

1    A    I don't think anyone told them to go there.  They were in

2    the area.

3    Q    They were just patrolling?

4         MS. SMITH:  Objection.

5         THE COURT:  Sustained.

6    Q    All right.  Now, you got into, you call your police car

7    an RMP; correct?

8    A    Patrol car, RMP.

9    Q    All right, what does it stand for?

10   A    RMP?  Radio motor patrol car.

11   Q    All right.  And the Radio Shack employee was in the back;

12   correct?

13   A    One of the employees was in the back seat.

14   Q    All right.  And he followed you when you turned on

15   your -- well.

16        Let me ask you this.  Did you turn on your siren?

17   A    We turned on our lights and sirens and he was in the back

18   seat of our vehicle.

19   Q    Is there a reason you didn't let him out?

20   A    I needed him to ID the perpetrator, Mr. Pierce.

21   Q    Had he not already done that?

22   A    Actually, I don't think he had done that.

23   Q    All right.  There were two Radio Shack employees;

24   correct?

25   A    I believe there was two, yeah.

Mercado - direct - Antollino                    258

1   Q    All right.  One of them was in the car and one of them

2   was on the sidewalk; correct?

3   A    I don't remember where they were.

4   Q    All right.  Now, when you followed Mr. Pierce down Fulton

5   and Flatbush, you collided with or -- let me put it

6   differently.

7        Mr. Pierce made contact with the RMP on Flatbush;

8   correct?

9   A    The perpetrator Mr. Pierce ran from scene, stopped on

10  Flatbush Avenue.  I followed on the street with

11  Officer Belardo, lights and sirens on Flatbush Avenue, he was

12  on the sidewalk running.

13  Q    Okay.  And at some point he crossed the street and it's

14  your testimony that he tried to jump over the car; correct?

15  A    I tried to jump over the car?

16  Q    No, that he tried to jump over the car.

17  A    At some point he crossed the street and he was headed in

18  the direction towards Atlantic Terminal and he was, there was

19  another vehicle, the beige vehicle that you were talking about

20  earlier, saw what was happening and was coming northbound.

21  Q    I'm asking you something much more simple.

22  A    Okay.

23  Q    Okay?  Is it your belief that Mr. Pierce tried to jump

24  over the car; is that correct?

25  A    Yes.

Mercado - direct - Antollino                    259

1   Q    Okay.  Had you ever seen anyone able to jump over a car?

2   A    Jump over a car?

3   Q    Yeah, have you ever seen someone jump over a car?

4   A    I've seen people jump on the hood of a car and continue

5   running.

6   Q    So, your belief was that he was going to jump on top of

7   the car and then continue running, not over the car?

8   A    Possibly on the hood, continue running.  Maybe possibly

9   over the car.

10  Q    Okay.  And that was your belief or that was -- how did

11  you come to that conclusion?

12  A    That's what I saw him attempt to do.

13  Q    Okay.  You saw him attempt to, if the wheel or right

14  here, tried to jump proximally, parallel to the wheel?

15  A    What wheel is that, the passenger side?

16         MS. SMITH:  Objection.

17         THE COURT:  Sustained.

18  Q    All right.  How big is the car?

19         It's a sedan, correct?

20  A    Yes.

21  Q    All right.  And there is a space where the front wheels

22  are and he tried to jump on top of the hood?

23         THE COURT:  Okay, I am going to have to help here.

24         Let me ask you this.  When he went over the car, did

25  he put his hands on the car because his feet left the ground?

Mercado - direct - Antollino                    260

1           THE WITNESS:  No.

2           THE COURT:  Okay.

3           Where was he in relation to the front wheel well

4    when he went to the car?

5           THE WITNESS:  To the right -- I was in the passenger

6    side, the right passenger wheel well.  He was on the right

7    side coming from the right side of the sidewalk.

8           THE COURT:  All right.

9           Please, continue.

10   Q    All right.  Coming from the right side of the sidewalk.

11          So, that's the side going towards Long Island or

12   Manhattan?

13   A    The side going towards Atlantic Terminal.

14   Q    You keep mentioning Atlantic Terminal, but that's in a

15   way towards Long Island; correct?

16   A    Southbound on Flatbush Avenue.

17   Q    And the reason you keep mentioning Atlantic Terminal is

18   that you are trying to assert that he was going toward

19   Atlantic Terminal; correct?

20          MS. SMITH:  Objection.

21          THE COURT:  Sustained.

22   Q    You don't know if he was going toward Atlantic Terminal,

23   do you?

24   A    No, I don't definitely know that, no.

25   Q    Okay.  And when he collided with this car, he fell off

Mercado - direct - Antollino                     261

1    the car and he was face-down correct?

2    A    His left ankle, left lower leg collided with the front of

3    our vehicle.

4

5              (Continued on following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mercado - direct - Antollino                        262

1  DIRECT EXAMINATION (continuing)

2  BY MR. ANTOLLINO:

3  Q    His left ankle collided with your vehicle?

4  A    As he attempted to jump over the vehicle on to the hood,

5  his left leg, lower leg, left ankle collided with the front

6  end of your vehicle.

7  Q    His left lower leg.  So as he is going toward the car

8  sideways, I fell on the side of the car or on the front of the

9  car?

10 A    No, he collided with the front of the car and he fell in

11 front of the vehicle.

12 Q    So he was able to get all the way on top of the hood and

13 then fall off the front?

14 A    He landed on the hood.

15 Q    I'm confused.  So he landed on the hood.  He didn't fall

16 on to the ground?

17 A    He landed on the hood and ended up on the ground.

18 Q    How did he land on to the ground?  Did he roll-off?

19 A    I believe he rolled off.

20 Q    Okay.  And he was faced down; correct?

21 A    In front of the vehicle, he was faced down when he

22 landed.

23 Q    And you placed him in handcuffs; correct?

24 A    I didn't place him in handcuffs.

25 Q    Okay.  There were several people there who were

MDL   RPR

Mercado - direct - Antollino                    263

1   assisting; correct?

2   A    Yes.

3   Q    And he was put in cuffs in the rear; correct?

4   A    He was rear-cuffed.

5   Q    He was rear-cuffed.  Okay.  You know there are

6   surveillance cameras around there; correct?

7   A    On Flatbush Avenue, I'm not sure.

8   Q    You are not sure.  Do you recall Ms. Belardo saying easy

9   guys, easy, there are cameras around here?

10  A    No.

11  Q    All right.  Now, you were there first when Mr. Pierce

12  fell off the car and rolled off, according to you, on to the

13  ground; correct?

14  A    I was there, yes.

15  Q    Okay.  Taqi was on foot; correct?

16  A    Taqi was following -- running after Mr. Pierce on foot.

17  Q    Would it be fair to say that you got there first?

18  A    Yes.

19  Q    Okay.  And is it your testimony that you did not

20  participate in the arrest?

21  A    I did not cuff him.  I was there at the arrest and I was

22  -- but I did not cuff him.  I was more concerned with crowd

23  control and the traffic on Flatbush Avenue.

24  Q    All right.  You were on the side on Flatbush Avenue that

25  goes toward Manhattan; correct?

Mercado - direct - Antollino                264

1   A    The southbound side.  More towards the southbound side.

2   Q    When you say southbound side, I just -- we can show you

3   what's already been admitted -- I don't know what southbound

4   side is.  Is that closest to the building that is now 300

5   Ashland Place with the green signs where there was

6   construction?

7   A    Northbound on Flatbush Avenue runs toward the bridge,

8   southbound runs toward.

9         THE COURT:  Prospect Park.

10  Q    So you were in the lane that was going with traffic?  You

11  were not on the median?

12  A    Driving on the median, you mean?

13  Q    No.  You didn't pull over into the median to stop Mr.

14  Pierce?

15  A    No.

16        THE COURT:  Is it a raised median?

17        THE WITNESS:  It is a marked median.  It's not a

18  raised median.  Yellow markings that make the median.  It is

19  not a concrete median.

20  Q    It is a flat median, correct?  It's just painted?

21  A    Yes, it's paint.  It's painted on.

22  Q    Now, when Mr. Pierce was on the ground, did you let Mr.

23  Rafique go immediately or did he stay and identify and point

24  out that's the guy?

25  A    When Mr. Pierce was on the ground, after he collided with

Mercado - direct - Antollino                265

1    my vehicle?

2    Q    When Mr. Pierce -- the question was simply when Mr.

3    Pierce was on the ground, did you let Mr. Rafique out of the

4    car and did he identify Mr. Pierce or did he just leave?

5    A    Mr. Rafique --

6             MS. DEPOIAN:  Objection.

7             THE COURT:  Sustained.

8             Ask another question, please.

9    Q    Did you let Mr. Rafique out of the car?

10   A    At that point, no.

11   Q    You kept him in the car?

12   A    He stayed in the car when that was happening.

13   Q    For about how long?

14   A    Seconds, when we were doing the arrest.  The arrest was

15   like 20 seconds.

16   Q    Okay.  And the arrest was in front of the car; correct?

17   A    In front of the vehicle.

18   Q    And he was sitting in the back seat; correct?

19   A    That's correct.

20   Q    And there's limited vision when you are sitting in the

21   back, right?

22             MR. ANTOLLINO:  Objection.

23             THE COURT:  Sustained.

24   Q    Do you have full vision when you are sitting in the back

25   seat?

1          MS. DEPOIAN:  Objection.

2          THE COURT:  Sustained.

3  Q    Do you have any reason to believe that if Mr. Pierce, the

4  plaintiff sitting here, knew that he had committed no crime

5  that he had any reason to be afraid of the police officers

6  debating on the sidewalk whether or not to cuff him?

7          MS. DEPOIAN:  Objection.

8          THE COURT:  Sustained.

9          MR. ANTOLLINO:  No further questions.

10          THE COURT:  All right.  Cross?

11          MS. DEPOIAN:  Yes, your Honor.

12          MS. SMITH:  Yes, your Honor.

13          THE COURT:  Full scope?

14          MS. SMITH:  Yes, full scope.  Thank you, Your Honor.

15          THE COURT:  Go ahead.

16          MS. SMITH:  If I could just have one second, Your

17  Honor.

18          THE COURT:  Ladies and gentleman, usually when a

19  witness is cross-examined, the questions are limited to the

20  things that he was asked about during his direct examination;

21  however, instead of having Sergeant Mercado recalled as a

22  witness during the defendant's case, the defendant is now

23  going to take him out of turn, that is, ask him all the

24  questions that she would ask if she were calling him as a

25  witness in the defense case.

1          All right.  Please proceed.

2          MS. SMITH:  Thank you, Your Honor.

3    CROSS EXAMINATION

4    BY MS. SMITH:

5    Q    Good afternoon, Sergeant Mercado.

6    A    Good afternoon.

7    Q    You indicated that you are currently a police sergeant.

8    How long have you been with the New York Police Department?

9    A    December 8th will be 20 years.

10   Q    How long have you been a police sergeant?

11   A    I was promoted in 2009, approximately, like eight years,

12   eight, going on nine years.

13   Q    Now, I would like to direct your attention to

14   September 1, 2014.  Were you working in your capacity as a

15   police sergeant on that day?

16   A    Yes.

17   Q    And what hours did you work that day?

18   A    I was doing a day tour.  I was 655 by 1552 hours, 7:00

19   a.m. by 4:00 p.m.

20   Q    What was your assignment on September 1, 2014?

21   A    Patrol supervisor.

22   Q    And what are your duties as a patrol supervisor?  What do

23   you do?

24   A    I work in the confines of the 84th Precinct.  I listen to

25   the radio runs coming over the 911 system, 84th Precinct, it's

Mercado - cross - Smith                          268

1    by Dumbo, downtown Brooklyn and I answer any complaints that

2    anybody has over the radio or on the street.

3    Q    Were you working alone or were you working with someone

4    else?

5    A    On that day, I had a driver.

6    Q    And who was your driver on September 1, 2014?

7    A    Officer Belardo.

8    Q    What were you and Officer Belardo wearing?

9    A    A uniform of the day.  Uniform.

10   Q    Is that the regular police blue uniform?

11   A    Regular police uniform.

12   Q    Was patrol supervisor your regular assignment at the

13   time?

14   A    At that time I was a school sergeant.

15   Q    What is the duties and responsibilities of a school

16   sergeant?

17   A    I controlled all the elementary, middle schools and high

18   schools in the confines of the 84th Precinct.

19   Q    You indicated that you had a driver, that Officer Belardo

20   was your driver that day.  What type of vehicle were you

21   assigned to?

22   A    It was  a marked patrol car.

23   Q    Now, on September 1, 2014, did there come a time that you

24   encountered the plaintiff, Lerin Pierce?

25   A    Yes.

Mercado - cross - Smith                                269

1    Q    How did you come into contact with the plaintiff?

2    A    It was a pickup of a petty larceny.

3    Q    When you say a pickup, can you explain to the jury what

4    you mean by that?

5    A    A pickup is when an officer is on patrol and a citizen

6    comes up to him with a complaint and sometimes he comes up to

7    the officer before it's put over the 911 system or if he put

8    it over the 911 system, I have not received it over my radio.

9    That day, it was a pickup of a petty larceny and then it came

10   over the 911 system as a petty larceny.

11   Q    So you had a pickup of a petty larceny.  Who picked you

12   up?

13   A    No one picked me up.  It was a store manager that came to

14   our vehicle and was complaining about a person that got into a

15   store and had stolen a cell phone case or a cell phone.

16   Q    And where was that store manager from?

17   A    Radio Shack.

18   Q    And approximately what time did the store manager

19   approach you?

20   A    I would say about 12:10.  After -- a little after noon.

21   Q    Did there come a time that you received a radio run in

22   regards to this incident?

23   A    Yes, it came over the 911 system, he had called 911.

24   Q    And how did it come over?

25   A    It came over as a petty larceny and it came over a

MDL   RPR

Mercado - cross - Smith                    270

1   description, a male black running -- going towards southbound

2   Flatbush, just left the store, Radio Shack.

3          THE COURT:  You are using the phrase, petty larceny,

4   what is that?

5          THE WITNESS:  Petty larceny is a misdemeanor, when

6   someone steals something that is less than $100, charged with

7   petty larceny.

8   Q    What information did you receive from the store manager?

9   A    He said that there was someone in the store was cutting

10  wire seals on cell phone case and possible the cell phones.

11  Q    And after you received this information, what did you do?

12  A    I asked him where did the individual go.  He said he went

13  southbound Flatbush Avenue, and at that point one of the

14  employees got into my vehicle so we could ID the person that

15  he was talking about.

16  Q    And did that individual get in your vehicle?

17  A    Yes.

18  Q    And once the Radio Shack employee was in your vehicle,

19  what did you do?

20  A    We drove up southbound Flatbush Avenue, a couple of

21  blocks up, we ran into Mr. Pierce.

22  Q    And as you drove southbound on Flatbush Avenue, what, if

23  anything, did the Radio Shack employee tell you?

24  A    He told me that was the guy that was in the store.

25  Q    And after the Radio Shack employee informed you that the

Mercado - cross - Smith                    271

1  plaintiff was the guy in the store, what did you do?

2  A    We exited the vehicle and I approached the perpetrator,

3  Mr. Pierce, and I asked him a couple of questions.

4  Q    What questions did you ask Mr. Pierce?

5  A    Was he in Radio Shack?  There was allegations that I said

6  the manager said that he had stolen a cell phone or cell phone

7  case.

8  Q    And how did the plaintiff respond?

9  A    He didn't give me a response.  He just looked at me.

10 Q    What did you do next?

11 A    Next, I asked him -- I asked him again were you stealing

12 at Radio Shack?  And, you know, we can go back and look at

13 some videotape and clarify the incident.

14 Q    At this time, who was present?

15 A    At that time it was another Radio Shack employee, I

16 believe it was the manager, Officer Belardo and Officer Taqi.

17 Q    How many people identified the plaintiff?

18 A    Two.

19 Q    Who were those individuals?

20 A    It was the store manager and the store employee.

21 Q    And after you made the comment about the video

22 surveillance, how did the plaintiff respond?

23 A    Again, he looked at me and he looked towards the left,

24 towards the right, and he didn't give me a response.

25 Q    Did you place the plaintiff in handcuffs at this time?

Mercado - cross - Smith                    272

1  A     No, I did not.

2  Q     Why not?

3  A     I wanted to hear his side of the story, I wanted to give

4  him the benefit of the doubt.  It was a minor offense, petty

5  larceny, and I just wanted to hear what he had to say.

6  Q     And what happened next?

7  A     I asked him if I could look inside -- he had a

8  backpack -- could I look inside of the backpack.

9  Q     Why did you want to look in the plaintiff's backpack at

10 this point?

11 A     For one, for my safety, if he had any weapons, maybe if

12 he had any merchandise from Radio Shack.

13 Q     How did the plaintiff respond?

14 A     He didn't give me an answer.  He just stuck out his hand,

15 took his backpack off and stuck his hand out with his backpack

16 like this (indicating).

17 Q     When the plaintiff stuck his hand  outreached in front

18 of his body, like you just demonstrated to the jury, what did

19 he do next?

20 A     He dropped it and he ran.

21 Q     In what direction did the plaintiff run?

22 A     Southbound on Flatbush Avenue on the sidewalk.

23 Q     Where was the plaintiff -- Where were you physically

24 located before he started running?

25 A     Maybe one or two blocks from Fulton and Flatbush, on

Mercado - cross - Smith                    273

1   Flatbush Avenue Flatbush Avenue.

2   Q    Can you describe Flatbush Avenue to the jury?

3   A    Flatbush Avenue is the main avenue downtown Brooklyn.  It

4   leads to the Manhattan Bridge going northbound and it's the

5   main avenue with a lot of traffic and a lot of pedestrians

6   walking on the sidewalk.

7   Q    When you say traffic, what are you referring to ?

8   A    Car traffic, pedestrian traffic, very busy avenue.

9   Q    Why is Flatbush Avenue in that area busy?

10  A    Commercial area.  It's -- Fulton Street, a lot of stores,

11  fast-food restaurants, parking center, Atlantic Terminal is

12  there also.

13  Q    How long after the plaintiff was stopped did he start

14  running on Flatbush Avenue?

15  A    I asked him a couple of questions, one or -- two or three

16  questions and I would say maybe like after I asked him those

17  questions, maybe like two, three minutes after I asked him

18  questions, he just started running.

19  Q    You were asked on -- by plaintiff's counsel something

20  regarding 15 minutes.  What does that 15 minutes represent?

21  A    15 minutes is he asked me what I put in my memo book and

22  15 minutes was the entire incident that occurred, 15 to

23  20 minutes from the times I stopped him, questioned him, until

24  the time we were in the patrol car and went down Flatbush

25  Avenue, lights and sirens and he was in custody four or five

Mercado - cross - Smith                    274

1   blocks up.  That was like 15 minutes.

2   Q    And as the whole entire incident is going on, are you

3   stopping to make memo book entries?

4   A    No.

5   Q    When do you make those memo book entries?

6   A    Usually after the whole incident is over and done.  I

7   don't have time to make it at that time.  It's all estimated,

8   most of the time.

9   Q    After the plaintiff started running southbound on

10  Flatbush Avenue, what did you do?

11  A    When he started running on Flatbush Avenue, I got back in

12  the vehicle with Officer Belardo and proceeded to follow him

13  on the street, lights and sirens.

14  Q    Who was in your car?

15  A    Myself, Officer Belardo and the store employee in the

16  back, the rear seat.

17  Q    Who was driving the car?

18  A    Officer Belardo.

19  Q    And what did Officer Taqi do when the plaintiff ran down

20  Flatbush Avenue?

21  A    When the plaintiff ran Flatbush Avenue, we chased him on

22  foot on the sidewalk.  He was after the plaintiff on foot.

23  Q    Initially, you said that the plaintiff was running on the

24  sidewalk; correct?

25  A    Yes.

Mercado - cross - Smith                              275

1          MR. ANTOLLINO:  Leading.  Objection.

2          THE COURT:  Overruled.

3    Q    What, if anything, did you see the plaintiff doing while

4    he was running?

5    A    He was running very fast on the sidewalk.  At one time I

6    saw him go on to the street and go back on the sidewalk,

7    continue on running very fast on Flatbush Avenue southbound on

8    the sidewalk.

9          (Continued on following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mercado - cross - Smith                    276

1   EXAMINATION CONTINUING

2   BY MS. SMITH:

3   Q    What happened next?

4   A    He decided to run across the street in the middle of the

5   street.  That point is when he collided with our vehicle.  He

6   ran from the sidewalk onto the street.

7   Q    What did you think when you saw the plaintiff cross

8   Flatbush Avenue?

9   A    When he was running down Flatbush Avenue crossing the

10  street, I thought he was trying to get to the Atlantic

11  Terminal.

12  Q    What is the Atlantic Terminal?

13  A    Atlantic Terminal is like a subway hub.  You got the

14  Barclays Center there.  You have four or five subway lines.

15  You have the Long Island Railroad.  Once somebody goes in

16  there and they're being chased for a crime, it's a lot harder

17  to get to them.  The likelihood of him getting away is much

18  greater.

19  Q    And what side was -- when the plaintiff first started

20  running down Flatbush Avenue, what side was he running on?

21  A    What side?

22  Q    Was he running, what direction was he running against?

23  A    He was running on the southbound side of Flatbush Avenue

24  in the direction of traffic I was going.  We were going in the

25  same direction in traffic.

SAM      OCR      RMR      CRR      RPR

Mercado - cross - Smith                                    277

Q    So what side of your vehicle was he on?

A    He was on my side.  I was on the passenger's side, he was

on the sidewalk on the passenger's side.

Q    Indicating the right-hand side?

A    The right-hand side.

Q    And what side of your vehicle was the Atlantic Terminal

on?

A    Atlantic Terminal was up on the left-hand side.

Q    Was the plaintiff running -- when the plaintiff ran into

Flatbush Avenue, did he run in the crosswalk?

A    No.

Q    And as the plaintiff ran into Flatbush Avenue, what, if

anything, else did you see?

A    When he ran across the street from the sidewalk to

Flatbush Avenue, I saw an unmarked car coming northbound, in

the northbound lane, which when he ran across the street he

saw that car also, which made him change direction and move --

and have him run towards -- more towards our car.  That's when

he collided with our car.  It's sort of like cut off with the

unmarked, and that made him change direction and run towards

us.

Q    You said that you saw an unmarked car.  How did you know

that it was an unmarked car?

A    When two uniformed police officers came out of the

vehicle.

Mercado - cross - Smith                          278

1   Q     And when the two uniformed police officers came out of

2   the vehicle, what did you observe the plaintiff do?

3   A     The plaintiff -- at that time the plaintiff had collided

4   with our vehicle and he was on -- on the ground in front of

5   our vehicle.

6   Q     You said that the unmarked car was coming northbound.

7   Was that in the same direction that you were going or the

8   opposite direction?

9   A     The opposite direction.

10  Q     And what did that unmarked car do?

11  A     He stopped in front of the complainant.  They exited the

12  vehicle and they helped us with the arrest.

13  Q     And when that unmarked car stopped, what did the

14  plaintiff do?

15  A     At that time he was on the ground.  He was not complying

16  with the orders to put his hands behind his back and the two

17  officers that came out of the unmarked vehicle held his hands

18  behind his back.  I'm not sure who cuffed him, who exactly was

19  the one who actually put the handcuffs on his wrist.

20  Q     When you indicated that the plaintiff ran, once the

21  unmarked car came the plaintiff ran towards your car and

22  changed directions, what did Officer Belardo do when the

23  plaintiff switched directions?

24  A     When he switched directions and he came towards our car,

25  she immediately put the brakes on.

SAM      OCR      RMR      CRR      RPR

Mercado - cross - Smith                                    279

1   Q     And what happened after Officer Belardo put the brakes

2   on?

3   A     She put the brakes on and the perpetrator attempted to

4   jump over the car.  I don't know if he was trying to jump on

5   the hood and continue running to the other side, but he fell

6   in his attempt to jump over the car or jump on the hood and

7   his left foot -- left lower leg collided with the front of our

8   vehicle, landed on the hood and rolled to the front.

9   Q     What part of your vehicle did the plaintiff collide with?

10  A     I would say the front end of the vehicle, more towards

11  the passenger's side, the right side front end.

12  Q     And what did the plaintiff do after he ran into your car?

13  A     He landed in front of our car.

14  Q     How far did the plaintiff run before you initially

15  stopped him to where he ran into your car?

16  A     From the initial stop when I was questioning him?

17  Q     Right.

18  A     I would say five, six blocks.

19  Q     And what did you do after the plaintiff ran into your

20  car?

21  A     Exited -- exited the vehicle and went to the front of the

22  car to place him under arrest.

23  Q     What did you see when you exited your vehicle?

24  A     He was on the ground and at that time the unmarked

25  vehicle had just stopped in front of him, which was going in

Mercado - cross - Smith                    280

1   the opposite direction, and they had exited out the vehicle

2   and they got to him first and they had him on the ground,

3   holding him down, he wasn't complying, and he was placed under

4   arrest.  I just don't know exactly who actually handcuffed

5   him.

6   Q    When you say that he wasn't complying, what do you mean

7   by that?  Can you describe for the jury?

8   A    He was -- his arms were stiff.  You know, they were

9   having a hard time putting his arms to the rear to cuff him.

10  Q    While the plaintiff was on the ground did you hear anyone

11  say, Watch out for the cameras?

12  A    No.

13  Q    Do you even know if there's cameras in the area where the

14  plaintiff ran into your car?

15  A    I don't know.  I'm not sure.

16  Q    Did you see any police officers punch the plaintiff?

17  A    No.

18  Q    Did you see any police officers kick the plaintiff?

19  A    No.

20  Q    Did you punch the plaintiff?

21  A    No.

22  Q    Did Officer Taqi punch the plaintiff?

23  A    No.

24  Q    Did Officer Belardo punch the plaintiff?

25  A    No.

Mercado - cross - Smith                    281

1   Q    Did any of you three kick the plaintiff?

2   A    No one punched, no one kicked the plaintiff.

3   Q    Did there come a time when the plaintiff was placed in

4   handcuffs?

5   A    Yes, when he was on the ground in front of my vehicle he

6   was placed in handcuffs.

7   Q    After the plaintiff was placed in handcuffs, how long did

8   it take to get the plaintiff in handcuffs?

9   A    Twenty, 30 seconds.

10  Q    And after he was placed in handcuffs, what happened next?

11  A    He was placed in handcuffs and we -- we got him up.  He

12  helped himself up with his feet.  We got him up and put him in

13  the patrol car.

14  Q    And when the plaintiff got up, did you observe any

15  injuries on him at this point?

16  A    I didn't observe any visible injuries.  He wasn't

17  complaining of any pain.

18  Q    And where were you when the plaintiff ran into your car,

19  what streets were you?

20  A    Might have been maybe around Schermerhorn Street.

21  Q    On Flatbush Avenue?

22  A    On Flatbush Avenue, yes, it was a cross street.

23  Q    You said that you placed the plaintiff into a vehicle.

24  What vehicle did you place the plaintiff into?

25  A    The -- our vehicle, the marked -- marked patrol car.

Mercado - cross - Smith                          282

1   Q     Were you the individual who was responsible for placing
2   the plaintiff in the vehicle?
3   A     I don't remember if I was actually the one that grabbed
4   him and placed him in the vehicle.  I don't remember that.
5   Q     Where was the RadioShack employee when the plaintiff was
6   placed in your vehicle?
7   A     He was outside the vehicle.
8   Q     And do you know where officer -- after the plaintiff was
9   placed into your vehicle, what did you do?
10  A     We proceeded to go to the precinct.
11  Q     When you say we proceeded to the precinct, who do you
12  mean?
13  A     Myself and Officer Belardo.
14  Q     And the plaintiff, correct?
15  A     And the plaintiff.
16  Q     Was there anyone else in your vehicle?
17  A     No.
18  Q     Do you know where Officer Taqi was at that time?
19  A     I believe Officer Taqi assisted us in the arrest and he
20  was -- he was going back to get his scooter that was left at
21  the original -- by Fulton and Flatbush where we actually had
22  questioned the plaintiff.
23  Q     You indicated that you went to the 84Th Precinct.  At the
24  precinct did you have any further interactions with the
25  plaintiff?

Mercado - cross - Smith                      283

1   A    I asked him if -- if he needed a bus.  A bus is an

2   ambulance.  And he didn't respond to me.

3   Q    Where were you when you asked him if he needed an

4   ambulance?

5   A    Outside the supervisor's parking lot where we bring the

6   prisoners in and walk them into the precinct.

7   Q    And if you didn't see any injuries on the plaintiff, why

8   did you ask him if he needed an ambulance?

9   A    Just for the simple fact that he collided with a marked

10  NYPD vehicle and I didn't want any allegations and I wanted

11  everything investigated.

12  Q    And after the plaintiff didn't respond to you, what

13  happened next?

14  A    He was brought inside the precinct in front of the desk

15  and we filled out a pedigree form, which is his information,

16  you know, name, date of birth.

17  Q    Did any officers attempt to dissuade the plaintiff from

18  getting medical attention?

19  A    No.

20  Q    Did the plaintiff ever ask you for medical attention?

21  A    No.

22  Q    There was some questions on direct examination from

23  plaintiff's counsel regarding your current position.  Have you

24  ever been a security guard?

25  A    No.

Mercado - cross - Smith                    284

1   Q    What is your position at Metrotech currently?

2   A    I'm at 11 Metrotech Center.  I am the head of security,

3   the midnight security at Metrotech Center, which is a 9-1-1

4   building in downtown Brooklyn.

5              MS. SMITH:  If I could just have one moment, Your

6   Honor.

7              THE COURT:  Yes.

8              (Pause.)

9   BY MS. SMITH:

10  Q    And just to be clear for the jury, Sergeant Mercado, at

11  the time that the plaintiff ran into your vehicle, how fast

12  was the car going?

13  A    I would say maybe like 20 miles an hour on Flatbush

14  Avenue at noon, 20 miles an hour.  I was going about 20, 25.

15  Q    And that was before the plaintiff ran into your car?

16  A    That's before he ran into the car at -- before she came

17  to a complete stop, put the brakes on.

18  Q    At the time that the plaintiff ran into the car, how fast

19  was it going?

20  A    Very slow because he was coming to a complete stop.  I

21  really can't say, maybe 5 miles an hour, I don't know.

22             MS. SMITH:  Nothing further.

23             THE COURT:  All right, any redirect?

24             MR. ANTOLLINO:  Judge, may we have a sidebar?

25             (Sidebar held outside the hearing of the jury.)

```
                        Sidebar                        285
```

1          (The following sidebar took place outside the

2    hearing of the jury.)

3          MR. ANTOLLINO:  Okay, I have a new document, which

4    is Plaintiff's Exhibit 16, in which I have in dark pen

5    redacted any reference to any IAB request.  The --

6          THE COURT:  What is it you want to show with this

7    document?

8          MR. ANTOLLINO:  -- defense -- because he just said

9    he didn't complain of injuries, and in this document he says

10   twice that he complained of injuries.

11         THE COURT:  Show me.

12         MR. ANTOLLINO:  Sure.

13         MS. SMITH:  I don't believe that's what the document

14   actually says.

15         MR. ANTOLLINO:  It says, second notice for injured

16   perp on the last page.  And I've crossed out all the

17   references, and then let me -- just give me a second, okay.

18         And then it says, it says notified -- I can take out

19   notified -- perp complaining of pain to right knee.

20         THE COURT:  What?

21         MS. SMITH:  The question was whether or not the

22   plaintiff reported to him.  This does not clearly indicate

23   whether or not the plaintiff reported to Sergeant Mercado.

24         THE COURT:  It gives him a good basis to ask.  Okay,

25   I will allow it.

redirect - Mercado - Antollino                    286

1              MR. ANTOLLINO:  Thank you.

2              (Sidebar concluded.)

3              (In open court - jurors present.)

4    REDIRECT EXAMINATION

5    BY MR. ANTOLLINO:

6    Q    Sergeant, earlier you testified a lot about what

7    Mr. Pierce was doing and why.  For example, that he was going

8    to the Atlantic station, correct?

9    A    That's what I believe he was doing.

10   Q    That's what you believe he was doing.

11             And you also testified that he made certain

12   machinations on the street because of this or that reason,

13   correct?

14             MS. SMITH:  Objection.

15             THE COURT:  Sustained.

16             MR. ANTOLLINO:  All right.

17   Q    You also testified that he moved out of the way of a

18   certain car in order to go in a different direction and then

19   jumped over your car, and the reason that he did that was such

20   and such, that he had to get out of the way; is that your

21   testimony?

22             MS. SMITH:  Objection.

23             THE COURT:  Sustained.

24   Q    That you knew what was on his mind?

25             THE COURT:  Sustained.

redirect - Mercado - Antollino                287

1           MR. ANTOLLINO:  All right.

2    BY MR. ANTOLLINO:

3    Q    Now, I am going to show you again.  You testified earlier

4    that the perpetrator as you call him, but Mr. Pierce did not

5    complain of any injuries, correct?

6           MS. SMITH:  Objection, mischaracterization.

7           THE COURT:  Sustained.

8    Q    Do you recall whether he complained of any injuries?

9    A    He didn't complain to me, no.

10   Q    All right.  Did he complain to anyone else?

11   A    I do not know.

12   Q    All right.  Isn't it true that you wrote in your memo

13   book that he complained of pain to his right knee?

14          MS. SMITH:  Objection.

15          THE COURT:  Sustained.

16          MS. SMITH:  And I would ask to strike.

17          THE COURT:  It is stricken.

18   Q    Isn't it true --

19          THE COURT:  Mr. Antollino, there is a way to do

20   this.

21          MR. ANTOLLINO:  Okay.

22   BY MR. ANTOLLINO:

23   Q    Let me ask you, I can show you whether this refreshes

24   your recollection at 1330, whether you wrote down that perp --

25          MS. SMITH:  Objection.

redirect - Mercado - Antollino                    288

1          THE COURT:  Does this refresh your recollection as

2     to whether any complaints were made by the plaintiff about any

3     injury?

4          THE WITNESS:  That's my handwriting, but -- that's

5     my handwriting, but it happened three years ago.  It doesn't

6     refresh my recollection.

7     BY MR. ANTOLLINO:

8     Q    All right, it doesn't refresh your recollection, but you

9     only write down correct facts in police documents, correct?

10         MS. SMITH:  Objection.

11         THE COURT:  Sustained.

12         MR. ANTOLLINO:  All right.

13    Q    You would not put anything false in a police document,

14    would you?

15         MS. SMITH:  Objection.

16         THE COURT:  Overruled.

17    A    No.

18    Q    All right, there is a protocol for putting down

19    information in a police memo book, correct?

20    A    Protocol you mean --

21    Q    There are certain rules, you are supposed to take down

22    certain information in police memo books, correct?

23    A    Whatever we ask them, we have to jot down in our memo

24    books.

25    Q    Now, on the last page, 1447, does it refresh your

SAM      OCR      RMR      CRR      RPR

redirect - Mercado - Antollino                    289

1  recollection as to whether you referred to Mr. Pierce as an

2  injured perp?

3              MS. SMITH:  Objection.

4              THE COURT:  Sustained.

5              MS. SMITH:  Move to strike.

6              THE COURT:  Granted.

7  BY MR. ANTOLLINO:

8  Q    Does this refresh your recollection in any way as to his

9  state physically on the day in question?

10 A    His state physically on the day --

11 Q    Yes, physical state.

12 A    It doesn't refresh my recollection, no.

13 Q    Would you have put anything false in here?

14 A    No.

15 Q    All right.

16             MR. ANTOLLINO:  Judge, I would ask that Exhibit L

17 be -- I'm sorry, Exhibit 16 be admitted into evidence.

18             THE COURT:  Any objection?

19             MS. SMITH:  Yes, Your Honor.

20             THE COURT:  Let's have a sidebar.

21

22             (Continued on the following page.)

23

24

25

SAM       OCR       RMR       CRR       RPR

1          (Side-bar.)

2          THE COURT:  I do not see why it does not come in.

3          MS. SMITH:  Your Honor, he's testified --

4          THE COURT:  You can speak up, we have white noise.

5          MS. SMITH:  Thank you.

6          He's testified to everything in there.  It's

7     cumulative and it's also additional, it's hearsay.

8          THE COURT:  Say that again.

9          MS. SMITH:  Hearsay.

10          THE COURT:  No, it is his statements.

11          It is his statement, it is his memo book, he wrote

12     it down.  He is a party, okay?  So, I really do not see

13     anything not to let in.

14          I will allow it.

15          MR. ANTOLLINO:  Thank you.

16          (Side-bar end.)

17

18          (Continued on following page.)

19

20

21

22

23

24

25

Mercado - direct - Antollino                    291

1                (In open court.)

2                MR. ANTOLLINO:  I would offer Plaintiff's

3    Exhibit 16.

4                THE COURT:  16 is admitted over objection.

5                (Plaintiff's Exhibit 16 received in evidence.)

6                THE COURT:  Go ahead.

7                MR. ANTOLLINO:  Okay, can I show those to the jury.

8                THE COURT:  Yes.

9                MR. ANTOLLINO:  All right.

10               (Exhibit published to jury.)

11   Q    Now, this is dark, but that says Sergeant Mercado;

12   correct?

13               THE COURT:  He's asking you.

14               THE WITNESS:  Oh.

15   A    Yes, it does.

16   Q    All right.  And you have a special ID that is referring

17   to the -- it says tax register number, but it has nothing to

18   do with tax.

19               It's your tax number?

20               THE COURT:  Mr. Antollino.  Mr. Antollino.

21               MR. ANTOLLINO:  Withdrawn, withdrawn.

22               THE COURT:  Hello, Mr. Antollino.  I am over here.

23               MR. ANTOLLINO:  Sorry.

24               THE COURT:  The witness has said this is his memo

25   book.

                    VB        OCR        CRR

Mercado - cross - Smith                    292

1          MR. ANTOLLINO:  Okay, this is his memo book.

2          THE COURT:  Is there something in his memo book you

3     would like to ask him about?

4          MR. ANTOLLINO:  I would.

5          THE COURT:  Okay, go ahead.

6          MR. ANTOLLINO:  Let me turn to page 1448.

7     Q    You wrote down at your memo book at 1330, right under

8     1330:  Perp complaining of pain to right knee; is that

9     correct?

10    A    Yes.

11    Q    Okay.  And on page 1447 you refer to him as injured

12    person; correct?

13    A    Yes.

14         MR. ANTOLLINO:  Nothing further.

15         THE COURT:  All right.

16         MS. SMITH:  Can I please have a moment, Your Honor.

17         THE COURT:  Okay.

18         (Pause in the proceedings.)

19    CROSS-EXAMINATION

20    BY MS. SMITH:

21    Q    You were just asked some questions regarding the memo

22    book entry.

23         When you made that memo book entry of perp

24    complaining of pain, did you know who he complained to?

25         MR. ANTOLLINO:  Objection.

VB        OCR      CRR

Mercado - cross - Smith                                   293

1              THE COURT:  Overruled.

2    A    Did I know who he complained to?

3    Q    Correct.

4    A    No.

5    Q    But that wasn't you who he complained to; correct?

6              MR. ANTOLLINO:  Objection.

7              THE COURT:  Overruled.

8    A    No, it was not.

9              MS. SMITH:  Nothing further, Your Honor.

10             THE COURT:  All right.

11             MR. ANTOLLINO:  Nothing further.

12             THE COURT:  You may step down, thank you.

13             THE WITNESS:  Thank you.

14             (Witness excused.)

15             THE COURT:  Does Plaintiff have any more witnesses

16   today?

17             MR. ANTOLLINO:  Well...

18             THE COURT:  It is a yes or no question.

19             MR. ANTOLLINO:  No witnesses.

20             THE COURT:  Okay.

21             Well, is there something else you want to do?

22             MR. ANTOLLINO:  Well, can we have a side-bar on

23   this?

24             THE COURT:  Yes, okay.

25             (Side-bar conference held on the record out of the

Side-Bar                                    294

1    hearing of the jury.)

2

3          (Side-bar.)

4          MR. ANTOLLINO:  All right, maybe there are -- this

5    is not something you are prepared to rule on right now but

6    there are some pages of his deposition that I would like to

7    read to the jury as a party admission.  And it's page 66

8    through 68, and that's not the whole thing; 88 through 89, not

9    the whole thing, and; 98, not the whole thing.

10         MS. DEPOIAN:  Your Honor, I'm unclear why he

11   couldn't have used it during the testimony if it was relevant

12   in any way.

13         THE COURT:  He does not have to use it during the

14   testimony.  He has the right to introduce a party's

15   deposition.  What he cannot do is introduce cumulative

16   evidence.  So, if this particular subject matter was already

17   covered on the rather extensive examination we have had, then

18   he cannot do it again.

19         I, of course, do not know if this is again or not.

20         MR. ANTOLLINO:  Do you want me to go overnight and

21   very carefully decide whether it's cumulative or not?  I don't

22   want to make a mistake.

23         THE COURT:  I think Defense Counsel is entitled to

24   some advance notice as well.

25         MR. ANTOLLINO:  All right.

Side-Bar                                      295

1          THE COURT:  In fact, it seems to me Defense Counsel

2    would have been entitled to advance notice in advance of

3    trial.

4          Why is this coming up now?  Why does it seem to me,

5    Mr. Antollino, that you are doing this by the seat of your

6    pants?

7          MR. ANTOLLINO:  Because the chemistry of the trial

8    changes.  I didn't know what to expect him to say.

9          THE COURT:  It is your case.  You had a deposition

10   of him.  You should know exactly what he is going to say.

11         MR. ANTOLLINO:  Well...

12         THE COURT:  And if he does not say what you think he

13   is going to say, then you impeach him with his deposition,

14   which is why people take depositions.  So, I do not know why

15   you are constantly unprepared for everything that happens in

16   this case.

17         MR. ANTOLLINO:  I'm sorry you feel that way.  It

18   embarrasses me.  I'm ashamed that you feel that way.

19         THE COURT:  Really, your reactions to it are not

20   important.  What is important is that we get this case

21   prepared and on track, as late as it is.

22         So, the question is -- well, first of all, let me

23   send the jury home.  They do not have to be here for this.  We

24   are not going to read it in today.  We will talk about it with

25   them out.  (Side-bar end.)  (Continued on following page.)

VB        OCR        CRR

Proceedings                                                        296

1              (In open court.)

2              THE COURT:  All right, ladies and gentlemen, rather

3      than keep you here for our discussions, we are going to recess

4      for the day.  We are pretty much on the timetable that I think

5      Judge Kuo advised you we would be on.  It might seem a little

6      slow to you but it is not, it is moving the way trials

7      typically move.  So, we will have you back here tomorrow at

8      9:30.

9              Please, try to be prompt and please remember, no

10     Internet research about anything, no Googling, no

11     communicating with anyone in any way, whether by Twitter or

12     SnapChat or anything else.  No posting on Facebook, no looking

13     anything up to see what you might understand, that would

14     violate your oath and would get us all in big trouble.  So,

15     please do not do any of that and we will see you tomorrow at

16     9:30 sharp.

17             Have a restful evening.

18             THE COURTROOM DEPUTY:  All rise.

19             (Jury exits.)

20             (In open court; outside the presence of the jury.)

21             THE COURT:  Okay.  Be seated.

22             So, I think the only question remaining from our

23     side-bar discussion is why wasn't the designation of this

24     testimony provided to Defense Counsel prior to the trial if it

25     is part of the plaintiff's case-in-chief being used to prove

Proceedings                                          297

1    points that the plaintiff wants to make.

2         MR. ANTOLLINO:  Because I did not anticipate that

3    his testimony would vary from the deposition testimony.

4         THE COURT:  Well, are you using it for impeachment?

5         MR. ANTOLLINO:  I, well, at some point, at some

6    levels, it's considered impeachment, but it is for

7    case-in-chief.  But if there's any -- let me just look at

8    this.  Maybe I will just let this go since I, since -- maybe I

9    will just let this go.

10        THE COURT:  I do not know what you want to do.  I am

11   not trying to steer you, I am just telling you, under the

12   normal rules you have to designate your witnesses to your

13   adversary, and your Exhibits, and that includes excerpts of

14   deposition testimony unless it is being used solely for

15   impeachment, in which event when the witness is on the stand,

16   you impeach him with it, you do not introduce it as an

17   Exhibit.

18        MR. ANTOLLINO:  Since I, let me just...

19        (Pause in the proceedings.)

20        MR. ANTOLLINO:  Okay.  Judge, since I did have an

21   opportunity in re-cross or redirect, whatever it was, to go

22   into this further and I didn't take it, that...

23        THE COURT:  Okay, you are withdrawing your proffer.

24        MR. ANTOLLINO:  I withdraw the application.

25        THE COURT:  Okay.

Proceedings                                              298

1        So, then tomorrow we have two more witnesses from

2   you; is that right?

3            MR. ANTOLLINO:  That's right.

4            THE COURT:  Okay.

5        Now, in addition, the letter from Ms. Trujillo's

6   supervisor has come in and she has expressed in that letter --

7   which I am going to have docketed, I don't know why it is not

8   on the docket yet -- but she had expressed that she is

9   available on I think Friday morning, was it?

10           THE LAW CLERK:  Yes.

11           THE COURT:  Friday morning.

12       You need to call her and I would suggest using a

13  nice tone to try to arrange that for Friday morning.

14           MR. ANTOLLINO:  Believe me, Ms. Trujillo and I have

15  no problem, but I will.

16           THE COURT:  But you have to work through her

17  supervisor because she is an employee and her time is not her

18  own.

19       Hang on one second.

20       (Pause in the proceedings.)

21           THE COURT:  All right.

22       I am advised that the supervisor just called

23  chambers and told us that Ms. Trujillo will be available

24  either tomorrow or Friday.  So, I think what you need to do,

25  since we are breaking early, is call right away and get her

VB        OCR        CRR

Proceedings                                          299

1    here tomorrow so that we can complete plaintiff's case and

2    proceed to defendant's case.

3               MR. ANTOLLINO:  That sounds Luke a good idea.

4               THE COURT:  Okay.

5               Is there anything further?

6               MR. ANTOLLINO:  No.

7               THE COURT:  Okay.  See you tomorrow morning, 9:30

8    sharp, please.  Do not be late.

9               ALL:  Thank you, Your Honor.

10

11              (Matter adjourned to Thursday, June 15th, 2017 at

12   9:30 a.m.)

13

14                          ooo0ooo

15

16

17

18

19

20

21

22

23

24

25

VB        OCR        CRR

300

1                              I N D E X

2

3    <u>WITNESS</u>                                    <u>PAGE</u>

4       B R A N D O N    T I L G H M A N

5          DIRECT EXAMINATION

6          BY MR. ANTOLLINO                          103

7          DIRECT EXAMINATION

8          BY MR. ANTOLLINO                          124

9          VOIR DIRE EXAMINATION

10         BY MS. DEPOIAN                            146

11         CROSS EXAMINATION

12         BY MS. DEPOIAN                            177

13         REDIRECT EXAMINATION

14         BY MR. ANTOLLINO:                         220

15

16      I V A N    M E R C A D O

17         DIRECT EXAMINATION

18         BY MR. ANTOLLINO                          235

19         CROSS EXAMINATION

20         BY MS. SMITH                              267

21         REDIRECT EXAMINATION

22         BY MR. ANTOLLINO                          286

23         CROSS-EXAMINATION

24         BY MS. SMITH                              292

25

                        VB      OCR      CRR

301

1                          **E X H I B I T S**

2

3

4        Plaintiff's Exhibit C                         132

5

6        Plaintiff's Exhibit 2                         142

7

8        Plaintiff's Exhibit 3                         143

9

10       Plaintiff's Exhibit 4                         143

11

12       Plaintiff's Exhibit 5                         144

13

14       Plaintiff's Exhibit 6                         144

15

16       Plaintiff's Exhibit 8                         151

17

18       Plaintiff's Exhibit                           155

19

20       Plaintiff's Exhibit 12                        172

21

22       Plaintiff's Exhibit X                         180

23

24       Defendants' Exhibit I                         201

25

VB          OCR          CRR

302

1

2      Defendants' Exhibit F-1                        215

3

4      Defendants' Exhibit F-3                        218

5

6      Defendants' Exhibit F-2                        220

7

8      Plaintiff's Exhibit 13                         221

9

10     Plaintiff's Exhibit 16                         291

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VB       OCR      CRR