UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

**LERIN PIERCE,**

               Plaintiff,

               -against-

**CITY OF NEW YORK, P.O. SONIA
BELARDO, P.O. TAQI, SGT MERCADO,**

               Defendants.
------------------------------------------------------------X

<u>**MEMORANDUM OF LAW
IN SUPPORT OF MOTION**</u>

16-5703-CV (RJD)

## PRELIMINARY STATEMENT

I contemplated moving to require so much in the way of argument and legal history: that Rule 59(a) is unconstitutional. Then I got distracted with a smaller, distinct question: Whether you, as a judge of coordinate jurisdiction, can revisit the so-called law of the case and correct what I believe is an injustice. I found that you are free to revisit Judge Cogan's decision. Thus, to avoid presenting you with a motion the size of a novel, I present the short story of this case.

Judge Cogan recused himself. You now are the guardian of the rights of one of the few African Americans who get a modicum of justice in court against the police. A cross section of the community deliberated and in its conscience found this officer (actually two, with one finding subject to de novo appeal) violated plaintiff's rights. Lerin Pierce is the *only* person of *any* race who got a jury verdict against the police in Judge Cogan's courtroom. I say this as far as my deepest research can determine. I am uncomfortable writing this, but I believe it explains why Judge Cogan pushed this case to trial, held there were issues of fact (twice) then held the jury's finding was a miscarriage of justice. My educated guess is he expected a different

1

outcome. But in doing what he did, he overlooked facts–one of which was undisputed–to make a witness appear incredible - Afshin Rafique, who was a non-party. Judge Cogan's omission of one fact of Rafique's testimony was an error of fact, or at a minimum an abuse of discretion to ignore. The other ephemeral points he used to "bolster" (his word) his decision were harmless error in the presentation of documents. *See* Rule 61. We ask you to vacate Judge Cogan's order granting P.O. Belardo a new trial. If the parties appeal, as I expect we will, and attorneys' fees are thereafter available, we will come back later and litigate those matters.

Judge Cogan's decision contradicts his statements at before, during and after evidence that there were "clearly" questions of fact. The facts that support the verdict for excessive force as to Belardo are few, but sufficient. He found incredible that she raced along the street at 45 miles an hour – as a non-party testified – because plaintiff would die if hit at such a speed. But he did not consider the non-party's testimony in its entirety–that Belardo applied the brakes. Applying the brakes reduces the speed. Nor does it appear he credited (or evaluated) plaintiff's testimony Belardo was driving on the left side of the street as he crossed. He made two contradictory statements regarding plaintiff's testimony as to Belardo's speeding up before she hit him, and his characterization of Afshin's – the non-party who was in the police car that hit plaintiff – edited out an important, material part: that Belardo applied the brakes, albeit too late.

Assuming plaintiff would now not be alive if hit by a car going 45 miles an hour (and can one make such an assumption without evidence?), when Belardo pressed on the brakes, the speed of the car decelerated. Thus, to ridicule Rafique's testimony by omitting this piece of testimony, Judge Cogan usurped the jury's role in finding facts that added up to police misconduct (with modest, though not nominal, damages).

2

The defense won't disagree that Belardo put on the brakes. She had to, as both she and Belardo got out of the car. Nothing plaintiff said contradicted that, not even his testimony that she sped up just before she hit him. But at the point of collision, the brakes applied, the rate of speed declines. Maybe the speed could have decreased to zero miles per hour before the collision, but Belardo did not press her foot fast enough, apparently, and she was driving in the left lane–a fact that plaintiff testified to that the jury credited. In fact, though this was not a sensible street encounter, it makes modest sense for Pierce to have crossed the street after seeing no traffic in the right lane until he reached the median when he saw Belardo in the left lane where he the car collided with Pierce. But she had to put on the brakes at some point, rendering the speed at which she hit plaintiff less than lethal.

That's excessive force: it's not complicated. This was not a patent infringement trial. Belardo's actions might be just over the line of excessive, but the jury did its duty. Judge Cogan ignored the testimony as to the brakes, by which he made Rafique's testimony sound ridiculous; this was an abdication of the duty of a neutral. He did not apply a crucial fact to the law. This was not a decision grounded in the nebulous "demeanor" of witnesses, but about discounting an important but undisputed fact that, but its omission, made a witness less credible. By construing Rafique's testimony to suggest Belardo was going 45 miles an hour without stoppage ignored, overlooked, discounted, forgot, snubbed the testimony that she put her foot on the brakes - and said "Oh, Shit!" - wherein her rate of speed had to decrease. Thus, there was no testimony the brakes were not working, Judge Cogan's post-trial decision on this alone, and at least as to Belardo, falls like as a house of cards.

We didn't suggest Belardo was evil, just that she made a gross error for which she must account. Judge Cogan in refuting that considered evidence such as the jury's seeing an

unadmitted picture of a street camera that they brought to the judge's attention. (The picture didn't help us. The verdict absolving Taqi and Mercado of beating plaintiff in front of the car, where Belardo allegedly apprised them of the camera. 130.) Thus it was anodyne, harmless error under Rule 61. Judge Cogan praised the jury for its attentiveness in bringing this exhibit forth,[1] yet overlooked the evidence of brakeage.

But the car knocked Mr. Pierce in a manner - in the left lane by a car going 45 miles at some point - and that's recklessness. Therefore, the City's requested instruction for excessive force–"reckless or intentional force"–met the test of excessive force given by the judge. You should revive the judgement and we'll come back for attorneys' fees if necessary. Yes, Lerin stood up after he got nailed; yes, the E.R. doctor only noted minor injuries - "a clip" rather than a knock down. But Lerin Pierce was subject to excessive force and suffered emotional trauma, out-of-pocket expenses, and the jury thought his ordeal was significant enough to award punitive damages. To allow Belardo a new trial sends an iniquitous message to the society and to the police: The police can always get away with a certain level of misconduct. If unpunished at the administrative level (with minor exceptions), they often let off on qualified immunity. When QI doesn't exist–and the defense waived it below–the judge examined the legal issue on his own despite the waiver, 293 F.Supp.3d at 314-15, suggesting excessive force victims cannot get justice even when a jury awards them modest damages.

This is wrong. The police must learn the lines they man not cross, otherwise misconduct will not decrease. If this decision survives a new trial, it sends the message to the victims of excessive force, those who will bring claims: Don't bother.

---

[1] And the only reason it was not admitted was that it was shot with a zoom lens. There was no dispute the camera was present.

If you grant the motion vacating the decision, the Circuit can correct any error, and we will come back for what attorney's fees might be available. You are the judge now and should not operate your docket with a defective Rule 59 decision that does little other than delay justice and denigrate a jury plus a third-party witness who didn't want to be there.

**ARGUMENT**

**You Have the Power to Correct a Previous Judge's Errors, especially when to do so Would Promote Judicial Economy.**

A.  The Rules Allow It

Rule 59(e) recognizes at least two grounds for any motion for reconsideration: "the availability of new evidence not previously available, and... the need to correct a clear error of law or prevent manifest injustice." *Oxford House v. City of Albany*, 155 F.R.D. 409, 410 (N.D.N.Y. 1994). Here we rely both and the new evidence - i.e., the evidence the judge did not consider, if it may be considered new and to correct a clear error or prevent manifest injustice. *Banco de Seguros Del Estado v. Mutual Marine Offices, Inc.,* 230 F. Supp. 2d 427, 428 (S.D.N.Y. 2002) (quoting *Griffin Indus., Inc. v. Petrojam, Ltd.,* 72 F. Supp. 2d 365, 368 (S.D.N.Y. 1999)); *Glob. View Ltd. Venture Capital v. Great Cent. Basin Expl., L.L.C.*, 288 F. Supp. 2d 482, 483 (S.D.N.Y. 2003). *See also* Rule 60(b)(6) (relief from judgment or order).

Further, Rule 612 applies. No trial is perfect, thus the kerfuffles in the mis-presentation of two exhibits–which the judge queried the jury about and otherwise instructed them to disregard–was sheer surplusage to an otherwise bad decision on Belardo's use of force; the judge admitted it was a "bolster" of his decision. Harmless error is a harmless error; harmless error equals nothing and nothing plus nothing means nothing; it does not increase the grounds for a new trial where Judge Cogan misapprehended at least one and perhaps two pieces of evidence and the City did not bother to ask for a mistrial. We therefore ask for relief from judgement under Rules

5

59(e) and Rule 60 given that Judge Cogan's decision is defective the fact he ignored, "bolstered" with harmless error, and in all – given his repeated statements to the contrary – in bringing the case to trial because of clear disputes of fact.

B.  The Law Allows You to Vacate a Decision of a Judge of Coordinate Jurisdiction.

Plaintiff did not ask Judge Cogan to recuse himself: He did so on his own. No one would doubt that if we had asked, Judge Cogan could have vacated his own decision. Here, Judge Cogan pushed the case to trial, not only finding questions of fact on two occasions (at summary judgment and Rule 50(a)) but also getting it to the jury in less than a year. Then he threw out the jury's verdict and dumped the case on another judge. The entire debacle seems strange, and wastes resources. You should throw out the grant of a new trial and the Court of Appeals can decide that portion of the Judge's order as to Sergeant Mercado; it will anyway. The judge granted a new trial, but perhaps thought he couldn't be fair to preside over it. He doesn't have to say why he recused himself, but you don't have to agree with his earlier decision. You can vacate it as simply as he. "[Judges of coordinate jurisdiction are not bound by each other['] s rulings, but are free to disregard them if they so choose." *United States v. Birney*, 686 F.2d 102, 107 (2d Cir. 1982) (emphasis added). This is because it would be self-defeating–not to mention a waste of resources–for the Court of Appeals "to reverse a correct ruling by the second judge solely because of a departure from the law of the case." *Wright v. Cayan*, 817 F.2d 999, 1002 a.3 (2d Cir. 1987). *See also* 18 B. Wright, et al., Federal Practice and Procedure §4478, p. 646, and n.16 (2d ed. 2002) (collecting cases).

This regime is allowed so long as the party relying on the previous ruling" (here, the City) "is not prejudiced. *Wright* at 1002 a.3; *First National Bank of Hollywood v. American Foam Rubber Corp.*, 530 F.2d 450, 453 a.3 (2d Cir.), *cert. denied*, 429 U.S. 858 (1976).

"Prejudice" in this context "refers to a lack of sufficiency of notice and an opportunity to prepare armed with the knowledge that one judge is disregarding the ruling of another." *Id*.; *United States v. Birney*, 686 F.2d 102, 107 (2d Cir. 1982). That won't happen here because the trial is not scheduled until December. The City also has the right of appeal; if anything, the City is less prejudiced than having to retry the case.

Overruling a judge of coordinate jurisdiction does this not happen often, and it might be unpleasant, but judges ultimately are people. Upon my research, Judge Cogan–though he ran a tight ship– has never before seen in his courtroom a verdict for a citizen against the police. His has written that the § 1983 cases he sees usually have nothing to do with race. B. Cogan, *Federalist Society Review*, A Modest Proposal for the Reduction of the Size of the Federal Judiciary by Two Thirds, 18:106, 108 (2017). He disallowed us to discuss the subject. The verdict was perhaps a surprise to his world belief, but he lives in a different world than does plaintiff or the vast majority of litigants who appear before him. But no matter how vituperative his post-trial decision, he pushed the case to trial on the fast track, denied summary judgment and judgment as a matter of law–stating at the end of trial, "I believe it is ***clearly*** a factual issue. That is why I am denying the motion" under 50(a). Tr. 463 (emphasis added). How can he do that then in a minute find the verdict a miscarriage of justice?

C.  Judge Cogan's Errors in the Context of the Facts

Plaintiff wanted more than $15,000. But the jury came to a consensus on that amount for a reason. A new trial could bring him more; but we believe the decision of the jury should not be overruled so easily – especially when the judge twice held there were questions of fact after both sides rested. In this his case, the jury paid careful attention to the evidence to the extent of bringing to the attention of the judge a guileless exhibit that had not been admitted for them to

see. And yet "somehow," Judge Cogan's word, it came to the conclusion that there was excessive force. *Pierce v. City of N.Y.*, 293 F. Supp. 3d 306, 309 (E.D.N.Y. 2017). This denigration of the jury is one I have never before seen uttered by a jurist. This Court cannot tolerate a new trial based on this denigration, compounded by mistakes of fact and law. There is no need for a partial new trial. Judge Cogan ignored at least one crucial undisputed fact in order to reduce the credibility of a non-party witness, and that was either an error of fact, or an abuse of discretion if the judge simply decided to ignore that Belardo hit the brakes, thereby decreasing her rate of speed.

This was a tough case, but not impossible; a finding could clarify the limits of police actions, therefore I thought it an important venture. I believed plaintiff had been a victim of injustice and – as the jury might have implicitly found – was provoked into fear and fleeing after unsuccessfully trying to reason with the police. Plaintiff was searched, and the complainant could not make out a coherent crime to charge him with: the parties talked for fifteen minutes as to what happened and the item allegedly stolen was in the complainant's hand as everyone on the street argued. The judge denied summary judgment, Docket #71, denied judgment as a matter of law during trial because there were "clearly" issues of fact, tr. 463, yet, as if he expected the conscience of the community to move in lockstep with his view of the world, he characterized the jury's verdict as to Belardo as a miscarriage of justice. It was not; the jury made a very careful finding. It did not award a windfall. The judge, on the other hand, made one finding of credibility without considering all of the evidence: the brakes, not to mention plaintiff's testimony that Mercado drove down the left side of Atlantic Avenue when she struck him.

In order to uphold the verdict in this case, one would need to believe only two things, which the judge did not deny were reasonable inferences:

(1) Belardo was going 45 miles an hour for a portion of the drive *and as she saw plaintiff,* braked to avoid collision, *severely reducing her speed*; and (2) Afshin Rafique's testimony that "that it was . . . a pretty decent hit" referring to the collision Tr. 360. Finally, add plaintiff's testimony that Belardo was driving in the wrong lane – ignored by Judge Cogan in his decision, and this is excessive force. That Belardo put on the brakes was uncontested – it was even highlighted by defense counsel in summation. Tr.505. This completely obliterates as a matter of fact Judge Cogan's misapprehension that plaintiff would have been killed if Rafique were true and the police car going was 45 miles an hour. Such a conclusion is objectively false: as one applies the brakes in the car, the car slows down. These three things plus modest damages put together with the *City's* request for an instruction at the charging conference (at the end of trial) that recklessness should be the standard for excessive force, Tr. 480, 498, and make this a sound verdict. Judge Cogan, to whose courtroom many § 1983 cases go to die, has never had to deal with a verdict against the police as far as my research indicates.[2] In response to the surprise of his first, he simply could not abide it and, in my firm opinion, overstepped his bounds. A new judge can and should correct this miscarriage of justice as your duty to judicial economy.

Judge Cogan heard the evidence and instructed the jury at the end, "The fact that I'm instructing you on the law of damages doesn't mean that I have any opinion as to whether plaintiff has proven any or all of his claims. **I have no opinion. It's entirely for you to decide**." Tr. at 544 (emphasis added). How does this statement comport with the grant of a new trial to Belardo? The jury returned a verdict – modest in size, but not nominal – allowing one defendant

---

[2] I found one case where Judge Cogan upheld an award of damages against the Administration for Children's Services. See *Southerland v. Woo*, 44 F. Supp. 3d 264 (E.D.N.Y. 2014). But searching high and low, I found no verdicts against the police, or even a one that went to trial.

off entirely and awarding a total of $15,000 in damages. This was less than plaintiff wanted. But it is more than zero, which we speculate is what Judge Cogan might have preferred.

One may leave some mere police questioning and preserve the right to remain silent under federal and New York law: Mr. Pierce was accused of a crime by a third party *who could not make out a coherent case that a crime had occurred*. Mr. Pierce was not under arrest. Plaintiff testified, again uncontradicted, before he left the store a manager by the name of Sharoon Samuel (who did not testify) approached him:

> I'm reading the box, and he's like, so, can I help you? . . . are you going to buy this or are you going to steal this? And I turned and looked at him and said, what? . . . I thought that was rude. He's like, well, are you going to buy it or not? I said, you know what? I wouldn't buy -- I said, I wouldn't buy shit here. I wouldn't buy shit from your store. And he said, well, maybe you should leave then. So, I tossed it back on the shelf and I was walking out, and he basically said, you know what? You know what? Do me a favor, what's your name? He asked me my name. He kept following me as I walked out. Told him to leave me alone. As I walked out the store, I did flip him the bird; told him "F" you, and from that point, he did the same thing. . . . And he kind of like followed me as I walked out. . . . And I put my headphones on and I went to the AT&T store.

Tr.76-77. As the judge correctly stated, "[g]enerally speaking, if police receive advice from a citizen that says that a subject committed a crime, the police are allowed to arrest that person who has been identified by the citizen." That's true, and it begs the question: why didn't the police take Lerin into custody? As the jury reasonably could have found – as plaintiff testified without contradiction – that not only was there no crime committed, but Samuel could not articulate a crime. Lerin testified that Samuel said at the street encounter, "he was going to steal this, he was going to steal this." 81. "This" rereferred to the phone charger Samuel was holding - uncontradicted testimony. "This" is a word that refers to closeness in space; "that" would be something out of his possession. In context, on the street, the cellphone charger must have been in Samuel's hand. No one testified that plaintiff had *removed* the charger from the store. Even if

10

Samuel had ESP as to what plaintiff intended to do, there is no such thing as probable cause for a thought crime.

As Samuel followed plaintiff out of the Radio Shack, Mr. Pierce didn't flee the vicinity as if he had committed a crime; rather, he made a deposit at Chase and then went into an AT&T Store. *Id*. At or about this time, Samuel's employee Afshin Rafique arrived to work by exiting the subway. Samuel pointed at Mr. Pierce and told him to call 911. Tr. 350. Rafique merely followed instructions; he knew nothing of what had happened in the store. *Id*. When Belardo and Mercado encountered plaintiff on the street, they put Rafique in the back seat of the car, and he identified Pierce as the one whom Samuel had pointed out. Tr. 352-53. The back door automatically locks, so he remained in place until the very end. Tr. 358. Although the judge chided me for misrepresenting the law of recklessness on opening, defense counsel in opening misrepresented facts: that plaintiff was identified by "**two** Radio Shack managers **for stealing**, and he was about to be placed under arrest when he ran away from the police." 40 (emphasis added). In fact, that was a double misrepresentation: There was no evidence of stealing and Rafique only had second-hand knowledge of Mr. Pierce. His identification was based on hearsay, and there was not an allegation that plaintiff stole, but, as Samuel held the charger in his hand in the store, he was accused of a thought crime: As plaintiff testified Samuel said uncontradicted, "he was going to steal this, he was going to steal this." 81. Predictions as to future events do not add up to probable cause. The City chose not to call Samuel to the stand and his statement is not hearsay: Plaintiff didn't state it for the truth but for Samuel's weak state of mind.

Mercado realized this was dubious proof; he thus he did not arrest and gave plaintiff an opportunity to explain. The parties talked for 15-20 minutes, tr.272, though Mercado and

Belardo quibbled with that time: as recorded (Mercado) or in toto (Belardo). But when plaintiff

could not convince the officers of the obvious, that there was no crime, as he testified:

> I don't feel I should have been chased down by a police car and hit by a police car for
> them to stop me when they knew I did not do a crime. That was the reason for the long
> conversation, and it was said many times, no, you're not being arrested. So, I asked them
> to please explain the difference, why you're trying to cuff me and take me back to the
> store when the manager just told you what you will find? I tried to be reasonable, I tried
> to be respectful.

Tr. 127. Determining probable cause on a petty crime doesn't take fifteen minutes. This was

uncontradicted by any testimony; the complainant, Sharoon Samuel, wasn't even called by the

defense, thus plaintiff's characterization of what happened – which was merely giving Samuel

the finger and returning his disrespect – was the reason for the 911 call; there is no evidence in

the record to contradict this. As Lerin testified:

> [Belardo] asked the guy the question. ["]So when he got the item back or when he gave
> the item or whatever he did, he tossed out of the store, were you guys in the middle of the
> store or were you guys by the door,["] and the Radio Shack manager basically admitted
> we were still in the middle of the store talking, and then I left.

Tr.82. During all this, Mercado admitted Plaintiff was not under arrest:

> Q. Do you always tell people you are arresting, You are under arrest; do you use those
> words?
> THE WITNESS: Depending on the situation.
> ***
> Q More often than not, correct?
> A Yes.
> ***
> A If he is a under arrest, he's under arrest, he gets cuffed.
> Q But you don't say, I'm gonna cuff you until I see a video and really mean that you're
> under arrest, correct?
> A He can be cuffed for my safety, he doesn't have to be under arrest.
> Q Okay. . . . you didn't feel danger from Mr. Pierce when he was on the sidewalk when
> you were inquiring with all the people there, were you?
> A No.

Tr. 237-38.

12

Belardo agreed: plaintiff *was not told* he was *not* free to go. 404. Thus, plaintiff not seized, left. The police jumped into their cars with Rafique still in the back, pursuing plaintiff down Atlantic going 45 miles an hour. Belardo veered into the wrong lane. Although she tried to press the brake before the collision, this was a reckless act. As plaintiff testified: "As I ran across the street, I made it *to the other side* of oncoming traffic in the first lane. . . . Then I was struck by a car, by the car that Officer Belardo and Sergeant Mercado was in." 88 (emphasis added).

It was undisputed that the nominal "complainant," Sharoon Samuel, who held "this," i.e., the $100 Mophie phone charger in his hand, could not articulate probable cause; although Judge Cogan would not let us use the word "iffy" in questioning Mercado – a word Mercado used at his deposition – Mercado did not arrest plaintiff, nor was he told he told not to leave. Tr. 252 (Mercado), 83 (Pierce); 404 (Belardo).

If an officer does not take the suspect into custody ten minutes after a complaint, as he stands there free to go, then there is likely no probable cause, "defined as such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe [a person] guilty." *Barone v. United States*, 2018 U.S. App. LEXIS 2329, at *7 (2d Cir. Jan. 31, 2018) (summary order). "He was going to steal this" does not support probable cause, though it might allow the officer a common law right of inquiry, which plaintiff was free to ignore. Officer Taqi arrived, and though it isn't clear who said this, someone suggested cuffing plaintiff and taking him to the store to look at the videotape. 83. Not arrest – just investigate. Nothing in the law allows this, and this is when plaintiff ran off because he was scared. He was getting nowhere in attempting to reason with the police that a complaint that had no basis. Pierce was never told he couldn't leave, or that he was under arrest. So, he did what he was entitled to under the law - leave – and it was the police who made it into a federal case, not Lerin.

13

In determining probable cause, the police have a *nominal* right to investigate a claim and detain a citizen, but not for an indefinite period. A person accused of a non-crime who tries to cooperate with the police has the right to leave. "[W]hen a person is questioned by the police, with or without probable cause – and Mercado's testimony implied there was none – he "has a constitutional right not to respond. He may remain silent or walk or run away. His refusal to answer [a police inquiry] is not a crime." *Uzoukwu v. City of N.Y.,* 805 F.3d 409, 415 (2d Cir. 2015). In this case, the jury was entitled to credit plaintiff's unimpeached testimony. He was never told he could not leave, never told he was under arrest. *See Morales v. New York*, 396 U.S. 102 (1969). Instead, the officers pushed the envelope for fifteen minutes, Tr. 83 (Pierce) 273 (Mercado). When Taqi arrived, he said something that so frightened plaintiff he fled:

> [Q]     This is a discussion you're having. About how long did it take? …
> ***
> A About 15 minutes or more.
> Q All right. Now, when you talked about going to the store, was there any particular way they offered to take you to the store?
> A They said we're going to cuff you, and I asked well, well, well, why, if what he just stated to you, if you're going to see the same thing on camera, you're not going to see me taking an item, why are you trying to handcuff me? Are you trying to arrest me? It just did not seem right, feel right, especially with a guy basically saying what he wanted . . . My bag was searched and Officer Taqi came about --
> ***
> Q. So, there came a time that you decided to leave; is that right?
> A Yes.
> Q What was going through your mind at that time?
> A That there's no way that I'm going to get out of this. They're trying to  . . . trick me and this makes no sense . . . I felt it was . . . was bull crap. I felt scared. I panicked. They searched my bag. I didn't know what more they needed to do and -- except the fact that **they were just going to, you know, try to arrest me for no reason[.]**

Tr. 83-84 (Pierce) (emphasis added).

Judge Cogan instructed the jury that the police had the right to "detain" plaintiff while investigating a crime, but that's more easily said without definition of under what circumstances an officer can detain without probable cause. Police power to investigate contraband is codified

in New York Criminal Procedure Law § 140.50, entitled "Temporary questioning of persons in public places[.]" It is not an endless right of detention. [T]he common-law power to inquire does not include the right to unlawfully seize," the last word "defined as the physical or constructive detention with a significant interruption of liberty." *People v. Lee*, 84 Misc. 2d 192, 194, 375 N.Y.S.2d 812, 815 (Sup. Ct. 1975). He also said,

> Ladies and gentlemen, there are **two** levels of restraint that police officers can place upon a citizen. If they have reasonable suspicion, they can stop the citizen to engage in further questioning and see if in fact there is probable cause to believe the citizen has committed a crime. Once they have that probable cause, they can put the citizen under arrest. So, when she says free to go, not free to go, that means that they stopped him for that first level of inquiry.

Tr. 403-04 (emphasis added). Actually, since what the judge said is true – except that there are three levels, not two – plaintiff was free to go. Under the seminal *People v. De Bour*, 40 N.Y.2d 210 (1976), the law in New York is that the police can only detain after the *third* level of inquiry:

> By this approach various intensities of police action are justifiable as the precipitating and attendant factors increase in weight and competence. The minimal intrusion of approaching to request information is permissible when there is some objective credible reason for that interference not necessarily indicative of criminality. The next degree, the **common-law** right to inquire, is activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion in that a policeman is entitled to interfere with a citizen to the extent necessary to gain explanatory information, **but short of a forcible seizure.**

*Id.* at 223 (emphases added). Thus, if the judge believed the police were at the first level, plaintiff was allowed to flee as fast as he wanted. *Uzoukwu*: it is a "well-settled principle that, in New York, an individual to whom a police officer addresses a question has a constitutional right not to respond. He may remain silent or walk or **run** away." 805 F.3d at 415-16 (bold added).

In a landmark decision by the Massachusetts Supreme Judicial Court, *Commonwealth v. Warren,* 475 Mass. 530, 58 N.E.3d 333 (2016), a unanimous decision found that flight is no longer an automatic basis to add to probable cause analysis, <u>especially when the suspect is black</u>.

This is not binding, but look at where we are because of police abuse: The highest court of a state holds that where a black male suspect is "stopped by the police . . . .the analysis of flight as a factor in the reasonable suspicion calculus cannot be divorced from  . . . a pattern of racial profiling of black males" in Boston. *Id.* at 58 at 336. After *Warren* was handed down, former federal judge and current Harvard Law Professor Nancy Gertner indicated that *Warren* should prompt officers to rethink their practices because the numbers of encounters between the police and African American men – especially young men like Lerin Pierce – "will be looked at critically by the courts, forcing them to put in context what we've all be watching on the news . . . and force the officers to pause…[because] they risk losing the very evidence they are trying to obtain. The outcome of this case is that the gun was suppressed." She continued in a manner that could have been said of Lerin Pierce: "It's about police officers "pushing the envelope . . . [when they] don't have enough evidence to stop someone and [they] push the envelope to see what the kid will do," and flight is the most obvious thing. But "that's the cause for a great deal of misunderstanding and great deal of trouble" where relations between black citizens and the police are so fraught. Nancy Gertner, WBUR, September 21, 2016, available at, https://tinyurl.com/y84hrv66. The jury saw that that is what happened here. The judge disagreed, but he did not correct a miscarriage of justice; he merely substituted his own view for the jury's finding by a clear line of evidence, bolstered by his admission there were questions of fact. His taking away a careful, modest verdict is the true miscarriage of justice.

We did not challenge probable cause because of the flight because we expected to lose on summary judgment - and it didn't add to damages. It was a tough decision given *Warren*, nevertheless. But the force used here must be put in context. Even though plaintiff fled, he consented to a search under CPL § 140.50, and by standing there for *fifteen* minutes – effectively

detaining him – the officers did not act on any probable cause. They pushed the envelope making an iffy complaint, suggesting plaintiff would be "cuffed" to determine probable cause – something that is not allowed when Belardo and Mercado did not fear for their safety. It ended up in a reckless police-pedestrian collision.

The optics of Mr. Pierce's running off, even if legal, were bad. Additionally, flight, notwithstanding *Warren,* arguably provided an additional basis for the calculus of probable case. But we still won on a remaining claim of excessive force and nothing justifies a new trial. There was a fine line for the jury to draw in this case, and they drew it very carefully with a thoughtful verdict. Judge Cogan refused to let us discuss race as a factor in how Mr. Pierce was treated, but the jury did not have to; everyone's race was evident, just as it is in a criminal trial in the days of the Old South where the only Afro-descendant person in the courtroom is black. The conscience of the community spent a considerable amount of time reaching a careful consensus. Perhaps they considered the issue of race; perhaps they did not. But what happened the jury saw as unnecessary police action. The police need not nearly mow people down in the street just because the officers are treated with contempt or want to push the envelope until black man runs out of fear.[3]

This Court should not be burdened by another trial because – as I see it, and you don't have to believe me on this  – Judge Cogan was surprised by the result. I told him that except for a few things where we disagreed, I didn't think he had erred. Tr. 557. He attacked me for saying that, *id.,* but I believed it and of course, this was before his Rule 59 motion decision. His failure to calculate the brakes into the collision - plus credit plaintiff's testimony as to the left lane - was gross error.

---

[3] For the record, Taqi is Middle Eastern and Mercado is probably a white Hispanic. Belardo's ethnicity is unknown to me, but she is white as well – if not Caucasian, fifty shades of white lighter than Mr. Pierce.

Judge Cogan disparaged the jury in his decision: "Somehow, this jury…." "Somehow" is a pejorative – one that suggests a lack of evidence or worse – a word one uses when there is no explanation for an event, as if the jury came to its verdict by force or fraud. But Judge Cogan had given the explanation in denying the summary judgment motion, and in stating "clearly" he thought there were questions of fact. That there were questions of fact – even in Judge Cogan's mind – is one reason as to why the jury came to its decision. By all appearances and according to the Judge at trial, the jury was entirely on top of matters. The judge notes in his opinion two kerfuffles in the presentation of documents that he likened to harmful expert testimony. See 293 F.Supp.3d at 315 (citing *Nimely v. City of N.Y.*, 414 F.3d 381, 392 (2d Cir. 2005)). *Nimely* was a case wherein an expert testified to an officer's credibility. Such is plainly verboten, and he is comparing what happened here to such obvious and plain error? The comparison doesn't jibe.

The judge gave essentially several intellectually insufficient, or otherwise factually incorrect, reasons for giving Belardo a new trial. If the City complained to the Court of Appeals about these points, it would a summarily affirm. In addition to disparaging the jury, and contradicting his own statements before, during and after trial that there issues of fact:

(1) First, Judge Cogan wrote that he believes one defendant, Taqi, over Mercado and Belardo in finding that Taqi reached the street encounter first and with him "a nearby police car joined the pursuit, proceeding south on Flatbush Avenue to try to get ahead of plaintiff." But this ignores the approximately fifteen-minute conversation that plaintiff and Mercado testified occurred. 83, 251. The judge continues: "Plaintiff then darted out into the middle of Flatbush Avenue the busiest street in Downtown Brooklyn — and made contact with the near corner of the police car, falling to the ground. He stood up immediately and was arrested. Plaintiff was taken to the hospital where he reported pain in his right knee and right hand; he was prescribed

Tylenol and promptly released to police custody. Pictures of him taken shortly after the incident showed, at most, a few scrapes on his face and right knee." *Pierce*, 293 F.3d at 311.

Thus, there was no dispute that plaintiff was at least hit by the car. Given the modest damages awarded, the jury likely took into account that plaintiff received these minor injuries, and emotional distress. Moreover, this was Labor Day. You can search the transcript and see there was no testimony as to the traffic on a day one would think people are out of the City. I would concede that the street is busy compared to others in downtown Brooklyn; but I was there taking pictures with Mr. Pierce on a Sunday and the traffic varied.

(2) "At some point during their conversation, Officer Taqi told plaintiff he was going to be handcuffed. At trial, Officer Taqi testified that one of the reasons he wanted to handcuff plaintiff was because the RadioShack manager had told him that plaintiff had a knife in his pocket." 293 F.3d at 310. But as the judge said at sidebar: "The question is what is he going to say. I don't care if it's true. It doesn't matter if it's true. The question is, is he going to testify that the manager told him that he had a knife in his pocket[?]" In other words, the truth didn't matter to the judge, and he credited this dubious testimony in his motion. Earlier, Judge Cogan prohibited us from bringing a tape of Samuel indicating there was no knife, only scissors. Docket: 81:10. We didn't get further into the knife, which was a kitchen utensil used to cut a mango that Ashley Holloway had attested to at deposition. Docket 58:10. But this point is irrelevant because Taqi was let off by the jury; his knowledge about a knife – which Judge Cogan didn't care whether it was true –cannot be transferred to the knowledge of another. Neither testified of any fear, and Mercado denied any. Tr.238. Notwithstanding all of this, as the judge repeatedly said, the question was not probable cause to arrest, but excessive force. Taqi

19

was not found liable of excessive force. Even assuming the truth of a knife, that doesn't justify hitting a pedestrian in the left lane by a different officer with no knowledge of a mango knife.

(3)      "Afshin Rafique, the RadioShack employee who was in the back seat of Officer Belardo's police car during the chase, estimated that the car was going approximately 40-45 mph from the time the officers got into it until the car stopped. Rafique testified that plaintiff "was trying to cross the street, it sort of looked like he was stumbling, and that's when he ran directly in front of the car." Contrary to plaintiff's testimony, and the judge's failure to note it, Rafique testified that when plaintiff ran in front of the car, Officer Belardo braked to avoid hitting him; he clarified that car didn't speed up and didn't turn to hit plaintiff. According to Rafique, Officer Belardo said "oh sh**" when plaintiff ran out in the street, but did not say anything else during the drive, and Sergeant Mercado did not say anything to her. 293 F.Supp.3d at 310.

But the judge did not point out the braking, nor that the car was in the left lane. Belardo testified that she knew plaintiff was running on and off the street and sidewalk. Tr. 422. Neither used good judgment, but Mercado was in a car and plaintiff was a pedestrian. Mercado was reckless to drive in the wrong lane at an excessive speed. Even if she didn't speed up – which the jury could have decided one way or another – driving in the left side of a two-way street is by definition reckless driving. Recklessness is the standard the defense asked the judge to instruct the jury in determining excessive force. 471-72. Ipso facto, it was excessive force.

That the immediate injuries were modest is taken into account by the modest verdict of $15,000. The jury decided that in chasing a suspect, it is reckless to drive in the left lane and they came to a consensus, given modest physical injuries and more significant emotional injuries. That is why we have juries – to decide cutting-edge, difficult questions, such as in this case. Judge Cogan, whom would one imagines would never, ever be stopped on the street – let alone

20

feel so afraid as to run from one – nakedly substituted his post-trial judgement (as contradicted by his pretrial judgment) for the jury's. That's not what Rule 59 is for. Why did he push the trial to verdict if he didn't think there were questions of fact? My opinion is that he knew there were disputed facts, but he expected plaintiff to lose. In my opinion, he looked highly embarrassed at the very last minutes of trial after the jury was dismissed.

(4)    "It was absurd for the jury to credit the testimony that the police car was going 40-45 mph at the time of impact — plaintiff would be dead, or at least thrown many feet from the vehicle and grievously injured if he were hit at such a speed. But plaintiff testified that he got up on his own "a couple of seconds" after he was hit." 293 F.Supp.3d at 315.

This is factually warped; here again he ignores Rafique's testimony about the braking and Lerin's testimony that Mercado was in the wrong lane. There was no testimony *whatsoever* that the car was going 45 miles an hour at the time of impact. As Rafique testified, Mercado hit the brakes when she saw she was going to hit him, then said "Oh, shit." 365. The City credited this in summation. 505. At the point the brakes were pressed, physics kicks in; that slows down the car. That's ineluctable logic that no reasonable person could disbelieve. The brakes put the lie to that conclusion that plaintiff was hit at 45 miles dead on, as does Mercado driving in the wrong direction. "Oh, shit" also reflects an expression of recklessness.

(5) "I cannot credit plaintiff's allegation that Officer Belardo accelerated and intentionally hit him or that she acted with conscious disregard for the known consequences in permitting the vehicle to strike plaintiff at the speed plaintiff claims she did." 293 F.Supp.3d at 315. This is reckless judging: in his subsequent order denying an interlocutory appeal, Judge Cogan said, "As to Officer Belardo, I denied judgment as a matter of law because, [I took] the evidence in the light most favorable to plaintiff (***including his own testimony at trial that Officer Belardo sped***

*up to hit him*)**[.]** *Pierce v. City of N.Y.*, 2018 U.S. Dist. LEXIS 16826, at *3 (E.D.N.Y. Feb. 1, 2018) emphasis added). Which is it? How does that contradiction comport with throwing out a verdict? It does not, and this is but one reason you should conserve judicial resources and recognize this decision for what it is: A substitution of the judge's views – and an inconsistent one at that – and a usurpation of the jury's consensus.

(6) Judge Cogan "buttresses" his support for a new trial in by criticizing the undersigned. But why would he need reinforcements if he were so certain there was a miscarriage of justice? In fact, these additional props are nothing but window dressing that no appellate court would ever consider. First, he notes a "significant possibility that plaintiff's counsel's presentation confused the issues for the jury. In his opening statement, plaintiff's counsel emphasized that the officers intentionally hit plaintiff with the car to stop him from escaping; he argued that "[the officers] went into the other lane and they hit him," and "they chased him with a car, hit him with a car in another lane just so he wouldn't get away." Judge Cogan stated that the only testimony presented to support this version was plaintiff's own testimony, which the jury could have chosen to credit. But then in his closing argument, plaintiff's counsel expressly and repeatedly disclaimed any argument that Officer Belardo intended to hit plaintiff. Plaintiff's counsel argued instead that Officer Belardo's actions were reckless."

But this is unfair. Attorney statements are not evidence, *United States v. Roberts*, 660 F.3d 149, 162 (2d Cir. 2011), and can be cured by jury instructions. *Id.* What is more important, we obviously had not had a charging conference before the opening statement.

If Judge Cogan found any reason that my statements in opening versus closing confused the jury, first, we hadn't notice that recklessness would be the standard Judge Cogan would instruct. Moreover, any statements I made in opening were susceptible of recklessness,

intentionality, or a combination thereof. Indeed, I was very circumspect about what the police

did and nothing I said contradicted my focusing on recklessness in summation:

> We understand that not all cops are bad and we don't believe that these police officers
> are all bad and we also know they have stressful jobs and they probably are not given
> enough services to deal with [those] stress[es]. . . The carrying out of the arrest is what
> we are talking about and there was a 15-minute discussion until . . . my client panicked
> and he ran. He was not under arrest, but  . . . he ran down Fulton to Flatbush  . . .
> Officers Mercado and Belardo went in this cruiser with Ace, who saw the whole thing,
> because he couldn't get out of the car because it's automatically locked. . . . . We're not
> saying they were wrong for the arrest. We are not saying Lerin was right in running, but
> how the arrest was carried out. . . . He made a turn from Fulton on to Flatbush and two
> of them were chasing him. At one point, he crossed the street and the two cars pursuing
> this man for a  . . . phone charger that was in Sharoon's hand had their sirens on. He ran
> across the street. They went into the other lane and they hit him. **And there might be
> some dispute as to what exactly happened when they hit him.**"

Tr. 28, 32-33. This speaks to the police officers' actions generally, not their state of mind, and

acknowledges that the testimony might conflict. There is not a thing in my opening – which

shows deference to the jury's having to weigh the evidence. I doubt there is a single decision

that throws out a verdict because of a statement made in opening before a charge conference.

Indeed, the same is true as to closing statements, which an appellate Court will only examine "

when counsel [is] informed of the instructions to be given before closing argument is an

important safeguard of the right to a full and fair trial by jury." *United States v. Blackmon*, 839

F.2d 900, 910 (2d Cir. 1988). Thus, by "bolstering" my opening statement in making his

decision to vacate the verdict, Judge Cogan prejudiced plaintiff because I had no idea what the

instructions would be at the end of the trial, let alone the dubious inference that the jury was

thinking of my opening statement four days later in deliberation.

(7) There was an exhibit, a photo, that found its way into the jury room on the backside of

another exhibit. Antollino Dec. Exhibit A. Indeed, it was plaintiff's exhibit but *both sides had

inspected the exhibits before they were submitted to the jury.* The reason both sides inspect what

23

goes to the jury is to be sure a mistake like this does not occur; it was thus just as much fault of the defense to overlook the backside as the plaintiff's. The judge did not accuse me of doing this intentionally, but he said it was reckless and compared me to a Mafiosi gambler:

> a deceptive lawyer would intentionally do what you did, to double-side the photographs to make it look like -- it's like a marked deck of cards. One photograph is admissible and the other one was excluded, and someone who wanted to deceive the jury would say to the defense counsel, Gee, look at this photograph and show them the face page of what was admitted into evidence and would not flip it over to show a document that was specifically excluded from evidence.

Tr. 567. His point ignores that the cards could not be marked when we handed them to each other to inspect; some were double sided, and Corporation Counsel and plaintiff handed each other the exhibits each side intended to send to the jury. One could just as easily impugn the defense by suggesting it saw the reverse side of the exhibit and let it go into the jury room and intended to use it to its advantage after trial, depending on the verdict. I don't think they did that, but it is an equally tenable inference. The City did not ask for a mistrial, just a corrective instruction. At this point – again I am speculating – the judge and the defense thought the defense would win. If the defense had feared prejudice, it would have asked for a mistrial. But they chose their strategy.

> The judge then. thanked the jury for bringing this to his attention:

> Hello, again, ladies and gentlemen. I want to thank you for passing out to us Plaintiff's Exhibit 8 and noting that . . . [it] was a two-sided photograph, the  . . . the backside of which was not admitted into evidence. We will get you a new version of the photograph that only has the one admitted into evidence, not the double-sided copy . . . . But I just wanted to give you a special direction to the extent that if any of you looked at the backside of that photograph, please exclude it from your mind and your deliberations. It is not part of the proceedings in this case. That is all I wanted to tell you. Please continue with your deliberations.

Tr. 572. What is most important is that the exhibit was an anodyne picture of a street camera, , of which any New York Court can take judicial notice, and which was discussed only in the context of excessive force against Belardo and Taqi, who were absolved of those claims. *See, e.g.,* tr. 130

"[a]nd I was continued to be punched until Officer Belardo mentioned cameras in the area and advised them to be easy and the guy stopped to be easy." (Pierce). But the jury did not factor this testimony because they found Taqi and Mercado not liable for excessive force. *See* Verdict Form, Docket 126 at I (1) and (3). Thus, there was nothing for which this mistake "bolsters" the judge's decision. It was a. nullity. The jury is legally presumed to follow a judge's corrective instructions. *Knight v. State Univ. of N.Y. At Stony Brook*, 880 F.3d 636, 643 (2d Cir. 2018).

Finally, when we played the deposition video of Hannah Ashley Holloway, I could hear it clearly, and was told people at the front of the courtroom could hear as well, but the judge stopped us saying it was "garbled," and suggesting we stop for the day so that I could prepare a transcript as an aide. Tr. 48-49. I followed his instructions, went home, and went to Fedex and a photograph made it into the transcript that I copied. I redacted on all four sides of all seven copies for the jury. The next day, the transcripts to be used as "an aid" were handed out, a copy given to defense counsel. 118. No objection was raised. 117-118. Antollino Dec. Exhibit B.

Since the judge thought the questions and answers "garbled," I began to start over. In fact, the day before, we were almost finished with the testimony. But the judge didn't like the idea of starting over, so we started in the middle. 118. After we finished, the defense brought the redaction to the attention of the judge, and he took "one copy of [what was handed the jury] to defense counsel which I am doing now so they can review and compare it to determine what motion they want to seek relief.' Tr. 123. They asked for no relief whatsoever, thus waiving the issue because the redaction clearly blocked out the picture. So, the judge, after again stating there were clearly issues of fact stated:

> I am going to need to poll the jury as we discussed yesterday regarding whether they pulled the taped picture back -- the taped portion of the transcript that was handed to them back in order to see that picture. Defendants still want to do that, right?

MS. SMITH: Yes, Your Honor.

Tr. 488. In fact, despite the use of the word "still," the defense expressed no preference earlier when he gave them the opportunity to do so. This suggests advocacy for the defense. But harmless, we didn't object. He then proceeded to bring in the jury member by member and each stated they had seen nothing and did not look behind the tape, which clearly secured the picture. 489-95. None said yes. Juror number 7 even added, "No. I was too nervous to do that." 495.

We are living in a society where officers kill people for selling cigarettes on the street, pulling out wallets and all sorts of anodyne ephemera. Some police departments teach de-escalation techniques, but not the NYPD. The judge does not live in a world where he would be killed by the police, and not only because he has protections inherent in his office. This *ipse dixit* statement that a police officer would not want to harm a citizen for a small crime, no crime or a big crime perhaps arises from subconscious bias, a lockstep belief that the police are here to protect us. They are, but they have developed their own culture wherein doing what they did to Mr. Pierce is deemed acceptable by some. They repeatedly get away with misconduct, even after jury findings, escalate petty situations into excessive force, false arrest and death, and no one can deny this. Please do not condone this awful decision. It is your case now, and just as Judge Cogan could have reconsidered his decision, so may you. He's abandoned the case. We ask that you do not abandon justice and a carefully considered, modest verdict.

Dated: New York, NY
          June 13, 2018

*Greg S. Antollino*
GREGORY ANTOLLINO, ESQ.
Antollino, PLLC
275 Seventh Avenue, Suite 705
New York, NY 10001
ATTORNEY FOR PLAINTIFF